## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| IN RE: FOLGERS COFFEE, MARKETING LITIGATION. | ) Case No. 21-2984-MD-W-BP<br>) This Document Relates to All Actions |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

Pending is Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint, (Doc. 74). For the following reasons, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

According to the Amended Consolidated Complaint ("ACC"), which is the operative pleading in this case, Defendant The J.M. Smucker Company ("Smucker") is an Ohio corporation and the parent company of Defendant The Folger Coffee Company ("Folgers"). (Doc. 68, ¶¶ 25–26.) Folgers manufactures and sells coffee in various flavors, roasts, and quantities. (*Id*.) Folgers coffee comes in canisters of various sizes, which are sold through retailers throughout the United States. (*Id*. at ¶ 27.)

Each canister of Folgers coffee includes a similar label (the "Label"). (*Id*. at ¶ 30.) Each Label appears prominently on the front of a coffee cannister, and indicates that the coffee grounds in the canister "MAKES UP TO" a certain quantity of "FL OZ CUPS" of coffee. (*Id*.) The "quantity" differs from cannister to cannister depending on the size of the cannister and the amount of coffee grounds therein. (*Id*. at ¶ 32.)

On the back of all of its cannisters, Folgers provides instructions on how to brew its coffee. (*Id*. at ¶ 33.) The instructions indicate that consumers should use one tablespoon of ground coffee to make one serving—which means a 6 fl. oz. cup—of coffee. (*Id*.) However, one tablespoon of

ground Folgers coffee weighs approximately 5 grams. (*Id.* at ¶ 34.) This means that consumers cannot make the quantity of cups advertised on the Label if they use one tablespoon per cup. (*Id.* at ¶ 35.) For example, a 30.5 oz. cannister of Folgers Classic Roast advertises that it makes up to 240 cups of coffee, which, according to the instructions, requires 240 tablespoons, or 1200 grams of ground coffee. (*Id.* at ¶¶ 36, 38.) But the 30.5 oz. cannister contains only 865 grams of ground coffee, meaning that if a consumer followed the instructions on the back of the cannister, she could make only 70% of the number of cups advertised on the Label. (*Id.* at ¶ 39.) The same is true of a large number of brands of Folgers coffee; Plaintiffs have identified 42 Folgers products which, according to the calculations illustrated above, produce on average about 70% of the number of cups advertised. (*Id.* at ¶¶ 43–44.)

The Plaintiffs are all individuals who purchased various brands of Folgers coffee in various different states. (*Id.* at ¶ 45.) Plaintiffs allege generally that they relied on Folgers's representations about the amount of coffee they could produce with each cannister, that they had no reason to know these representations were false, that Defendants had reason to know the Labels were misleading, and that they all suffered economic loss as a result of their purchases. (*Id.* at ¶¶ 45–53.)[1] The specific allegations for each Plaintiff or group of Plaintiffs are as follows:

- Plaintiffs Shelly Ashton, Ramon Ibarra, and Frederick Tan are California citizen who purchased various Folgers products in California for their personal use, and later brought suit in California. (*Id.* at ¶¶ 9, 11–12.)

- Plaintiff Jay Schoener is a New York citizen who purchased a cannister of Folgers in New York for his personal use, and brought suit in California. (*Id.* at ¶ 10.)

---

[1] Plaintiff A. Kevin Fahey is in a slightly different situation from the other Plaintiffs, because he has brought suit under the District of Columbia Consumer Protection Procedures Act which requires aggrieved consumers to satisfy fewer requirements than other states' consumer protection laws. (*See generally* Doc. 67 (discussing Fahey's claims).) Thus, Plaintiffs clarify that Fahey does not allege—and does not need to allege—that he relied on the Label in making his purchase. (Doc. 68, ¶ 45.)

2

- Plaintiff Ellen Moser is an Illinois citizen who purchased a cannister of Folgers coffee in Illinois for her personal use, and brought suit in Illinois. (*Id*. at ¶ 13.)

- Plaintiffs Marcia Sorin and Rodger Smith are citizens of Florida who purchased Folgers products in Florida for their personal use, and brought suit in Florida. (*Id*. at ¶¶ 14, 18.)

- Plaintiff Geoff Thomson is a citizen of Texas who purchased several Folgers cannisters in Texas for his personal use, and brought suit in Texas. (*Id*. at ¶ 15.)

- Plaintiff Julie Marthaller is a Washington citizen who purchased a Folgers cannister in Washington for her personal use, and brought suit in Washington. (*Id*. at ¶ 16.)

- Plaintiff Sharel Mawby is a Missouri citizen who purchased several Folgers products in Missouri for her personal use, and brought suit in Missouri. (*Id*. at ¶ 17.)

- Plaintiff A. Kevin Fahey is a citizen of Virginia who purchased a Folgers cannister in Washington, D.C., and brought suit in D.C. (*Id*. at ¶ 9.)[2]

In addition to allegations concerning these individual Plaintiffs, the ACC contains a number of allegations related to a putative nationwide class of consumers of Folgers coffee, along with subclasses of consumers in California, New York, Illinois, Florida, Texas, Washington, and Missouri, and the general public of the District of Columbia. (*Id*. at ¶¶ 54–65.) These class allegations indicate generally that this case satisfies the requirements to certify a class under the Federal Rules of Civil Procedure. (*Id*.)

The ACC advances sixteen separate Counts, which the Court groups based on the nature of the cause of action contained in each Count:

- Counts I, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII all advance claims under various state consumer protection laws, many of which have similar or overlapping elements.

- Count II asserts that Defendants breached an express warranty by failing to provide the amount of coffee needed to brew the number of cups listed on the front of its cannisters. (*Id*. at ¶¶ 78–93.)

---

[2] Several other cases have been filed alleging similar theories, and subsequently transferred to this district for consolidation into this MDL. (*See Clark v. The J.M. Smucker Company*, (Case No. 21-0475); *Bosso v. The J.M. Smucker Company*, (Case No. 21-1239); *Smith v. The J.M. Smucker Company*, (Case No. 21-0828).) The current deadline to join additional parties was December 2, 2021. On December 1, Plaintiffs filed a motion for a 21-day extension to this deadline. (Doc. 90.) The motion is **GRANTED.**

3

- Count III asserts that Defendants breached an implied warranty of merchantability in the same manner. (*Id*. at ¶¶ 94–104.)

- Count XIV asserts that Defendants committed common law fraud. (*Id*. at ¶¶ 194–201.)

- Count XV asserts that Defendants committed negligent misrepresentation. (*Id*. at ¶¶ 202–09.)

- Count XVI asserts that Defendants were unjustly enriched by their misrepresentations. (*Id*. at ¶¶ 210–16.)

The ACC seeks compensatory, statutory, and punitive damages, attorney fees, and injunctive relief. (Doc. 68, p. 53.)[3] Now, Defendants have filed a Motion to Dismiss the ACC in its entirety, or, alternatively, to strike its class allegations. (Doc. 74.)[4] Plaintiffs oppose the motion. (Doc. 84.) The Court resolves these issues below.

## II. DISCUSSION

Defendants' arguments for dismissing portions of the ACC fall into two general categories: (1) arguments for dismissing allegations related to particular parties, products, or forms of relief, and (2) arguments for dismissing specific Counts. For clarity, the Court addresses these two categories separately, beginning with the first.

### 1. Specific Products, Parties, and Requests for Relief

#### a. Defendant Walmart and Plaintiff Smith

Originally, Plaintiff Smith brought his suit against only Defendant Walmart, Inc. ("Walmart"). (*See* Case No. 21-0245.) As Defendants point out, the ACC contains no allegations

---

[3] All page numbers are those automatically generated by the Court's CM/ECF system, and may not match the internal pagination of the documents.

[4] Defendants raised many of these arguments in motions to dismiss filed before the transferor courts before all the member cases were consolidated in this MDL, and two of those courts issued written orders addressing some or all of Defendants' arguments. *See Ashton v. J.M. Smucker Co.,* 2020 WL 8575140 (C.D. Cal. Dec. 16, 2020) ("the *Ashton* order"); *Sorin v. The Folger Coffee Company,* Case No. 21-0222, Doc. 36 ("the *Sorin* order"). These opinions diverge from one another in some respects, especially their determination as to the basic plausibility of Plaintiffs' claims. Because it is impossible to rule consistently with both the *Ashton* and *Sorin* orders, since the two reached opposite conclusions on key issues, the Court has considered the parties' arguments and formed its own conclusions.

4

against Walmart, and all of Smith's allegations concentrate on Folgers and Smucker. (Doc. 77-1, pp. 19–20.)[5] Plaintiffs do not contest that Walmart is no longer part of the case, but they argue that Smith should be permitted to reallege his claims to identify Folgers and Smucker as the wrongdoers. (Doc. 84, p. 15.) The Court agrees that Smith should be allowed to amend his claims, particularly given that the ACC was filed well before the December 28, 2021 deadline to amend the pleadings, and with the Court's permission. (*See* Doc. 52.) Therefore, Smith's claims may proceed against the remaining Defendants. Walmart, however, is **DISMISSED** from the case, because the ACC contains no allegations about Walmart.

b. Nationwide Class Allegations

Defendants also move to strike allegations related to the putative nationwide class Plaintiffs seek to represent relating to their negligent misrepresentation, fraud, and unjust enrichment claims. FED. R. CIV. P. 12(f) provides that the Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." The Eighth Circuit has held that "a district court may grant a motion to strike class-action allegations prior to the filing of a motion for class-action certification" if it is "apparent from the pleadings that the class cannot be certified" and "permitting such allegations to remain would prejudice the defendant." *Donelson v. Ameriprise Fin. Servs*., 999 F.3d 1080, 1092 (8th Cir. 2021) (reversing district court's decision not to strike class allegations under Rule 12(f)). However, motions under Rule 12(f) are "viewed with disfavor" because "striking a party's pleadings is an extreme measure." *Stanbury Law Firm, P.A. v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000). Thus, judges in the Eighth Circuit, including the undersigned, typically deny as premature motions to strike class allegations filed significantly in advance of any

---

[5] Defendants filed several different versions of their suggestions in support of their motion to dismiss, (*see* Docs. 75, 76-1, 77-1.) Doc. 77-1 represents the final corrected version of the suggestions, and the Court considers only that document in evaluating Defendants' motion.

5

possible motion for class certification.  *E.g., Jones v. Monsanto Company*, 2019 WL 9656365, at *9 (W.D. Mo. June 13, 2019); *Jones v. Carondelet Health*, 2012 WL 12898834, at *4 (W.D. Mo. Aug. 17, 2012).

Defendants contend that under no circumstances will Plaintiffs be able to prove that common issues predominate over individual ones for a nationwide class, because a nationwide class's claims would be governed by the laws of all fifty states, which differ in several material respects.  (Doc. 77-1, pp. 47–50.)  But while there are no doubt many differences among these bodies of law, at this juncture, the Court lacks the information necessary to determine with certainty that the certification of a nationwide class is impossible.  For one, while Plaintiffs have presented a class definition, "they are not bound to it and may present something different in a formal motion."  *Monsanto Company*, 2019 WL 9656365, at *9.  Similarly, Plaintiffs may choose to move for class certification on only certain Counts or legal theories, which may shift the balance between common and individual issues.  Whether there are common issues that justify class certification is best determined after the Record is fully developed and Plaintiffs have filed a motion setting forth their request in greater detail.  At this juncture, the Court "cannot determine from the pleadings alone that a nationwide class cannot be certified."  *Monsanto Company*, 2019 WL 9656365, at *9.

Moreover, unlike the defendants in *Donelson*, Defendants have not shown any prejudice they will suffer if the nationwide class allegations remain in the case.  In *Donelson*, the continued existence of the classwide allegations prevented the defendants from enforcing an arbitration agreement with the plaintiff, placing them in a double-bind: the defendants had to either continue battling the plaintiff in court even though "the[] [parties] previously agreed to arbitrate," or "litigate . . . with one hand tied behind their backs to avoid substantially invoking the litigation

machinery and waiving their right to arbitrate." 999 F.3d at 1092. No such considerations apply here. For these reasons, the Court **DENIES** Defendants' motion to strike Plaintiffs' nationwide class allegations and defers ruling on their legal arguments until the class certification stage.

c. <u>Personal Jurisdiction</u>

In the same vein, Defendants also argue that the Court lacks personal jurisdiction over the claims of putative class members who do not live in any of the states in which the individual Plaintiffs reside. (Doc. 77-1, pp. 22–24.) Plaintiffs respond that the Court has jurisdiction because the individual Plaintiffs' cases were transferred under 28 U.S.C. § 1407, and transfers under that section are "simply not encumbered by considerations of in personam jurisdiction," because "the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." (Doc. 84, p. 23 (quoting *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L. 1976)). Plaintiffs' response misses the point: Defendants are not arguing that the Court lacks personal jurisdiction over the claims of putative class members who live in the same states as the individual Plaintiffs; instead, they are arguing that the Court lacks personal jurisdiction over the claims of putative class members who live in the *other* 43 states, where none of Plaintiffs' cases were filed before consolidation under § 1407. (Doc. 77-1, p. 23.)

However, the Court disagrees with Defendants' understanding of personal jurisdiction in the context of putative class action lawsuits. Before the Supreme Court decided *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773 (2017) ("*BMS*"), there was a general "consensus . . . that due process neither precluded nationwide or multistate class actions nor required the absent-class-member-by-absent-class-member jurisdictional inquiry." *Knotts v. Nissan North America, Inc.*, 346 F. Supp. 3d 1310, 1332 (D. Minn. 2018) (citation omitted). This

7

consensus was based on decades of precedent and practice, including the Supreme Court's decision in *Phillips Petroleum Co. v. Shutts*, where the Court held that "a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff" without undertaking a detailed personal jurisdiction inquiry. 472 U.S. 797, 811 (1985).

In *BMS*, the Supreme Court held that in a state-law mass tort action, the state court lacked personal jurisdiction over the claims of nonresident plaintiffs because the state court failed to "identif[y] any adequate link between the State and the nonresidents' claims." 137 S.Ct. at 1781. But the Eighth Circuit has not addressed whether *BMS* extends to federal class actions, and the vast majority of district courts in this circuit that have addressed the issue have held that it does not. *E.g., Knotts*, 346 F. Supp. 3d at 1334; *Krumm v. Kittrich Corporation*, 2019 WL 6876059, at *5 (E.D. Mo. Dec. 17, 2019); *Swinter Group, Inc. v. Service of Process Agents, Inc.*, 2019 WL 266299, at *2 (E.D. Mo. Jan. 18, 2019); *Harrison v. General Motors Company*, 2018 WL 6706697, at *7 (W.D. Mo. Dec. 20, 2018). The two federal courts of appeal to have squarely addressed the issue have also held that *BMS* does not extend to federal class actions. *Lyngaas v. Ag.*, 992 F.3d 412, 435 (6th Cir. 2021) ("[P]recedent shows that absent class members are not considered 'parties,' as a class representative is, for certain jurisdictional purposes."); *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020) ("We see no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so.").

There are sound reasons for this conclusion. "[A] class action fundamentally differs from a mass tort action" because in a mass action, "each plaintiff is a real party in interest to the complaints" who may "each . . . make different claims requiring different responses," while in a

class action, the defendant will necessarily be "presented with a unitary, coherent claim to which it need respond only with a unitary, coherent defense." *Swinter Group, Inc.*, 2019 WL 266299, at *2 (citations omitted). To extend *BMS* to class actions would create an "extraordinary sea change in class action practice" because nationwide classes would be possible only "in . . . the one or two States where the defendant is subject to general jurisdiction." *Krumm*, 2019 WL 6876059, at *5 (citation omitted). The Supreme Court described *BMS* as a "straightforward application . . . of settled principles of personal jurisdiction," a "characterization [that] is hard to square with" Defendants' suggestion that the case fundamentally alters how class actions work. *Krumm*, 2019 WL 6876059, at *5 (citation omitted). Therefore, the Court rejects Defendants' personal jurisdiction arguments with respect to unnamed class members from the 43 states where no suit against Defendants was filed.

> d. <u>Request for Punitive Damages</u>

Defendants contend that Plaintiffs cannot recover punitive damages under California or Missouri law. (Doc. 77-1, pp. 46–47.) Under California law, in order to recover punitive damages against a corporation, a plaintiff must "allege that an officer, director, or managing agent of the corporation had 'advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice'" of the allegedly wrongful conduct. (*See* Case No. 21-0221, Doc. 56, p. 18 (transferor court explaining the standard and dismissing Plaintiff Ashton's punitive damages claim under California law) (quoting *Evans v. DSW, Inc.*, 2017 WL 7058232, at *6 (C.D. Cal. Sept. 14, 2017)). As Defendants point out, Plaintiffs did not correct this issue in the ACC, and there are no allegations suggesting that any particular agent of Defendants had any advanced knowledge of the alleged misrepresentations. Moreover, Plaintiffs do not respond to this

argument, (*see* Doc. 84), effectively conceding it. Therefore, the Court agrees that Plaintiffs may not recover punitive damages under California law.

Similarly, under Missouri law, to recover punitive damages on a product misrepresentation theory, a plaintiff must allege that the defendant "not only . . . knew" it had made a misrepresentation, but that the misrepresentation "was outrageous because of an evil motive or reckless indifference to the rights of" the plaintiff. *Cohen v. Express Fin. Servs.*, 145 S.W.3d 857, 866 (Mo. Ct. App. 2004). Defendants point out that the ACC makes no such allegations, (Doc. 77-1, p. 47), and once again, Plaintiffs do not respond to this argument. Therefore, the Court finds that Plaintiffs also may not recover punitive damages under Missouri law.

     e.   <u>Plaintiffs' Standing</u>

       i.  *To Allege Misrepresentations on Products They Did Not Purchase*

The ACC discusses 42 separate Folgers products which displayed the allegedly misleading Label. (Doc. 68, ¶ 44.) The current individual Plaintiffs have, collectively, purchased only fifteen of those products. Defendants argue that Plaintiffs lack standing to assert claims based on products they did not purchase. (Doc. 77-1, pp. 20–21.) Plaintiffs respond that under Missouri law (which both parties seem to assume applies), individuals alleging that they were injured by misrepresentations about products have standing to represent a class of people who purchased "substantially similar" products due to "substantially similar" misrepresentations. (Doc. 84, p. 18.)

The undersigned has confronted this issue on several previous occasions, and on each occasion, has ruled that questions of which individual plaintiffs purchased which products, and who has standing to challenge what products, are "more efficiently resolved at the class certification stage by limiting the class definition." *Yoakum v. Genuine Parts Company*, 2020 WL

11142483, at *2 (W.D. Mo. Nov. 24, 2020) (quoting *Anderson v. Ford Motor Co.*, 2017 U.S. Dist. LEXIS 213132, at *5 (W.D. Mo. Dec. 29, 2017)); *see also Jones v. Monsanto Co.,* 2019 U.S. Dist. LEXIS 232815, at *29 (W.D. Mo. June 13, 2019). This is partly because the claims for which Plaintiffs will seek class certification, as well as the individuals who may represent the putative class and subclasses, are as yet uncertain. Therefore, the Court defers ruling on Plaintiffs' standing to assert claims concerning the various Folgers products until the class certification stage, and it also takes no position on whether Missouri courts follow the "substantially similar" approach, as Plaintiffs suggest. [6]

### ii. *To Request Injunctive Relief*

Defendants contend that in order to qualify for injunctive relief, Plaintiffs must show the existence of "an ongoing injury or [] an immediate threat of injury," and that Plaintiffs have alleged only past harm. (Doc. 77-1, p. 21 (quoting *Harmon v. City of Kansas City, Mo.*, 197 F.3d 321, 327 (8th Cir. 1999)).) However, as Plaintiffs point out, this is inaccurate; the ACC alleges that "Plaintiffs . . . are also susceptible to reoccurring harm in that they desire to continue to purchase [Folgers] Products but cannot be certain Defendants have corrected their deceptive and false advertising scheme. Indeed, Plaintiffs . . . regularly shop at stores where the Products are sold, and they would like to continue purchasing the products." (Doc. 68, ¶ 23.)[7] Because the ACC plausibly alleges that Plaintiffs are suffering at least some ongoing harm, they have standing to seek injunctive relief.

---

[6] For the same reasons, the Court disagrees with Defendants' argument that Plaintiffs "cannot bring claims on behalf of putative class members in states in which no Plaintiff purchased the Products and in which no Plaintiff resides." (Doc. 77-1, p. 20.) This appears to be a combination of Defendants' personal jurisdiction and standing arguments and a logical extension of this argument is that no complaint could ever include allegations relating to a nationwide class if it did not name individuals from all fifty states. The Court perceives no justification for that position.

[7] This excludes Plaintiff Fahey, who, under the CPPA, does not need to allege an ongoing injury to obtain injunctive relief. Fahey's standing is discussed at greater length below.

11

## 2. Specific Counts

Defendants seek the dismissal of Plaintiffs' Counts under Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) entitles a party to dismissal if the opposing party has failed to state a claim upon which relief can be granted. When considering a motion under Rule 12(b)(6), the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. . . . The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). A claim is facially plausible if it allows the reasonable inference that the defendant is liable for the conduct alleged. *E.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Horras v. American Capital Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013).

Defendants argue that all of Plaintiffs' claims sound in fraud, and are therefore subject to additional pleading requirements under FED. R. CIV. P. 9(b). Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." This means that a plaintiff must "specify the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts" by explaining the "who, what, when, where and how surrounding the alleged fraud" and what the defendant "obtained as a result." *OmegaGenesis Corporation v. Mayo Foundation for Medical Education and Research*, 851 F.3d 800, 804 (8th Cir. 2017).

12

### a. Whether Defendants Made Any Material Misrepresentation

At the outset, Defendants contend that Plaintiffs have not adequately alleged that Folgers made a misrepresentation of any kind—which is a necessary prerequisite to all of Plaintiffs' claims. (Doc. 77-1, pp. 24–28.) To support this argument, they have supplied the instructions printed on the back of all Folgers coffee cannisters (the "Instructions"). (Doc. 77-2.)[8] The Instructions provide that "[f]or best brewing results," consumers should use one tablespoon of coffee to produce one 6-oz serving of coffee, or ½ of a measuring cup to produce ten 6-oz servings. (*Id*. at p. 4.) Like the Labels, the Instructions provide that each cannister "makes up to" a certain number of "suggested strength 6 fl oz servings." (*Id*.)

Defendants claim that the ACC, together with the Instructions, fail to support a viable theory that Defendants misrepresented anything. There are three prongs to this argument. First, Defendants point out that according to the ACC, Plaintiffs did not try "scooping out every grain of ground coffee" in a given cannister to see how many servings they could make. (*E.g.,* Doc. 68, ¶ 23.) Instead, Plaintiffs rely on a mathematical inference to support their claim that they could not brew as many cups of coffee as the Label indicated: according to the ACC, they weighed a tablespoon of coffee grounds and compared the result with the total weight of the coffee grounds in each cannister to ascertain how many tablespoons were in the cannister—and, by extension, the number of cups the cannister would produce according to the brewing instructions. (Doc. 68, ¶¶ 34–40.) Defendants claim that this is inadequate to show that *Plaintiffs* were unable to brew the listed number of cups from the canisters they purchased. (Doc. 77-1, pp. 25–26.) The Court disagrees. At this stage, the Court must accept all the allegations in the ACC, and draw all

---

[8] The Court can consider these instructions because the ACC explicitly references them, (Doc. 68, ¶ 46), and therefore they are necessarily embraced by the pleadings. *Porous Media Corp. v. Pall Corp*., 186 F.3d 1077, 1079 (8th Cir. 1999).

reasonable inferences in Plaintiffs' favor. It is reasonable to infer that Folgers places approximately the same weight of coffee grounds into each cannister (based on the amount of coffee each cannister claims to contain), and therefore, that the cannisters Plaintiffs originally purchased contained the same quantity of grounds as the ones Plaintiffs tested. It follows that if Plaintiffs followed the instructions on the cannisters, they were unable to brew as many servings as the Labels advertised.

The second prong of Defendants' argument is that the Instructions actually provide for two different methods of brewing coffee: the "Single-Serving Method," which requires one tablespoon to brew one serving, and the "Pot Method," which requires half a measuring cup to brew ten servings. (*See* Doc. 77-2, p. 4.) The parties seem to agree that half a measuring cup equates to eight tablespoons, so by using the Pot Method, a consumer can brew ten cups of coffee per eight tablespoons (the "8:10 ratio"), which is more efficient than the "1:1 ratio" of the Single-Serving Method. (Doc. 77-1, p. 17.) The problem with this argument, as Plaintiffs point out, is that most Folgers products contain only about 70% of the tablespoons of grounds necessary to brew the listed number of cups using the Single-Serving Method, so even if a consumer used exclusively the Pot Method, she still could not brew the listed number of cups. (Doc. 84, pp. 30–31.)[9]

Finally, Defendants contend that the language of the Label promising that a consumer can make "up to" a certain number of cups of coffee would not lead a reasonable person to conclude that the contents of the cannister are guaranteed to make the listed number of cups. (Doc. 77-1,

---

[9] Defendants characterize Plaintiffs' arguments about the "Pot Method"—which is not mentioned in the ACC—as an attempt to amend their complaint in their briefing. (Doc. 91, p. 18.) The Court disagrees: Plaintiffs' arguments concerning the Pot Method are simply a logical extension of the facts pleaded in the ACC. For example, the ACC alleges that the Label on the 24.2 oz French Roast cannister advertises that a consumer can brew up to 210 cups, but that the cannister contains only 137.2 tablespoons of ground coffee, yielding 137.2 cups under the Single-Serving Method, or 65.3% of the number on the Label. (Doc. 68, ¶ 43.) Even multiplying that number by 10/8, which would be the result if the consumer exclusively used the Pot Method, yields 171.5 cups, or 81.67% of the number on the Label. Either way, there is an appreciable shortfall compared to the number on the Label.

14

pp. 27–28.) The Court agrees with the general principle that "a promise to provide 'up to' a certain [quantity] is not a guarantee that that [quantity] will be achieved." (Doc. 77-1, p. 28 (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 742 n.3 (2d Cir. 2013)).) However, according to the ACC, an average canister of Folgers coffee produces only 70 to 80% of the quantity of cups listed on the Label—even if the consumer uses the more efficient Pot Method. Multiple courts discussing similar language have concluded that if a seller represents that a good produces "up to" a certain quantity of something, and there is a significant disparity between that quantity and the amount a consumer can actually produce, "a fact question is presented as to whether a reasonable consumer" would be deceived. *Rawa v. Monsanto Company*, 2017 WL 3392090, at *4 (E.D. Mo. Aug. 7, 2017) (a label indicating that weedkiller concentrate "Makes Up to 23 Gallons" was arguably a misrepresentation where, using the mixing directions, most bottles of concentrate made significantly less); *see also Ashton v. J.M. Smucker Co.*, 2020 WL 8575140, at *9–10 (C.D. Cal. Dec. 16, 2020) (transferor court in this MDL rejecting Defendants' argument about the "up to" language); *Arthur v. United Indus. Corp.*, 2018 WL 1472500, at *7 (C.D. Cal. March 23, 2018).

Defendants rely extensively on *Brodsky v. Aldi, Inc.*, in which the Northern District of Illinois dismissed a complaint with very similar allegations to Plaintiffs'—namely, that labels indicating that a package of coffee could brew "up to" a certain number of cups were inaccurate because no consumer following the instructions on the package could brew that number of cups. 2021 WL 4439304, at *5 (N.D. Ill. Sept. 28, 2021). The Court disagrees with *Brodsky*. The *Brodsky* court reasoned that the "up to" language "is not a promise that the cannister <u>will</u> make that amount, but just that it can under certain circumstances." *Id*. (emphasis in original). But the ACC alleges a huge disparity between the amount of coffee a consumer could make using the Instructions and the amount of coffee indicated on the Labels—a disparity comparable to "if a

15

consumer purchased a six-pack of soda, but only received four cans of soda." (Doc. 68, ¶ 52.) So while it might not be reasonable for a consumer to expect to always brew the exact quantity of coffee advertised on the Labels, a consumer might reasonably expect to brew *close to* that number at least some of the time, especially if she exclusively used the more efficient Pot Method. But, accepting all the allegations in the ACC as true and drawing all reasonable inferences in Plaintiffs' favor, it is *impossible* to *ever* brew anywhere near the number of servings on the Labels while simultaneously following the Instructions. Therefore, the Court concludes that the ACC adequately alleges that a reasonable consumer could be misled by the Labels.

Defendants repeat versions of these three arguments throughout their brief. The Court will not address these arguments in detail in every separate place where they appear, because it concludes that the ACC plausibly alleges that the Labels are false and/or misleading. Now, the Court turns to Defendants' arguments for dismissing specific Counts

**b. The Consumer Protection Claims**

All of the individual Plaintiffs, except Thomson, have brought a claim under the consumer protection statutes of their respective states. Defendants argue that each consumer protection claim is defective. The Court considers each of these arguments in turn.

1. Count I: the Missouri Claim

Count I is a claim under the Missouri Merchandising Practices Act ("MMPA") brought by Plaintiff Mawby. That statute provides a cause of action against any person who makes a "misrepresentation . . . or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." MO. REV. STAT. § 407.020(1). A fact is "material" under the MMPA if "a reasonable consumer would likely consider [the fact] to be important in making a purchasing decision." 15 C.S.R. § 60-9.010. For a plaintiff to recover under the MMPA,

16

she must show that she "suffered [ascertainable] pecuniary loss." *Grawitch v. Charter Commc'ns, Inc.*, 750 F.3d 956, 960 (8th Cir. 2014). A plaintiff has suffered an ascertainable pecuniary loss if there is a "difference between the actual value of the property and what its value would have been if it had been as represented." *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp. 3d 754, 758 (W.D. Mo. 2015).

Defendant first argues that Mawby has failed to allege an ascertainable pecuniary loss, because the ACC does not allege the difference between the value of the cannisters Mawby actually purchased and the value of cannisters which contained enough coffee to brew the number of servings represented. (Doc. 77-1, p. 31.) The Court disagrees. The ACC alleges that Mawby "would have paid significantly less for the Products [she purchased] had she known that the Products did not contain enough ground coffee to make the represented number of cups of coffee." (Doc. 68, ¶ 17.) Thus, Mawby has alleged an ascertainable pecuniary loss, and there is no authority for requiring her to quantify the loss at this stage. *E.g., Thornton v. Pinnacle Foods Group, LLC*, 2016 WL 4073713, at *4 (E.D. Mo. Aug. 1, 2016) (declining to dismiss the plaintiff's MMPA claim based on a similar argument because "[i]t is not for the Court to determine on a motion to dismiss precisely what damages, if any, Plaintiff may be entitled to").

Next, Defendant contends that the alleged misrepresentations on the Labels do not pertain to a "material fact." (Doc. 77-1, p. 32.) The Court disagrees. It is, at the very least, possible to infer from the ACC that a reasonable consumer would "consider" the quantity of an item she will receive "to be important in making a purchasing decision." For these reasons, Defendants' Motion to Dismiss is **DENIED** with respect to Count I.

2. Counts IV–VI: the California Claims

Plaintiffs Ashton, Tan, and Ibarra have brought claims under three California statutes: the California Legal Remedies Act ("CLRA", Count IV), the California False Advertising Law ("CFAL", Count V), and the California Unfair Competition Law ("CUCL", Count VI).

The CLRA forbids "[r]epresenting that goods or services have . . . quantities that they do not have." CAL. CIV. CODE § 1770(a)(5). Defendants contend that under the CLRA, a plaintiff must "sufficiently allege that a defendant was aware of a defect at the time of sale." (Doc. 77-1, p. 32 (quoting *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1163, 1145 (9th Cir. 2012)).) Plaintiffs respond that this requirement applies only for plaintiffs alleging *design* defects, and that in other circumstances—including where the plaintiffs allege product misrepresentations—the CLRA "ha[s] no scienter requirement." (Doc. 84, p. 34 (quoting *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 591 (9th Cir. 2012)).) Defendants do not respond to this argument, and the Court agrees with Plaintiffs.

Next, Defendants contend that all three claims fail because under each of the California statutes, Plaintiffs must show that Defendants made a "material" misrepresentation; a misrepresentation is "material" under California law if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 892 (Cal. 2011) (citation omitted). Defendants claim once again that the Labels do not contain a "material" misrepresentation. (Doc. 77-1, p. 33.) The Court disagrees for the same reasons discussed in the context of the MMPA claim: accepting the allegations in the ACC as true and drawing all reasonable inferences in Plaintiffs' favor, it is certainly plausible that a significant misrepresentation about the quantity of coffee in a cannister would affect a reasonable consumer's decision about whether to buy that cannister.

Finally, Defendants claim that the ACC fails to state a claim under the CUCL because Plaintiffs have failed to establish that any of their practices is "unfair." (Doc. 77-1, p. 34.) One of the transferor courts already found that Plaintiffs had stated a claim under the CUCL, and rejected Defendants' arguments on that score. *See Ashton*, 2020 WL 8575140, at *10. The Court will follow that court's lead, and declines to dismiss the CUCL claim.

For these reasons, Defendants' Motion to Dismiss is **DENIED** with respect to Counts IV, V, and VI.

### 3. Counts VII–VIII: the New York Claims

Plaintiff Schoener purchased the Folgers cannisters at issue while he was in New York, where he is a citizen and resident. (Doc. 68, ¶ 10.) He later brought suit in California, alleging violations of New York's consumer protection laws. (*Id*.) The ACC does not allege that Schoener suffered any injury in California, nor that Defendants' alleged misconduct occurred in California.

Defendants contend that the California court in which Schoener brought his suit lacked personal jurisdiction over his claims. (Doc. 77-1, p. 35.) Because Schoener's case was transferred to this Court as part of an MDL proceeding, this Court's personal jurisdiction "is co-extensive with the personal jurisdiction of the transferor court[]." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 486 (J.P.M.L. 1968). Thus, this Court has personal jurisdiction only if the California court did.

Defendants raised this argument in the Central District of California before the case was transferred here. *See Ashton*, 2020 WL 8575140, at *8. The transferor court held that it could exercise "pendent party" jurisdiction over Schoener's claims because they arose from the same "common nucleus of operative facts" as the California Plaintiffs' claims. *Id*.

19

The Court is unsure whether the exercise of pendent party jurisdiction in these circumstances is appropriate under Eighth Circuit law, but exercises its discretion not to revisit this issue now. As Plaintiffs point out, if the Court dismisses Schoener's claims, Schoener will refile his claims in New York, after which the JPML will likely transfer them here as part of this MDL. (Doc. 84, p. 35.) Moreover, if the Court ultimately transfers the case back to the Central District of California, that court will have already held that it can exercise personal jurisdiction over Schoener's claims. Therefore, the Court declines to reverse the *Ashton* decision on whether personal jurisdiction exists over Schoener's claims.

Defendants also repeat their arguments that they never made a material misrepresentation; the Court once again rejects these arguments. Consequently, Defendants' Motion to Dismiss is **DENIED** with respect to Counts VII–VIII.

4. Count IX: the D.C. Claim

Plaintiff Fahey has brought a claim under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901. As discussed in greater detail in the Court's previous order, the CPPA is a somewhat unusual statute that enables private individuals to act as "private attorney[s] general" in enforcing consumer protection laws. (Doc. 67, p. 2.) The result is that a consumer can obtain damages and injunctive relief on behalf of the population of D.C. without (1) representing a class or (2) alleging an ongoing injury.

Defendants first argue that Fahey lacks standing to seek injunctive relief. Under Eighth Circuit law, "[i]n the case of complaints for injunctive relief, the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." *Park v. Forest Service of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2002). Defendants contend that Fahey lacks standing to pursue injunctive relief due to the lack of any allegation of ongoing or future harm.

(*See* Doc. 68, ¶ 23 ("Plaintiffs, *except Plaintiff Fahey*, may again purchase a falsely-advertised ground coffee product[] . . .") (emphasis added).) Plaintiffs respond that Fahey has standing as a "tester plaintiff," a category of individual recognized in Supreme Court precedent. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982). However, the issue in *Havens Realty Corp.* was whether the "tester plaintiffs" could establish that they had suffered a *past* injury from receiving false information; the Court held that they could, even though they fully expected the information they received to be false. *Id*. That case does not excuse a tester (or any plaintiff) from demonstrating that he faces an ongoing injury that can be addressed with an injunction. And of course plaintiffs must establish standing for each form of relief they seek. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). In the absence of any allegations about an ongoing or future injury on Fahey's part, the Court agrees that he lacks standing to pursue injunctive relief.

Next, Defendants argue that the ACC fails to allege that the misrepresentations that affected Fahey were "material." (Doc. 77-1, p. 36.) The Court rejects this argument for the same reasons discussed above: the ACC clearly alleges that the Labels' misrepresentations were "material," (*e.g.,* Doc. 68, ¶ 197), and more importantly, it describes *how* the actual products differed in material respects from the Labels' description.

In sum, Fahey lacks standing to pursue injunctive relief under the CPPA, but in all other respects, Defendants' Motion to Dismiss is **DENIED** on Count IX.

5. <u>Count X: the Florida Claim</u>

Plaintiffs Sorin and Smith have brought claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). "A claim under FDUPTA has three elements: (1) a deceptive

act or unfair practice; (2) causation and (3) actual damages." *Randolph v. J.M. Smucker Co.*, 2014 WL 1018007, at *4 (S.D. Fla. March 14, 2014).

Defendants argue that the ACC does not adequately allege a "deceptive act or unfair practice" on the part of defendants. (Doc. 77-1, pp. 36–37.) Under Florida law, a deceptive act is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted). Defendants made this same argument in Sorin's original case in the Southern District of Florida. There, the court agreed with Defendants' theory that the "up to" language "would lead a reasonable consumer to expect that the actual number of coffee cups produced could be less," and hence that the Labels contained no misrepresentation. (*See* Case No. 21-0222, Doc. 36, p. 3.) The Court disagrees with this conclusion for the reasons discussed above, and for the sake of consistency, applies its ruling on this subject to the Florida case as well. Of course, nothing in this order will preclude the transferor court from reaching the same conclusion it did before the case was transferred, but at that point any decision will be on surer footing because a full Record will have been developed.

Defendants' other arguments to dismiss Count X are the same issues about materiality and damages the Court has already rejected in other contexts. The Court finds that the ACC states a claim under the FDUTPA, and therefore **DENIES** Defendants' Motion to Dismiss with respect to Count X.

6.  Counts XI–XII: the Illinois Claims

Plaintiff Moser has brought a claim under two Illinois statutes: the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA", Count XI) and the Illinois Uniform Deceptive Trade Practices Act ("IDTPA", Count XII).

22

The ICFA requires plaintiffs to show that they suffered an "actual pecuniary loss," which "may occur if the seller's deception deprives the plaintiff of 'the benefit of her bargain' by causing her to pay 'more than the actual value of the [product].'"  *Muir v. Playtex Products, LLC*, 983 F. Supp. 2d 980, 990 (N.D. Ill. 2013) (quoting  *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010)).  Defendants contend that Moser has failed to allege this because she received the "benefit of her bargain" in that she received the cannisters of coffee she purchased.  (Doc. 77-1, pp. 38–39.)  However, Moser *does* allege that she paid "more than the actual value of" the cannisters she purchased due to Defendants' misrepresentations, and would not have purchased them had she known of the misrepresentations.  (Doc. 68, ¶ 174.)[10]  Therefore, Defendants' Motion to Dismiss is **DENIED** with respect to Count XI.

Under the IDTPA, "the only remedy available is injunctive relief."  *Aliano v. Louisville Distilling Company, LLC*, 115 F. Supp. 3d 921, 929 (N.D. Ill. July 20, 2015).  Defendants argue that Moser lacks standing to pursue injunctive relief for the reasons discussed above; the Court once again rejects this argument.  However, given that the IDTPA provides for only injunctive relief, the Court agrees that Plaintiffs cannot obtain damages, attorney fees, or disgorgement under this statute as the ACC requests.  (*See* Doc. 68, ¶ 187.)  Therefore, Defendants' Motion to Dismiss is **GRANTED** with respect to the request for non-injunctive relief in Count XII.

7.  Count XIII: the Washington Claim

Plaintiff Marthaller has brought a claim under the Washington Consumer Protection Act ("WCPA").  To state a claim under this statute, a plaintiff must "establish five distinct elements:

---

[10] The cases Defendants cite for the proposition that a consumer who receives the good he paid for cannot maintain an ICFA claim appear to be limited to cases where the consumer alleges a false pricing scheme. *E.g., Camasta v. Jos. A. Bank Clothiers, Inc.*, 2013 WL 474509, at *4 (N.D. Ill. Feb. 7, 2013) (noting that the plaintiff "does not allege that he paid an unfair price or more than the value of the shirts," but simply that the price of the item he purchased was inaccurately designated as a "sale price").

23

(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986) (en banc).

Defendants contend that the ACC contains no allegations relating to the "public interest impact" of their alleged misrepresentations. (Doc. 77-1, pp. 39–40.) But as Plaintiffs point out, a deceptive trade practice satisfies this element "when (1) it is part of a pattern or generalized course of conduct, and (2) there is a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff." *Eifler v. Shurgard Capital Management Corp.*, 861 P.2d 1071, 1079 (Wash. Ct. App. 1993). The ACC alleges that Defendants' misrepresentations are ongoing and systematic, and that they affect a large number of consumers. (Doc. 68, ¶¶ 2, 4, 29, 30.) Therefore, the Court finds that Plaintiffs have adequately alleged this element, and **DENIES** Defendants' Motion to Dismiss with respect to Count XIII.

### c. Count II: Breach of Express Warranty

All Plaintiffs advance a common law breach of express warranty claim under the laws of their respective states. Initially, Defendants argue that no reasonable consumers would interpret the Labels as a representation about the precise amount of coffee each cannister will produce, and therefore, there was no express warranty to breach. (Doc. 77-1, p. 41.) The Court rejects this argument for the reasons discussed above.

Next, Defendants argue that specific state-law express warranty claims should be dismissed on various grounds. First, they argue that while Plaintiffs purport to bring these warranty claims "on behalf of the[ir] [respective] State Subclasses," Plaintiff Fahey does not represent a class, because he sues under the unique DCPPA. (Doc. 77-1, pp. 40–41.) The Court agrees that Fahey cannot bring this claim on behalf of a class in the manner described in FED. R. CIV. P. 23, as

24

discussed in greater detail in the Court's previous order, (*see* Doc. 67), but finds that the phrasing used to describe Fahey's relationship to the D.C. general public is immaterial.

Next, Defendants argue that the express warranty claims arising under Texas, Illinois, Florida, and Washington law fail because Plaintiffs did not provide pre-suit notice of the alleged issue with Defendants' products. (Doc. 77-1, p. 41.) Plaintiffs contend that (1) Florida and Washington do not require consumers to give pre-suit notice of their claims and (2) Defendants were on notice of Plaintiffs' allegations generally even if specific Plaintiffs failed to give pre-suit notice. (Doc. 84, p. 42.)

With respect to Florida and Washington's notice requirements, the Court agrees with Plaintiffs that Florida does not require buyers to provide notice to the manufacturer of the allegedly deficient products. The Florida statute at issue provides that before filing suit, a buyer "must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of the breach." FLA. STAT. § 672.607(3)(a). However, Florida district courts have generally held that "seller" does not include "manufacturer" under this statute, and hence, that the notice requirement does not apply to manufacturers. *Toca v. Tutco, LLC*, 430 F. Supp. 3d 1313, 1323 (S.D. Fla. 2020); *PB Property Management, Inc. v. Goodman Manufacturing Company, L.P.*, 2014 WL 12640371, at *4 (M.D. Fla. Aug. 14, 2014); *but see Jovine v. Abbott Labs., Inc.,* 795 F. Supp. 2d 1331, 1340 (S.D. Fla. 2011) (appearing to assume, without deciding, that the notice requirement applies to a manufacturer). Washington law is less clear. WASH. REV. STAT. § 62A.2-607(2)(b) also provides that a buyer must "notify the seller of breach or be barred from any remedy," but there appears to be no authority on whether Washington defines "seller" broadly or narrowly. Lacking any guidance on that subject, the Court follows the example of other courts which have considered this issue under Washington law and declines to hold that Washington law requires

giving pre-suit notice to upstream manufacturers before bringing a breach of warranty claim. *E.g.,*
*In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1105 (N.D. Cal. 2015).

That leaves Texas and Illinois, where Plaintiffs concede that pre-suit notice of breach of
warranty claims is required. Plaintiffs contend that Plaintiffs Ibarra, Ashton, and Schoener all sent
pre-suit notice letters to Folgers or the J.M. Smucker Company. (Doc. 84, p. 42.) However, none
of those individuals bought goods in Texas or Illinois, and thus they do not raise claims under
Texas or Illinois law; Marthaller is the putative class representative from Texas, and Moser is the
putative class representative from Illinois. And both Texas and Illinois law provide that "the *buyer*
[of a good] must within a reasonable time after he discovers or should have discovered any breach
notify the seller or be barred from any remedy." IL. STAT. CH. 810 § 5/2-607(3)(a); TEX. BUS. &
COM. § 2.607(c)(1) (emphasis added). Further, under both Texas and Illinois law, initiation of a
lawsuit is not an adequate notice of a breach of warranty claim, and express warranty plaintiffs are
required to provide notice to upstream manufacturers. *Board of Educ. of City of Chicago v. A, C*
*and S, Inc.*, 546 N.E.2d 580, 592 (Ill. 1989); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1103 (N.D.
Cal. 2015) (applying Texas law).

For these reasons, Plaintiffs' claims under Texas and Illinois law are **DISMISSED**.
Otherwise, Defendants' Motion to Dismiss is **DENIED** with respect to Count II.

### d. Count III: Breach of Implied Warranty of Merchantability

All Plaintiffs advance a common law breach of implied warranty claim under the laws of
their respective states. Initially, Defendants refer to their previous arguments and argue that this
claim should be dismissed because it "rises or falls" with the express warranty claims. (Doc. 77-
1, p. 42.) The Court rejects this argument for the reasons discussed above.

Next, Defendants argue that the California breach of implied warranty claim fails because there must be "privity of contract" between a manufacturer and buyer to maintain such a claim, and all Plaintiffs purchased their coffee cannisters through a retail intermediary. (Doc. 77-1, p. 42.) Plaintiffs respond that California recognizes an exception to this rule where the product at issue is food, or where the consumer is a third-party beneficiary of the implied warranty. (Doc. 84, pp. 42–43.) In *Clemens v. DaimlerChrysler Corp.*, the Ninth Circuit interpreted this second exception to the privity requirement to include circumstances where "the plaintiff relies on written labels or advertisements of a manufacturer." 534 F.3d 1017, 1023 (9th Cir. 2008) (citing *Burr v. Sherwin Williams Co.*, 268 P.2d 1041 (Cal. 1954)). Defendants do not meaningfully respond to this line of cases, (Doc. 91, pp. 24–25), and so the Court finds that the California Plaintiffs may maintain their claims as third-party beneficiaries of the implied warranty.

Finally, Defendants argue that in Texas, a plaintiff must provide pre-suit notice of a breach of implied warranty claim, and Plaintiff Thomson failed to do so. (Doc. 77-1, pp. 42–43); *see also Reed v. C.R. Bard, Inc.*, 2015 WL 11110600, at *5 (dismissing warranty claims where the "plaintiff wholly failed to plead that he provided any notice . . . about the alleged problems"). Plaintiffs offer no meaningful response, except that Defendants should have been aware of the alleged breach due to other litigation. (Doc. 84, p. 42.) The Court rejects this argument for the reasons discussed with respect to Count II.

Therefore, the Texas breach of implied warranty claims are **DISMISSED**. Otherwise, Defendants' Motion to Dismiss is **DENIED** with respect to Count III.

### e. Counts XIV and XV: Common Law Fraud and Negligent Misrepresentation

Counts XIV and XV are common law claims for fraudulent and negligent misrepresentation, respectively. Because these claims depend on state law, their elements may

27

vary from state to state. However, all of the states at issue in this MDL rely, at least to some extent, on the Restatement (Second) of Torts in defining misrepresentation claims, so the Court will begin its analysis there. *E.g.*, *Bily v. Arthur Young & Co.*, 834 P.2d 745, 757 (Cal. 1992) (en banc); *Besett v. Basnett*, 389 So.2d 995, 997 (Fla. 1980); *Nestlé Purina Petcare Company v. Blue Buffalo Company Ltd.*, 181 F. Supp. 3d 618, 639–40 (E.D. Mo. 2016) (discussing Missouri law); *Schaaf v. Highfield*, 896 P.2d 665, 668 (Wash. 1995) (en banc); *Board of Educ. of City of Chicago*, 546 N.E.2d at 592; *Bowhead Information Technology Services, LLC. v. Catapult Technology Ltd.*, 377 F.Supp.2d 166, 175 (D. D.C. 2005) (discussing D.C. courts following the Restatement generally); *CLC Roofing, Inc. v. Helzer*, 594 S.W.3d 414, 420 (Tex. Ct. App. 2019) (noting that the Texas Supreme Court has not explicitly adopted the Restatement, but applying the Restatement rules anyway); *Powers v. Ostreicher*, 824 F.Supp. 372, 376 (S.D.N.Y. 1993) (discussing New York law).

The Restatement defines liability for fraudulent misrepresentation as follows: "One who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act . . . is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation." RESTATEMENT (SECOND) OF TORTS § 525. The Restatement defines liability for negligent misrepresentation as follows: "One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information." RESTATEMENT (SECOND) OF TORTS § 552. There are two primary differences between these definitions. First, "fraudulent misrepresentation requires proof that the defendant knew the statement was untrue or

28

was reckless as to whether the statement was true or false, while negligent misrepresentation only requires that the defendant failed to exercise reasonable care or competence to obtain or communicate true information." *Ryann Spencer Group, Inc. v. Assurance Co. of America*, 275 S.W.3d 284, 290–91 (Mo. Ct. App. 2008) (discussing Missouri law). Second, negligent misrepresentation requires that some sort of "special relationship between the parties" exist, although the nature of that relationship varies from state to state. *Ravenna v. Christie's Inc*., 289 A.D.2d 15, 16 (N.Y. Ct. App. 2001). With these tenets in mind, the Court addresses Defendants' arguments for dismissing these Counts.

Defendants first argue that they never made a misrepresentation, and that if they did, the ACC fails to adequately allege that they knew or should have known of its falsehood. (Doc. 77-1, p. 43.) The Court has already rejected the first prong of this argument, and it rejects the second as well. The ACC explicitly alleges that Defendants "knew or should have known that each of the Products falsely and deceptively overstates the number of servings of coffee that can be made." (Doc. 68, ¶ 49.)[11] And while this is somewhat vague, FED. R. CIV. P. 9(b) explicitly states that "knowledge[] and other conditions of a person's mind may be alleged generally" in a fraud case.

Next, Defendants contend that Plaintiffs have failed to state a negligent misrepresentation theory because they have failed to plead a "special relationship" between the parties. (Doc. 91, pp. 26–27.) Plaintiffs argue that this is not a requirement, at least in most of the states relevant to this MDL. (Doc. 84, pp. 43–44.) Both parties cite a hodgepodge of cases—often failing to correctly identify the propositions for which those cases stand—to support their respective positions.

---

[11] Indeed, from the allegations in the ACC, one can reasonably infer that one of two things occurred: either Defendants tested the number of cups it is possible to make from each cannister, or they did not. If the former is true, Defendants had actual knowledge that the Labels were false; in the latter case, Defendants had no basis whatsoever for making the representations.

After reviewing the relevant case law on its own, the Court concludes as follows. New York and California require the existence of some sort of special relationship between the parties— beyond mere receipt of an advertisement—to sustain a negligent misrepresentation claim. *Mazella v. Coca Cola Company*, __ F. Supp. 3d __, 2021 WL 2940926, at \*5 (S.D.N.Y. 2021) (summarizing New York caselaw, and finding that "negligent misrepresentation requires more than receipt of a mass advertisement" and "a closer degree of trust between the parties than that of the ordinary buyer and seller is required"); *Leining v. Foster Poultry Farms, Inc.*, 61 Cal.App.5th 203, 219–20 (Cal. Ct. App. 2021) (negligent misrepresentation is only available to a "limited group of persons for whose benefit and guidance" defendant made the representation, and "any potential [product] buyers in the general public" is "the opposite of a limited group of persons"). Additionally, Illinois imposes a comparable requirement that the defendant be "in the business of supplying information," and Illinois courts have held that "manufacturers of tangible noninformational goods" (like coffee) are not in the business of supplying information. *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc*., 125 F.3d 468, 476–77 (7th Cir. 1997) (applying Illinois law). Therefore, the negligent misrepresentation claims arising under New York, California, and Illinois law are **DISMISSED**.

The Court finds that the remaining states (Florida, Missouri, Washington, and Texas) do not impose a special relationship requirement for negligent misrepresentation claims. *Chandler v. Van Dyke Farm Homeowners*, 2003 WL 21639021, at \*4 (Fla. Cir. Ct. 2003) (holding that an anticipated "business transaction is not required to sustain a cause of action for negligent misrepresentation"); *Brummett v. Washington's Lottery*, 288 P.3d 48, 56 (Wash. Ct. App. 2012) (considering negligent misrepresentation claim based on allegedly false advertisement); *Chubb Group of Ins. Companies v. C.F. Murphy & Associates, Inc*., 656 S.W.2d 766, 784–85 (Mo. Ct.

App. 1983) (negligent misrepresentation claim survives if "the plaintiff is a member of the group that the defendant seeks to influence," including through advertising); *see also Torp v. General Motors Acceptance Corp.*, 2007 WL 2811437, at *9 (W.D. Mo. Sept. 24, 2007) (interpreting *Chubb* in the context of advertisements); *Correct Rx Pharmacy Servs., Inc. v. Cornerstone Automation Sys., LLC*, 2018 WL 4680568, at *2 n.5 (N.D. Tex. Sept. 28, 2018), *aff'd sub nom. Correct RX Pharmacy Servs., Inc. v. Cornerstone Automation Sys., L.L.C.*, 945 F.3d 423 (5th Cir. 2019) (noting a conflict among federal district courts in Texas over the "special relationship" requirement, but observing the absence of any state law authority to support such a requirement).

Finally, Defendants argue that Plaintiffs' misrepresentation claims under California, Missouri, and Texas law are barred by the economic loss doctrine ("ELD"). (Doc. 77-1, pp. 43–45.) The Court disagrees with Defendant's reading of those cases, however; it finds that none of the states Defendants cite apply the ELD to cases like the present one. *E.g., Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004) ("[T]he economic loss rule does not bar [the plaintiff's] fraud and intentional misrepresentation claims because they were independent of [the defendant's] breach of contract."); *Woodard v. Labrada*, 2021 U.S. Dist. LEXIS 189649, at *63–64 (C.D. Cal. Aug. 31, 2021) (citing *Robinson* and holding that the ELD does not bar negligent and fraudulent misrepresentation claims based on misleading labels); *Dunne v. Resource Converting, LLC*, 991 F.3d 931, 943 (8th Cir. 2021) (summarizing the ELD under Missouri law as a rule that "a *commercial* buyer of goods" cannot "seek[] to recover in tort for economic losses that are contractual in nature," and declining to extend the rule "beyond the contexts in which it has been applied by Missouri courts") (citation omitted; emphasis added);[12] *Sharyland Water*

---

[12] Defendants argue that *Dunne* is "limited to the facts of that case," and that an earlier Eighth Circuit case, *Dannix Painting, LLC v. Sherwin-Williams Co.*, supports their position. (Doc. 91, p. 28.) The Court disagrees: *Dannix* summarized the ELD in the same way as *Dunne*, namely that a "*commercial* buyer of goods" cannot "recover in tort for economic losses that are contractual in nature." 732 F.3d 902, 905–06 (8th Cir. 2013).

*Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011) ("[W]e have applied the economic loss rule only in cases involving defective products or failure to perform a contract" because in "those situations . . . the parties' economic losses were more appropriately addressed through statutory warranty actions or common law breach of contract suits than tort claims."). Thus, based on the Court's review of the applicable caselaw, the ELD does not bar Plaintiffs' misrepresentation claims.

In sum, the negligent misrepresentation claims arising under New York, California, and Illinois law are **DISMISSED**. Otherwise, Defendants' Motion to Dismiss is **DENIED** with respect to Counts XIV and XV.

### f. Count XVI: Unjust Enrichment

All Plaintiffs, aside from Fahey, assert a common law unjust enrichment claim. Defendants argue that this claim "simply duplicates" Plaintiffs' other claims, and that because Plaintiffs have an available remedy at law, the unjust enrichment claim should be dismissed. (Doc. 77-1, pp. 45–46.) While some courts may require the dismissal of equitable unjust enrichment claims where other remedies exist, the Court does not adopt this practice. Mindful that "[a] party may state as many separate claims or defense as it has, regardless of consistency," FED. R. CIV. P. 8(d)(3), the Court has previously declined to require plaintiffs to elect their remedies at the 12(b)(6) stage, and sees no reason to depart from that practice. *E.g., Jones v. Monsanto Company*, 2019 WL 9656365, at *4 (W.D. Mo. June 13, 2019). Therefore, Defendants' Motion to Dismiss is **DENIED** with respect to Count XVI.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, (Doc. 74), is **GRANTED IN PART** and **DENIED IN PART**. In particular:

- Walmart is **DISMISSED** as a Defendant;
- Plaintiffs may not obtain punitive damages under California and Missouri law;
- Plaintiffs may not obtain injunctive relief under the CPPA;
- Plaintiffs may not obtain non-injunctive relief under the IDTPA;
- Plaintiffs' breach of express warranty claims under Texas and Illinois law are **DISMISSED**;
- Plaintiffs' breach of implied warranty claim under Texas law is **DISMISSED**; and
- Plaintiffs' negligent misrepresentation claims under New York, California, and Illinois law are **DISMISSED**.

In all other respects, Defendants' Motion to Dismiss is **DENIED**.


**IT IS SO ORDERED.**



/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: December 28, 2021          UNITED STATES DISTRICT COURT