**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

IN RE: FOLGERS COFFEE MARKETING LITIGATION

Case No.: 4:21-md-02984-BP

The Honorable Beth Phillips

This Document Relates to:
*Tan*, No. 21-cv-00220;
*Ashton*, No. 21-cv-00221

Plaintiffs' Suggestions in Support of Motion for Certification of the California Class

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 5

A. J.M. Smucker's and Folgers' Business ........ 5

B. Folgers is the Market Leader with Millions in Annual Sales ........ 6

C. The Ground Coffee Products in Dispute ........ 6

D. Common Evidence Shows That The Cups Claim Is Material to Consumers ........ 8

E. Common Evidence Shows That Consumers Believe the Products Will Meet The Cups Claim Under All Brewing Instructions ........ 12

F. The Products Fail to Meet the Cups Claim Under *Either* Brewing Instruction ........ 13

G. Defendants' Purported Method for Validating The Cups Claim is Flawed and Not Consistent with the State of the Coffee When Consumers Purchase It ........ 15

H. The *Real* Reason Defendants Kept the Cups Claim was to Reassure Consumers that the Products were the Same Despite Defendants' Ongoing Shrinkflation Campaign ........ 17

III. SUGGESTIONS IN SUPPORT ........ 21

A. The Claims Plaintiffs Seek to Certify ........ 21

B. Legal Standard for Class Certification ........ 23

C. Application of Rule 23 ........ 23

D. Named Plaintiffs Have Standing to Represent Class Members Who Purchased Substantially Similar Products ........ 25

IV. PLAINTIFFS SATISFY RULE 23(A) ........ 27

A. Ascertainability ........ 27

B. Numerosity ........ 28

C. Commonality ........ 29

D. Typicality ........ 32

E. Adequacy ........ 33

V. PLAINTIFFS ALSO SATISFY RULE 23(B)(3) PREDOMINANCE AND SUPERIORITY ........ 34

A. Predominance ........ 34

B. Superiority ........ 45

VI. CONCLUSION ........ 47

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) ....................29

*Allen v. Hyland's Inc.*,
300 F.R.D. 643 (C.D. Cal. 2014) ....................40

*Allen v. Similasan Corp.*,
306 F.R.D. 635 (S.D. Cal. 2015) ....................30

*Alpern v. UtiliCorp United, Inc.*,
84 F.3d 1525 (8th Cir. 1996) ....................33

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................23, 34

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ....................23

*Ang v. Bimbo Bakeries USA, Inc.*,
No. 13-cv-01196-WHO, 2014 WL 1024182 (N.D. Cal. Mar. 13, 2014) ....................25

*In re Aquila ERISA Litig.*,
237 F.R.D. 202 (W.D. Mo. 2006) ....................29

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) ....................32

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ....................2

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ....................22

*Astiana v. Kashi Co.*,
291 F.R.D. 493 (S.D. Cal. 2013) ....................30, 31, 40

*Baggett v. Hewlett-Packard Co.*,
582 F. Supp. 2d 1261 (C.D. Cal. 2007) ....................40

*Baghdasarian v. Amazon.com, Inc.*,
258 F.R.D. 383 (C.D. Cal. 2009) ....................22

*Bailey v. Rite Aid Corp.*,
338 F.R.D. 390 (N.D. Cal. 2021) ....................38, 39, 40, 44

*Barrales v. New Chapter, Inc.*,
No. 2:25-cv-01171-HDV-KES, 2025 WL 1584424 (C.D. Cal. June 4, 2025)........................25

*Beck-Ellman v. Kaz USA, Inc.*,
283 F.R.D. 558 (S.D. Cal. 2012) ..........................................................................33, 40

*Blades v. Monsanto Co.*,
400 F.3d 563 (8th Cir. 2005) .................................................................................34

*Bradford v. AGCO Corp.*,
187 F.R.D. 600 (W.D. Mo. 1999)...........................................................................28

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ..........................................................................27, 47

*Broomfield v. Craft Brew All., Inc.*,
No. 17-cv-01027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ............................37, 42

*Browning v. Anheuser-Busch, LLC*,
539 F. Supp. 3d 965 (W.D. Mo. 2021) ...................................................................25

*Butler v. Sears, Roebuck and Co.*,
727 F.3d 796 (7th Cir. 2013) .................................................................................45

*Cartwright v. Viking Indus., Inc.*,
No. 2:07-CV-02159-FCD-EFB, 2009 WL 2982887 (E.D. Cal. Sept. 14, 2009).....................40

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
308 F.R.D. 606 (N.D. Cal. 2015)............................................................................27

*Chapman v. Wagener Equities, Inc.*,
No. 09 C 07299, 2012 WL 6214597 (N.D. Ill. Dec. 13, 2012) .............................................47

*Chavez v. Blue Sky Natural Bev. Co.*,
268 F.R.D. 365 (N.D. Cal. 2010)....................................................................3, 42, 45

*City and Cty. of San Francisco v. Purdue Pharma L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. 2020) .....................................................................36

*City of Pomona v. SQM North America Corp.*,
750 F.3d 1036 (9th Cir. 2014) ...............................................................................32

*Clemens v. Daimler Chrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008) ..........................................................................41, 42

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................................43

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ........................................................................... 30

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ........................................................................ *passim*

*Cope v. Let's Eat Out, Inc.*,
319 F.R.D. 544 (W.D. Mo. 2017) ........................................................................... 25

*Cortez v. Purolator Air Filtration Prods. Co.*,
23 Cal. 4th 163 (2000) ............................................................................................. 36

*Cummings v. Connell*,
402 F.3d 936 (9th Cir. 2005) ................................................................................... 23

*Custom Hair Designs by Sandy v. Central Payment Co., LLC*,
984 F.3d 595 (8th Cir. 2021) (en banc) .................................................................... 46

*de Lacour v. Colgate-Palmolive Co.*,
338 F.R.D. 324 (S.D.N.Y. 2021) ............................................................................. 40

*DeBoer v. Mellon Mortg. Co.*,
64 F.3d 1171 (8th Cir. 1995) .............................................................................. 32, 33

*Delarosa v. Boiron, Inc.*,
275 F.R.D. 582 (C.D. Cal. 2011) ............................................................................. 42

*In re Dial Complete Mktg. and Sales Practices Litig.*,
312 F.R.D. 36 (D.N.H. 2015) .................................................................................. 45

*In re DirecTV Early Cancellation Litig.*,
738 F. Supp. 2d 1062 (C.D. Cal. 2010) ................................................................... 24

*In re. Dollar Gen. Corp. Motor Oil Mktg. and Sales Practices Litig.*,
MDL No. 2709, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019) ................................ 2, 27, 40

*DZ Reserve v. Meta Platforms, Inc.*,
96 F.4th 1223 (9th Cir. 2024), *cert. denied* 145 S.Ct. 1051 (2025) ........................... 35, 39, 42

*East Texas Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977) ................................................................................................ 33

*Edwards v. Ford Motor Co.*,
603 F. App'x 538 (9th Cir. 2015) ............................................................................... 3

*Ellsworth v. U.S. Bank, N.A.*,
No. C 12-02506 LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014) .......................... 41

*Falco v. Nissan N. Am. Inc.*,
No. CV 13-00686 DDP, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) ............................23, 42

*In re First All. Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ............................................................................32, 44

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018).........................................................................37, 40

*Fitzpatrick v. General Mills, Inc.*,
263 F.R.D. 687 (S.D. Fl. 2010)...............................................................................35

*Forcellati v. Hyland's, Inc.*,
No. CV 12-1983- GHK, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014).................................28

*In re Gen. Am. Life Ins. Co. Sales Practices Litig.*,
391 F.3d 907 (8th Cir. 2004) ...................................................................................23

*Grayson v. 7-Eleven, Inc.*,
No. 09CV1353-MMA WMC, 2012 WL 1059902 (S.D. Cal. Mar. 28, 2012)........................22

*Guido v. L'Oreal, USA, Inc.*,
284 F.R.D. 468 (C.D. Cal. 2012) ...............................................................................22

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ...........................................................................23, 33

*Hawkins v. Kroger Co.*,
337 F.R.D. 518 (S.D. Cal. 2020) ...............................................................................31

*Hilsley v. Ocean Spray Cranberries, Inc.*,
No. 17cv2335-GPC(MDD), 2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) ..........................40

*Hopkins v. Kan. Teachers Cmty. Credit Union*,
265 F.R.D. 483 (W.D. Mo. 2010)..............................................................................34

*Hughes v. Big Heart Pet Brands*,
740 Fed. App'x 876 (9th Cir. 2018) ..........................................................................38

*Hunt v. Check Recovery Sys., Inc.*,
241 F.R.D. 505 (N.D. Cal. 2007)...............................................................................22

*In re Hyundai and Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ...........................................................................34, 35

*Johns v. Bayer Corp.*,
280 F.R.D. 551 (S.D. Cal. 2012) ..................................................................3, 22, 39, 42

*Johnson v. General Mills, Inc.*,
275 F.R.D. 282 (C.D. Cal. 2011) ............ 3, 30

*Johnson v. General Mills, Inc.*,
276 F.R.D. 519 (C.D. Cal. 2011) ............ 30

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ............ 3

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*,
609 F. Supp. 3d 942 (N.D. Cal. 2022) ............ 23, 40, 42

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ............ 36

*Khoday v. Symantec Corp.*,
No. 11-180, 2014 WL 1281600 (D. Minn. Mar. 13, 2014) ............ 38

*Kidd v. Mayorkas*,
343 F.R.D. 428 (C.D. Cal. 2023) ............ 28

*Kim v. Benihana, Inc.*,
No. 5:19-cv-02196-JWH-KKx, 2022 WL 1601393 (C.D. Cal. Mar. 25, 2022) ............ 31

*In re Korean Air Lines Disaster*,
829 F.2d 1171 (D.C. Cir. 1987) ............ 24

*Krommenhock v. Post Foods, LLC*,
334 F.R.D. 552 (N.D. Cal. 2020) ............ 34

*Krueger v. Wyeth*, Inc.,
310 F.R.D. 468 (S.D. Cal. 2015) ............ 28

*Kumar v. Salov N. Am. Corp.*,
No. 14-CV-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016) ............ 30

*Kwikset Corp. v. Superior Ct.*,
246 P.3d 877 (Cal. 2011) ............ 26

*Labrier v. State Farm Fire & Cas. Co.*,
315 F.R.D. 503 (W.D. Mo. 2016) ............ 32

*Lafollette v. Liberty Mut. Fire Ins. Co.*,
No. 2:14-cv-04147-NKL, 2016 WL 4083478 (W.D. Mo. Aug. 1, 2016) ............ 27

*Lavie v. Procter & Gamble Co.*,
105 Cal. App. 4th 496 (Cal. Ct. App. 2003) ............ 37

*Lilly v. Jamba Juice Co.*,
308 F.R.D. 231 (N.D. Cal. 2014) ........ 28, 40

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007) ........ 24

*Lytle v. Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024) ........ 35, 45

*Lytle v. Nutramax Labs., Inc.*,
No. ED CV 19-0835 FMO, 2022 WL 1600047 (C.D. Cal. May 6, 2022) ........ 38

*Martin v. Monsanto Co.*,
No. ED CV 16-2168-JFW, 2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) ........ 2

*Massachusetts Mut. Life Ins. Co. v. Superior Ct.*,
97 Cal. App. 4th 1282 (Cal. Ct. App. 2002) ........ 38

*In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*,
422 F. Supp. 3d 194 (D.D.C. 2019) ........ 24, 27, 44

*McKeage v. TMBC, LLC*,
847 F.3d 992 (8th Cir. 2017) ........ 27, 28

*McKell v. Washington Mut., Inc.*,
142 Cal. App. 4th 1457 (Cal. Ct. App. 2006) ........ 36

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
241 F.R.D. 185 (S.D.N.Y. 2007) ........ 24

*Mier v. CVS Pharmacy, Inc.*,
No. SA CV 20-1979-DOC-(ADSx), 2021 WL 3468951 (C.D. Cal. Apr. 29, 2021) ........ 30

*Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
713 F. Supp. 3d 660 (N.D. Cal. 2024) ........ 31

*Moore v. Wilson Logistics, Inc.*,
No. 21-03212-CV-S-BP, 2022 WL 22961415 (W.D. Mo. Nov. 14, 2022) ........ 47

*In re NJOY Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) ........ 28, 30

*Occidental Land, Inc. v. Superior Ct.*,
18 Cal.3d 355 (1976) ........ 42

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ........ 24

*Paduano v. Am. Honda Motor Co., Inc.*,
169 Cal. App. 4th 1453 (Cal. Ct. App. 2009) ....................38

*Paxton v. Union Nat. Bank*,
688 F.2d 552 (8th Cir. 1982) ....................29, 33

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....................46

*Pino v. Cardone Cap., LLC*,
No. 2:20-CV-08499-JFW (KSX), 2026 WL 1381724 (C.D. Cal. Mar. 27, 2026)....................33

*Radcliffe v. Experian Info. Sols. Inc.*,
715 F.3d 1157 (9th Cir. 2013) ....................33

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015) ....................26

*Reitman v. Champion Petfoods USA, Inc.*,
No. CV 18-1736-DOC, 2019 WL 7169792 (C.D. Cal. Oct. 30, 2019) ....................28

*Ries v. Arizona Beverages USA, LLC*,
287 F.R.D. 523 (N.D. Cal. 2012)....................28

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497(6th Cir. 2015) ....................3, 38

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*,
No. SACV 07-1306 JVS (RNBx), 2008 WL 4906433 (C.D. Cal. Nov. 13, 2008). ....................41

*Robertson v. Clean Control Corp.*,
No. 5:24-cv-01478-SSS-DTBx, 2024 WL 5193852 (C.D. Cal. Dec. 18, 2024) ....................2

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal.4th 979 (2004) ....................42

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2010) ....................29

*In re Rubber Chemicals Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005)....................32

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) ....................27, 31

*Shaeffer v. Califia Farms, LLC*,
44 Cal.App.5th 1125 (Cal. Ct. App. 2020) ....................37, 38

*Shields v. World Aquatics*,
No. 23-15092, 2024 WL 4211477 (9th Cir. Sept. 17, 2024) ....................46

*Shin v. Sanyo Foods Corp. of America*,
348 F.R.D. 477 (C.D. Cal. 2025) ....................22, 41

*Smith v. Keurig Green Mountain, Inc.*,
No. 18-CV-06690-HSG, 2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) ....................22

*In re Sony PS3 Other OS Litig.*,
551 F. App'x 916 (9th Cir. 2014) ....................26

*State Farm Fire & Cas. Co. v. Superior Ct.*,
45 Cal. App. 4th 1093 (Cal. Ct. App. 1996) ....................36

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ....................32, 33

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ....................37, 38

*Steroid Hormone Prod. Cases*,
181 Cal. App. 4th 145 (Cal. Ct. App. 2010) ....................36, 38

*Suchanek v. Sturm Foods, Inc.*,
764 F. 3d 750 (7th Cir. 2014) ....................23

*Tait v. BSH Home Appliances Corp.*,
289 F.R.D. 466 (C.D. Cal. 2012) .................... *passim*

*TBK Partners v. Chomeau*,
104 F.R.D 127 (E.D. Mo. 1985) ....................29

*In re Tobacco II Cases*,
46 Cal. 4th 298 (Cal. 2009) ....................37

*In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*,
No. 2:11-07382, 2019 WL 2521958 (D.N.J. June 18, 2019) ....................38

*True Health Chiropractic, Inc. v. McKesson Corp.*,
896 F.3d 923 (9th Cir. 2018) ....................27

*Tunick v. Takara Sake USA Inc.*,
806 F. Supp. 3d 912 (N.D. Cal. 2025) ....................22, 41

*Vasquez v. Superior Ct.*,
4 Cal.3d 800 (1971) ....................2, 37, 39, 42

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................29

*White v. Symetra Assigned Benefits Servs. Co.*,
104 F.4th 1182 (9th Cir. 2024)....................36

*Wiener v. Dannon Co.*,
255 F.R.D. 658 (C.D. Cal. 2009)....................32

*Williams v. Gerber Food Prods. Co.*,
523 F.3d 934 (9th Cir. 2008)....................37

*Wolph v. Acer Am. Corp.*,
272 F.R.D. 477 (N.D. Cal. 2011)....................28

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010)....................35, 45

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001)....................46

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011)....................24, 35

**Statutes**

Cal. Bus. & Prof. Code §17200....................36

Cal. Bus. & Prof. Code §§ 17204, 17535....................26

Cal. Civ. Code § 1770(a)(5)....................38

Cal. Comm. Code § 2314(2)(f)....................42

**Other Authorities**

*Restatement (First) of Restitution* § 1 (1937)....................40

Fed. R. Civ. P. 23(a)(1)....................28

Fed. R. Civ. P. 23(a)(3)....................32

Fed. R. Civ. P. 23(a)(4)....................33

Fed. R. Civ. P. 23(b)(3)....................45

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs Shelly Ashton and Frederick Tan, individually and on behalf of all others similarly situated (hereafter, "Plaintiffs") respectfully submit this suggestion in support of their motion for class certification of claims asserted against Defendants J.M. Smucker Company ("J.M. Smucker") and The Folger Coffee Company ("Folgers" and, collectively, "Defendants").

## I. INTRODUCTION

This is a straightforward consumer fraud action involving Defendants' misrepresentations to consumers that their Folgers ground coffee canister products can make up to a certain number of cups of coffee when in actuality, they cannot.[1] Additionally, Plaintiffs have learned through discovery that Defendants have been engaged in a decade plus long "shrinkflation" campaign to repeatedly reduce the number of grams of ground coffee contained in Folgers ground coffee canisters. Despite these repeated product downsizes—[redacted][2]—Defendants have continued to maintain the same "makes up to" cups claim (hereinafter, the "Cups Claim" or "serving representation") on each of the at-issue Folgers ground coffee canister products (hereinafter, collectively referred to as the "Products"),[3] in order to mislead consumers that they are still receiving the same amount of coffee. Plaintiffs have likewise learned that Defendants' internal method to supposedly validate and calculate the Cups Claim is deeply flawed because: (a) it is not based on the coffee's actual density when it gets to the consumer; (b) it completely ignores the tablespoon brewing instructions (1 Tbsp

---

[1] *In Re: Folgers Coffee Mktg. Litig.*, Third Amended Consolidated Class Action Complaint, Feb. 27, 2023 ("Complaint"), ECF No. 240 ¶ 1.

[2] *See* Ex. 1, FOL00148022 (email from a J.M. Smucker Sr. Technologist stating [redacted] Unless otherwise specified, all references to "Ex. _" are exhibits to the Declaration of Todd Carpenter in support of this motion, filed concurrently herewith.

[3] The complete list of Products for which Plaintiffs seek class certification is attached as Ex. 2. Note that the at-issue Products have changed slightly from the Complaint. Nonetheless, the Products at issue in this case still consist of numerous varieties (e.g., different types of roasts) and sizes (e.g., 20 oz., 20.5 oz., etc.) of Folgers ground coffee canisters sold across the United States.

of ground coffee per cup of coffee), which is Defendants' preferred methodology;[4] and (c) if Defendants' internal methodology were to be used to validate the tablespoon method, the Products cannot and do not meet the Cups Claim.

Plaintiffs have alleged that "Defendants have sold the Products to consumers based on the representation that they contain enough ground coffee to make up to a specific number of servings (e.g., '240 6 FL OZ CUPS'). However, by following Defendants' own definitions and instructions, the Products do not contain enough ground coffee to make the number of servings represented or even close to it."[5] Had Plaintiffs known "that the Products do not contain enough coffee to make the specified number of servings [], they would have paid less for them, or would not have purchased them at all."[6]

False advertising class actions involving uniform misrepresentations throughout the class period, including those involving "up to" claims such as the instant action, are ideal for class certification and are routinely certified. *See, e.g.*, *Martin v. Monsanto Co.*, No. ED CV 16-2168-JFW (SPx), 2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) (certifying class alleging that "Makes Up to __ Gallons" statement on herbicide packaging violated California consumer protection statutes); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334 (N.D. Cal. 2018) (certifying class alleging that representations, including representation that a cable modem could achieve "download speeds up to 1.4 Gbps," violated California consumer protection statutes); *Robertson v. Clean Control Corp.*, No. 5:24-cv-01478-SSS-DTBx, 2024 WL 5193852, at *2-5 (C.D. Cal. Dec. 18, 2024) (sustaining California consumer claims and breach of express warranty based on a representation that a product "makes up to 32 gallons").[7] Like the foregoing cases and as discussed

---

[4] https://www.folgerscoffee.com/coffee/learn/measure (last visited June 19, 2026).

[5] Complaint, ¶ 2.

[6] Complaint, ¶ 4. As this Court noted in substantially denying Defendants' Motion to Dismiss, "These class allegations indicate generally that this case satisfies the requirements to certify a class under the Federal Rules of Civil Procedure." ECF No. 105 at 3.

[7] *See also In re. Dollar Gen. Corp. Motor Oil Mktg. and Sales Practices Litig.*, MDL No. 2709, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019); *Vasquez v. Superior Ct.*, 4 Cal.3d 800, 808 (1971); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) ("district courts in California routinely certify

below, the facts and law overwhelmingly demonstrate that Class certification is appropriate. The question presented here at the certification stage is whether Plaintiffs' claims can be collectively resolved on a Class-wide basis—not whether the Products' Cups Claims are in fact true or false (or misleading or not). At class certification, "the plaintiff need not prove the existence of the defect." *Edwards v. Ford Motor Co*., 603 F. App'x 538, 540 (9th Cir. 2015). "[T]hat is a merits question not appropriately addressed at the class certification stage." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1122 (9th Cir. 2017). Plaintiffs' claims can readily be resolved at trial because the question of whether the Products provide the promised number of cups is one that can be answered with a simple "yes" or "no" using common evidence.

Further, each of the Rule 23(a) criteria is satisfied. For numerosity, Defendants' sales records indicate that since May 2016, they have sold over [redacted] of Folgers ground coffee nationwide.[8] For commonality, Plaintiffs demonstrate that Defendants' behavior was the same as to all Class members, so that their liability to each will be determined by answering the same questions, namely whether the Cups Claims were likely to deceive consumers. For typicality, Plaintiffs demonstrate that the legal theory and type of injury is the same for all Class members, regardless of canister size or variety. And for adequacy, Plaintiffs demonstrate that they and their counsel have no conflicts and will continue to vigorously prosecute the case.

Additionally, the Rule 23(b)(3) criteria are satisfied. The Class's claims present predominating common questions based on objective standards that will be resolved through class-wide evidence. The Class challenges a single deceptive representation (that the Products fail to meet their on-label Cups Claims), so their damages—the price premium paid for the shortage of ground coffee—necessarily flow from Defendants' conduct creating the legal liability. Further, the

---

consumer class actions arising from alleged violations of the CLRA, FAL, and UCL") (collecting cases); *Johns v. Bayer Corp*., 280 F.R.D. 551, 560 (S.D. Cal. 2012); *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 527(6th Cir. 2015) (affirming certification of five state classes, including California); *Johnson v. General Mills, Inc.*, 275 F.R.D. 282, 290 (C.D. Cal. 2011) (certifying California UCL, CLRA class).

[8] Ex. 3, FOL00000001 (Folgers' internal sales data).

liability issues associated with Plaintiffs' claims are based on Defendants' common course of conduct toward *all* Class members and Plaintiffs will use common evidence to prove their claims.[9] Moreover, as this is essentially an underfill case, the shortage of ground coffee can be determined by mechanical application and averaged across the Products. *See* Hockert IR ¶¶ 25-26. Plaintiffs also presented (and performed) not one, but *four* robust damages models to calculate the per cup price premium paid by consumers due to the Products' Cups Claim, demonstrating that multiple methodologies[10] can be applied to the Products to measure damages on a Class-wide basis. These methodologies are tied to the proposed Class's claims and are applicable Class-wide. Finally, class treatment is the superior means of adjudicating these individually small value claims that are not economically feasible to adjudicate individually and which would not otherwise be brought.

Plaintiffs seek to certify a California statewide class ( the "Class")— for breach of express warranty, breach of implied warranty of merchantability, common law fraud, unjust enrichment/quasi-contract, and claims under California's False Advertising Law ("FAL") (Cal. Bus. & Profs. Code § 17500, *et seq.*), California's Consumer Legal Remedies Act ("CLRA") (Cal. Civil Code § 1750, *et seq.*), and California's Unfair Competition Law ("UCL") (Cal. Bus. & Profs.

---

[9] E.g., Werner Initial Report ("Werner IR") ¶¶ 44, 45, 54-56, 65-67, 72-74, 76 (calculating damages for the proposed classes based on common evidence from Defendants records and IRI sales data), Werner IR, Schedules 17, 19, 20, 21, 24, 25, 26, 27; Hockert Initial Report ("Hockert IR") ¶¶ 13-16, 28 (describing common methodology to determine ground coffee shortfall in the Products and concluding based on measurement results that consumers would not be able to make the number of cups claims on the Products); Dennis Initial Report ("Dennis IR") ¶¶ 26-30 (describing key findings from consumer survey that (1) a substantial majority of consumers perceive the Products' Cups Claim "to mean it will make the same total number of cups of coffee when making one cup at a time and when making a pot," and (2) the Cups Claim "is material to purchase decision making for the reasonable consumer.").

[10] Plaintiffs' damages expert, economist Dr. Daniel P. Werner, Ph.D., CPA, performed a preliminary calculation of damages under several approaches and opined that at least four generally accepted methodologies exist to calculate damages in this case. Werner IR ¶¶ 11,77. These methods include the use of: (1) a calculation of the price premium paid by consumers based on their estimated willingness-to-pay per advertised cup (i.e., damages utilizing conjoint analysis and assuming fixed supply); (2) an economic market simulation that incorporates dynamic supply that estimates the prices consumers would have paid absent the deceptive Cups Claims on the Products (i.e., damages utilizing conjoint analysis and incorporating dynamic supply); (3) a regression analysis that measures the relationship between prices paid and the Cups Claims; and (4) a price premium paid by consumers where the percentage shortfall of servings represents a proxy for price premium. *Id.* ¶ 11. As discussed further below, Dr. Werner then multiplies the per unit damages under each model to Product sales volume to arrive at preliminary actual damages figures. *Id.* ¶¶ 44-45, 54-55, 66-67, 73-74; Werner IR, Schedules 19a-19f, 21a-21f, 25a-25f, 27a-27f.

Code § 17200, *et seq.*), on behalf of California consumers who purchased the Products for personal, family, or household purposes, within the applicable statute-of-limitations period.[11] Plaintiffs also seek to be appointed Class Representatives for the claims asserted herein and to appoint current interim class counsel, Lynch Carpenter, LLP and Faruqi & Faruqi, LLP, as Class Counsel. *See* ECF No. 48.

## II. STATEMENT OF FACTS

### A. J.M. Smucker's and Folgers' Business

In November 2008, J.M. Smucker acquired Folgers for $2.95 billion from Procter & Gamble.[12] J.M. Smucker manufactures a plethora of consumer products present in nearly 90% of U.S. homes.[13] Under the Folgers brand, Defendants sell a variety of retail coffee products, including an assortment of ground coffee canisters in various sizes and roasts. In 2022, J.M. Smucker reported $2.5 billion in net sales within its U.S. Retail Coffee segment, which represented approximately 31% of the company's worldwide net sales.[14] Notably, while J.M. Smucker does have a consumer-facing sales website,[15] it sells Folgers coffee primarily to retailers who then sell to consumers. *See* Ex. 6, Rule 30(b)(6) Deposition of Tina Meyer-Hawkes ("30(b)(6) Meyer-Hawkes Dep.") at 218:16-219:4.

---

[11] *See* Ex. 4 setting forth the Class Plaintiffs seek to certify, including definition, proposed representative, counsel, and claims.

[12] Brad Dorfmann, "Smucker to buy P&G's Folgers in $3 bln stock deal," Reuters, June 4, 2008, https://www.reuters.com/article/us-folgers-smucker/smucker-to-buy-pgs-folgers-in-3-bln-stock-dealidUSWNAS687320080604, last accessed June 19, 2026. *See also* J.M. Smucker Company Form 10-K for Fiscal Year ended April 30, 2012, and filed with the SEC on June 25, 2012 ("2012 10-K") at p. 2; Ex. 5, Deposition of James Trout ("Trout Dep.") at 46:1-3.

[13] J.M. Smucker's Annual Report on Form 10-K for Fiscal Year ended April 30, 2022, and filed with the SEC on June 16, 2022 ("2022 10-K") at p. 25.

[14] 2022 10-K, p. 31; Nils-Gerrit Wunsch, "J.M. Smucker's global net sales share worldwide in 2017, by segment," Statista, Nov. 20, 2020, at https://www.statista.com/statistics/873759/global-net-sales-share-of-the-jm-smucker-company-by-segment (last accessed June 19, 2026).

[15] https://www.folgerscoffee.com/ (last visited June 19, 2026).

### B. Folgers is the Market Leader with Millions in Annual Sales

Folgers products have been sold nationally by J.M. Smucker since it acquired Folgers. Trout Dep. at 45:1-5. Since 2008, Folgers has consistently been the top selling ground coffee canister product in the United States.[16] [redacted] Werner IR, Schedule 1. [redacted] 30(b)(6) Meyer-Hawkes Dep. at 334:15-335:1. By any account, Folgers has been and continues to be America's top brand of roast and ground-canister coffee. 30(b)(6) Meyer-Hawkes Dep. at 334:15-335:4. [redacted] Ex. 3, FOL00000001; Werner IR, Schedules 4, 21a. [redacted]. Werner IR, Schedules 5, 27a.

### C. The Ground Coffee Products in Dispute

Regardless of roast or size, each of the Products have a similar label (the "Label").[17] Each Label appears prominently on the front of the coffee canisters and indicates via the Cups Claim graphic on the top right of the Label that the coffee grounds in the canister "MAKES UP TO" a certain quantity of "6 FL OZ CUPS" of coffee.[18] The quantity of cups differs from canister to canister depending on their size. *Id*. Other than the quantity, the Cups Claim graphic has appeared the same on all Products through the class period, shown below:[19]

[16] *See, e.g.*, Ex. 7, FOL00002200; Ex. 8, FOL00002202; Ex. 9, FOL00002404; Ex. 10, FOL00202529 at 4; Ex. 11, FOL00076320 at 4; Ex. 12, FOL00137721 at 3; Ex. 13, FOL00329293; and Ex. 14, FOL00331636.

[17] *See* Exs. 15-28, 30(b)(6) Meyer-Hawkes Dep. Exs. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15.

[18] *Id*.

[19] *See* Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 52:6-53:24, 56:22-58:2, 59:1-13, 60:14-61:1, 62:9-63:3, 65:1-21, 66:4-11, 71:13-24, 72:22-73:7, 73:17-22, 74:10-75:18, 76:5-7, 77:15-79:10, 81:13-24, 82:7-10, 82:14-18, 83:2-12, 83:18-20, 84:15-25, 85:6-12, 86:2-12, 87:1-6, 87:20-89:5.




On the side of each canister, Defendants provide instructions on how to brew the coffee. *See* Ex. 29, October 4, 2022 30(b)(6) Deposition of Christopher Mickowski ("Oct. 4 Mickowski 30(b)(6) Dep.") at 84:23-85:10. The brewing instructions first tell consumers to use one tablespoon of ground coffee to make one serving (6 fl. oz.) of coffee (the "single serving method").[20] A second instruction directs consumers to use one-half of a measuring cup of ground coffee to make ten servings, meaning ten 6 fl. oz. cups of coffee (the "half-cup method").[21] The Labels do not indicate that a half cup is less than 10 tablespoons or that the half-cup method is more diluted than a 1 tablespoon to 1 serving ratio.[22] Thus, even if the Products meet the Cups Claim under the half-cup method (they do not), the Products are still misleading because consumers are led to believe the Products will meet the claim under the single serving method, as discussed further below. The brewing instructions have remained the same on all Products throughout the class period.[23]

---

[20] *See* Exs. 15-28, 30(b)(6) Meyer-Hawkes Dep. Exs. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15.

[21] *Id.*

[22] Defendants have produced no evidence that they researched whether consumers understand that one half cup equals 8 tablespoons. *See* Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 110:1-6.

[23] *See* Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 54:22-55:25 (Folgers Classic Roast 30.5 oz. label); 60:8-13, 61:5-10 (Folgers Black Silk 24.2 oz. label); 63:4-10, 63:18-23 (Folgers Breakfast Blend 25.4 oz. label); 65:22-66:3, 66:12-16 (Folgers Classic Roast 48 oz. label); 71:2-5 (Folgers Classic Roast 51 oz. label); 72:9-13 (Folgers Coffeehouse 25.4 oz. label); 73:8-16, 73:23-74:3 (Folgers 100% Columbian 24.2 oz. label); 75:13-15, 76:5-7 (Folgers Country Roast 25.1 oz. label); 81:25-82:18 (Folgers French Roast 24.2 oz. label); 83:13-17, 84:4-6 (Folgers Gourmet Supreme 24.2 oz. label); 85:1-5, 85:13-17 (Folgers House Blend 24.2 oz. label); 86:13-17, 87:7-11 (Folgers Simply Smooth 31.1 oz. label); 89:23-90:6 (Folgers Special Roast 10.3 oz. label); *see also* Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 81:14–82:3 (Defendants made the decision regarding the brewing instructions "to try to standardize that across the products."), 85:6-85:10 (testifying that Defendants were unaware of "any labels that have been used by Folgers that did not have the brewing recommendation on them."), and 85:15-86:25 (confirming that regardless of the product and the canister size, the labels contain the same brewing instruction language as seen in Ex. 30, FOL00020025).




Moreover, all canisters within a Product line (e.g., Classic Roast 30.5 oz.) follow the same formula and all Labels are consistent based on size and roast. *See* Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 112:8-19 ("everything in a canister would be the same formula"), 117:14-23 (labels are consistent), 118:24-119:21 (a Folgers Classic Roast 30.5 oz. canister bought in California and one bought in New York should be the same if not substantially the same), 120:4-5 ("we're going to hit our marked weight regardless of the variety."); Ex. 31, Deposition of Doug Hennig ("Hennig Dep.") at 143:16-143:20 ("we try and make sure that our products are consistent and uniform that the consumers can have great experience every time.").[24]

**D. Common Evidence Shows That The Cups Claim Is Material to Consumers**

Plaintiffs' materiality and consumer perception survey expert, Dr. J. Michael Dennis, Ph.D., performed a survey to measure whether the Cups Claim is material to consumers' purchase decisions. Dr. Dennis's survey concluded that "79.8% of respondents preferred to purchase the Products *with* the Challenged Descriptor compared to only 14.3% for the Products *without* the Challenged Descriptor[,]" and thus that "the reasonable consumer finds material the Challenged

[24] Defendants use "weight cards" that list specifications for each Product line so that when they manufacture the Products "all plant systems and the specifications they set up match the specifications." Ex. 31, Hennig Dep. at 95:11-96:23. During the manufacturing process, Defendants track the Products' specifications to ensure the Products remain consistent. *Id.* at 166:5–167:9; *see also id.* at 223:7-12 ("We want consistency and we want to make sure . . . we are delivering the same product no matter what line we are producing it on."). Likewise, the Products have a consistent outage specification. "Outage" refers to the amount of space between the packed ground coffee and the top of the canister. Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 46:19-47:2; Ex. 31, Hennig Dep. at 47:15-17, 49:16-19 [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 53:15-16 [redacted]

Descriptor in terms of influencing their purchase decisions (compared to Products not having the Challenged Descriptor)." Dennis IR ¶ 87 (emphasis in original).[25]

Dr. Dennis's results are also consistent with the results of Plaintiffs' conjoint survey expert, Dr. Samantha Iyengar, Ph.D., who devised and conducted a Choice-Based-Conjoint ("CBC") survey "to evaluate the extent to which the contested statements (*i.e.,* representations that a product contains enough ground coffee to make "up to" a given number of servings) impacted consumers' preferences for the ground coffee products at issue." Iyengar Initial Report ("Iyengar IR") ¶ 7.[26] Dr. Iyengar's CBC survey used six product attributes that would typically be available to consumers in the marketplace—brand, flavor and roast, packaging type, net weight, number of 6 fl. oz. servings, and price—and then used a mixed logit model to estimate the influence of each attribute on the choices made by the survey respondents. Iyengar IR ¶¶ 32-42, 51-54. Dr. Iyengar concluded "that there is a statistically significant positive association between number of servings and the likelihood of selecting a product, such that consumers prefer ground coffee products with a greater number of servings. In other words, consumers are more likely to select a ground coffee product that is shown as making a larger number of 6 fluid ounce servings as compared with an otherwise identical product that is shown as making fewer 6 fluid ounce servings, holding all else constant." Iyengar IR ¶ 56.

The materiality of the Cups Claim to consumers (and the Products' shortfall with respect thereto) is also supported by the voluminous body of consumer complaints and questions Defendants have received during the class period that were produced in discovery, including, *inter alia*:

---

[25] Dr. Dennis also concluded that these consumer preferences do not vary based on individualized characteristics (*i.e.,* age, gender, geographical region, etc.). Dennis IR ¶¶ 30, 85.

[26] As Dr. Iyengar explains, "Conjoint surveys have been used in the field of market research for more than 50 years and are a widely accepted methodology for measuring consumer preferences and purchase decision making." Iyengar IR ¶ 11. Defendants' expert, Dr. Ran Kivetz, appears to agree with this. *See* Ex. 32, Deposition of Dr. Ran Kivetz ("Kivetz Dep.") at 162:18-163:10.

- August 2, 2017: "I did not get the right amount our [sic] of the can. How do you come up with the serving size?" Ex. 33, FOL00005982 ("Complaints" tab, Case ID 12255140);

- August 3, 2017: "Per the label, a 10.8 oz canister has 90 – 1 tablespoon servings, 1 for every 6 ounces of water. I always use 2 level tablespoons for 12 ounces of water so should expect to get at least 45 servings. However, I'm almost done with my current canister and am nowhere near 45 servings. Was just wondering how Folgers came up with the number of servings." Ex. 83, FOL00023639;

- October 22, 2018: "How can 30oz can make 240 cups? That's misleading marketing." Ex. 34, FOL00011482 ("Data" tab, Case ID 13095656);

- "I am really upset about this. I do not understand that I am getting less ounces but how can I get more cups of coffee. That is false advertising. I am not gonna buy your product again. If I use the same amount to make a pot of coffee, how can I get more cups with that much less ounces." Ex. 35, FOL00027869 ("Verbatim" tab, Case ID 8699296);

- June 19, 2019: "The canister is short of coffee content. So, about 16 cups of brewed coffee we don't get because of the shortage." Ex. 36, FOL00011494 (Case ID 13759230);

- November 26, 2019: "You have false advertising, pure and simple, when you state you would get 305 cups of coffee from a 38.4 oz container." Ex. 36, FOL00011494 (Case ID 14030741);

- "You now state that the 52 oz will make 360 six oz cups. The 48 oz will make 380 six oz cups." Ex. 35, FOL00027869 ("Verbatim" tab, Case ID 8700921);

- "I just happened to look at two plastic containers of your Classic Roast coffee—one says it can make 360 cups of coffee . . . one says it can make 380 cups of coffee . . . I would like to know how this is possible, making more coffee with less . . ." Ex. 35, FOL00027869 ("Verbatim" tab, Case ID 8699002);

- "I just got this new size container and it has less ounces but more cups of coffee. How can that be?" Ex. 35, FOL00027869 ("Verbatim" tab, Case ID 8700787);

- "Why does the 1st can make 360 cups and is 52 oz. While the second can has 48 0z [sic] and makes 380 cups. How is this possible?" Ex. 35, FOL00027869 ("Verbatim" tab, Case ID 8700778);

- "Trying to cheat the public. 13 oz can of coffee makes up to 90 cups. 11.3 Oz can of coffee makes up to 90 cups." Ex. 35, FOL00027869 ("Verbatim" tab, Case ID 8698927);

- "I have complaint regarding the deceptive advertising practice being used regarding the number of cups available that is printed on the label of the Folgers container." Ex. 35, FOL00027869 ("Verbatim" tab, Case ID 8699335);

- July 22, 2019: "I would like to know the fuzzy math that gets 240 cups of coffee out of a 30.5 ounce canister at 1 TB per cup." Ex. 36, FOL00011494 (Case ID 13810346);

- "Why does this larger (32 oz) container make 40 cups less of coffee than the smaller 30.5 can?" Ex. 36, FOL00011494 (Case ID 13969165); and
- "How is it that the 25.1 oz canister and the 31.1oz canister [of the Country Roast] yield the same exact number of servings, which is 240?" Ex. 36, FOL00011494 (Case ID 13643339).[27]

In truth, Defendants are keenly aware of the importance consumers place on the Products' yield,[28] even going so far as to prepare and internally distribute a Q&A document with standard responses to customer inquiries about the Cups Claim following one of Defendants' campaigns to shrink the Products' net weight.[29] [redacted] Internal correspondence from J.M. Smucker's former Director of Research & Development, Nancy Lakes, similarly notes, "when we ask a consumer about package size they will often say . . . 'I use the 90 cup one'." Ex. 44, FOL00396708; *see also* Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 97:16-21 (Q. "Has -- has [J.M. Smucker] ever researched whether the cup-claim graphic is a factor in consumer purchase decisions?" A. "We have done research." Q. "Can you describe that?" A. "We've done a lot of research.").[30]

---

[27] *See also* Ex. 37, FOL00327224, slide 9 ("Consumers questioned how Country Roast achieved the lower oz weight while maintaining 240 cups.").

[28] *See, e.g.*, Ex. 38, FOL00175456 [redacted] Ex. 39, FOL00275313 [redacted] *see also* Ex. 5, Trout Dep. at 276:22-277:1 ("Smucker tracks complaints broadly and has been doing so for longer than five years.").

[29] *See* Ex. 40, FOL00012561 (The questions include: "Why is there a change to the marked weight but no change to the cups"; "How is the technology able to deliver on the same number of cups with less ounces in the can?"; and "You reduced your weight by 19% but only reducing our price by 7%, why?"); *see also* Ex. 41, FOL00090390 (Email dated March 9, 2018 from Adam Cordea to Josh Marshall, et al.: "A consumer called and brought to my attention some questions . . . .[t]he second question was about how coffee that has 6 ounces less of product can make the same amount of cups and she commented that it is ***deceiving***.") (emphasis added); Ex. 42, FOL00007205 (consumer Q&A document dated June 7, 2015, titled "Downsize Announcement Questions" and including questions like "Why are you downsizing your products?"; "I loved that you still offered 270 cups! Why did you lower this?"; and "Does this change the way I should brew my coffee?").

[30] This evidence of materiality is likewise consistent with market research and consumer data analytics companies' evidence that food labeling is important to consumer choice and demand for packaged food

### E. Common Evidence Shows That Consumers Believe the Products Will Meet The Cups Claim Under All Brewing Instructions

Dr. Dennis also performed a survey to address how consumers perceive the Cups Claim. *See* Dennis IR ¶¶ 20, 27. Specifically, Dr. Dennis was asked to measure consumers' perceptions of the brewing language (single serving per tablespoon vs. 10 servings per one half cup) in terms of whether or not the Products will make the same total number of servings when brewing one cup at a time versus 10 cups at a time. Dennis IR ¶ 20. According to the survey data (n=555 interviews), 72.4% of consumers perceived the brewing language to mean that the Products "will make the same total number of cups of coffee when making one cup at a time and when making 10 cups at a time." *Id.* ¶ 27.[31] Thus, as Dr. Dennis explained, "[a] substantial majority of consumers [] perceive the Challenged Descriptor [Cups Claim] to mean that it will make the same total number of cups of coffee when making one cup at a time and when making a pot." *Id.* ¶¶ 27, 86 (concluding this is understanding of the "reasonable consumer").

Notably, this conclusion is consistent with what Defendants state on their website. Although it was taken down after this action was filed, Folgers' website used to include a webpage entitled "How to Measure Coffee Cups Calculator."[32] That webpage confirmed that 1 serving of coffee uniformly required 1 tablespoon of ground coffee for "household coffee makers" (i.e., "[n]ot for use with foodservice machines."). *Id.* It also featured an interactive calculator which calculated how much ground coffee to use depending on how many cups the user desired to brew. Remarkably, regardless of how many cups were input by the user, the webpage calculator universally followed the single serving instruction by instructing the user to use 1 tablespoon of ground coffee per serving (*e.g.*, 100 desired cups = 100 tablespoons of ground coffee), completely ignoring the half-cup method. *See* Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 312:15–313:11

---

products. *See* Werner IR ¶ 25 (providing numerous examples, including from Nielsen, Forbes, the FDA, and Consumer Reports).

[31] Compared to only 22.5% of consumers who did not believe both methods would make the same number of cups and 5.0% who did not have an opinion. *Id.*

[32] *See* Ex. 45, FOL00019858 (webpage printout). The "calculator" portion of the webpage was taken down following the inception of this litigation, but as of Sept. 14, 2020, could be found at https://www.folgerscoffee.com/coffee-how-to/how-to-measure-coffee (last visited Sept. 14, 2020).

(claiming that the results produced by the cups calculator were "not accurate" because it did not track the "half-cup brewing recommendation that we tie everything back to."); Ex. 46, Deposition of Joshua Marshall ("Marshall Dep.") at 157:5-21 (claiming the cup calculator was "erroneous").

More remarkably, Folgers' website also had a webpage entitled "How to Make Coffee In A Coffee Maker" that provided the following written instructions (accompanied by a "How-To" video) for brewing a ***pot*** of coffee: "Add the desired amount of grounds to the filter: about ***1 tablespoon per 5 to 6 fluid ounces of cold water for regular coffee, and 2 tablespoons per 5 to 6 fluid ounces for strong coffee***." This webpage was removed following the submission of Plaintiffs' Opposition to Defendants' Motion to Dismiss. ECF No. 84.[33] However, the **most recent** version of that webpage,[34] entitled "How to Make Coffee With A Drip Coffee Maker," also features a video and states "For the recommended drip coffee ratio, ***add 1 tablespoon* of Folgers® coffee grounds to the filter for every 6-fluid ounce serving you plan to make. *Use a measuring spoon to ensure the exact amount.***" *Id.* (emphasis added). Despite being a tutorial on brewing a *pot* of coffee, the webpage—like its former version and the cup calculator before that—completely fails to mention or otherwise follow the half-cup method. Dr. Dennis's perception survey results are therefore consistent with what Defendants have long been telling consumers via their publicly accessible website.

### F. The Products Fail to Meet the Cups Claim Under *Either* Brewing Instruction

Plaintiffs' legal metrology expert, Carol Hockert, who has more than 25 years of experience in measurement science, was retained to "determine whether the contents of containers of Folgers coffee could produce the number of cups of coffee claimed on the container if the

---

[33] *See* Ex. 47, FOL00028735-FOL00028738 (printout of the "How to Make Coffee In A Coffee Maker" webpage at https://www.folgerscoffee.com/coffee/how-to/make-coffee). An archived version of the webpage can be found here: http://web.archive.org/web/20210621163615/ https://www.folgerscoffee.com/how-to/make-coffee (last accessed March 22, 2023).

[34] *See* https://web.archive.org/web/20240208041021/https://www.folgerscoffee.com/coffee/how-to/make-coffee (last accessed March 22, 2023).

brewing instructions are followed." Hockert IR ¶ 1.[35] Although the question of whether or not the Products meet the Cups Claim is not relevant for class certification purposes, Plaintiffs provide a brief overview of Ms. Hockert's preliminary findings below. Ms. Hockert tested 176 Folgers ground coffee canisters ranging in variety and size to determine the number of cups that could be prepared from each canister based on both the single-serving and half-cup brewing instructions. Hockert IR ¶ 25. Ms. Hockert's robust and reliable methodology included, *inter alia*: (1) obtaining samples from a wide variety of popular retailers, including Walmart, Target, HyVee, Cub Foods, Amazon, and Sam's Club;[36] (2) using a scientifically calibrated balance to determine the actual net weight of each canister; (3) emptying the ground coffee into another vessel and agitating it before scooping it; (4) using a scientifically calibrated tablespoon and half-cup measuring cup to scoop and measure the ground coffee to determine their average tablespoon weight[37] and average half-cup weight;[38] and (5) dividing the net weight of each canister by the average measured weight of tablespoon and half-cup ground coffee to calculate the maximum yield of each canister under each brew method. *Id.* ¶¶ 13-16, 25. Importantly, Ms. Hockert's methodology was consistent with Defendants' own internal methodology. *See* Ex. 50, FOL00028620 [redacted]; *infra* n.40.

---

[35] Ms. Hockert's report deftly lays out her qualifications, showing her to be pre-eminent in the field of measurement science, (Hockert IR ¶¶ 2-11), as well as the precise methodology she followed in obtaining and testing the Products. *Id.* ¶¶ 13-18.

[36] Thus, Ms. Hockert was testing the Products in the same state as when they reach consumers.

[37] Notably, Ms. Hockert's tablespoon weight measurements [redacted] *See* Ex. 48, FOL00024292 [redacted] Ex. 48, FOL00024218 (same); Ex. 46, Marshall Dep. at 162:14-22 (agreeing that 1 tablespoon of coffee weighs 4.5 grams); Hockert IR. Ex. 5 at pp. 1-10, 17-26 (calculating average weight of 1 tablespoon of Classic Roast 22.6 oz (180 cup count) Product from 4.701 to 4.802 grams).

[38] For each canister, Ms. Hockert measured twenty tablespoons and five half-cups in order to calculate the average weight of a tablespoon and a half-cup of ground coffee. Hockert IR ¶ 16. Mr. Mickowski, Defendants' Rule 30(b)(6) designee, agreed that it is recommended to scoop more than 1 or 2 tablespoons or more than "a few scoops" to minimize variability when determining the number of tablespoons within a package. Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 306:18-307:7. Here, Ms. Hockert minimized variability through taking a wide-range of measurements, and analyzed her calculations to confirm that they are within the margin of error and "well within the expected variation of the measurement." Hockert IR ¶ 20.

Ms. Hockert weighed over *3,500 tablespoons* and *880 half-cups* of Folgers coffee and concluded that ***none*** of the 176 canisters tested could produce the number of cups claimed on the canister—regardless of which method was used. *See* Hockert IR ¶¶ 23-25. She went on to conclude: "[b]ased on the results of many measurements, the calculations performed as described above, and my experience as a measurement scientist, I conclude that if a consumer followed the directions on the package, they would not be able to realize the number of cups of coffee claimed on the container for any of the products tested. The methodology used to reach these conclusions could be expanded as needed to accommodate any sample size." *Id.* ¶ 28.

### G. Defendants' Purported Method for Validating The Cups Claim is Flawed and Not Consistent with the State of the Coffee When Consumers Purchase It

Although this is a merits-issue not relevant to this Motion, Plaintiffs note that Defendants do have [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 97:17-98:5, 127:18-128:4; Ex. 51, FOL00000003-FOL00000004. The problem with this formula is two-fold. [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 100:12-13. [redacted] *See* Hockert IR ¶ 24.[39] Second, and more importantly, the formula is [redacted]

[39] As to the single serving brewing method, Defendants cannot and do not dispute that the Products do not meet the Cups Claim according to this method. *See* Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 118:21-120:25; Ex. 52, FOL00278450 ("Making individual servings will not yield the maximum amount of brewed coffee cups.")

[40] [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 41:22-42:12. [redacted] *Id.* at 42:11-12. [redacted] *Id.* at 42:13-16. [redacted] *Id.* at 41:22-42:21. Two points should bear in mind

[redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 69:2-11, 69:21-25, 135:22-136:7; *see also* Ex. 54, FOL00020569 [redacted]

Interestingly, Defendants' in-house coffee scientist and first-time expert witness, Christopher Mickowski, actually calculated densities based on the weight measurements made by Ms. Hockert and found they were [redacted] *See* Ex. 55, February 9, 2023 Deposition of Christopher Mickowski in his Individual Capacity ("Feb. 9 Mickowski Individual Dep.")[41] at 22:17-24:19, 28:4-25, 29:19-30:13. Nevertheless, in spite of this glaring evidence, [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 71:21-23 [redacted] But despite Plaintiffs' request, Defendants have produced zero documentation to support these claims by Mr. Mickowski.[42] Moreover, it is unclear whether Defendants have actually conducted any off-

here. First, this method mirrors what Ms. Hockert did in that pre-specified volumes of ground coffee were weighed (tablespoon and half measuring cup), and the resulting weight (i.e., mass) was divided by the volume (of the canister) to determine the number of servings the canister would yield. [redacted] *See* Ex. 53, ISO Standard No. 6669:1995 at https://www.iso.org/obp/ui/#iso:std:iso:6669:ed-1:v1:en, last accessed June 19, 2026 (ISO 6669 specifies the bulk density measurement process as the "[r]atio of the mass of green or roasted coffee to the volume it occupies (mass per unit volume) after it has been allowed to pour freely into a measuring receptacle[.]"). However, the ISO 6669 expressly applies to ***coffee beans, not ground coffee***, and even states "[t]he method is not recommended for measurement of the bulk density of ground roasted coffee." Ex. 53, ISO 6669, p.1.

[41] Mr. Mickowski was deposed on two separate occasions: October 4, 2022 (as a 30(b)(6) and 30(b)(1) witness), and February 9, 2023 (as an expert witness and a 30(b)(6) witness).

[42] *See* Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 389:14-24 [redacted] Ex. 5, Trout Dep. at 184:8-19 [redacted]

the-shelf testing,[43] as they have steadfastly refused to produce any documents or testimony related to the existence or absence of off-the-shelf testing to see whether the Products meet the Cups Claim.[44]

### H. The *Real* Reason Defendants Kept the Cups Claim was to Reassure Consumers that the Products were the Same Despite Defendants' Ongoing Shrinkflation Campaign

In [redacted] Defendants began the first of several iterations of what is known [redacted] Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 161:13-15; Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 16:23-17:5; Ex. 31, Hennig Dep. at 43:11-13 [redacted] The goal of [redacted] Ex. 5, Trout Dep. at 148:3-7; Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 16:23-17:5.

[redacted] is inextricably linked with the Cups Claim. As J.M. Smucker's Vice President of Coffee Research and Development, James Trout, explained: [redacted] Ex. 5, Trout Dep. at 6:16-22; 64:20-23. [redacted]

---

[redacted]

[43] *See* Ex. 5, Trout Dep. at 164:21-23 ("We – products research does not test products off the shelf regularly."), 165:21-23 ("I am not aware of any off-the-shelf testing programs.").

[44] *See, e.g.*, Ex. 46, Marshall Dep. at 171:13-172:4 (refusing to answer if he recalled whether he conducted off-the-shelf density testing), 173:17-174:1 (same), 229:21-230:12 (refusing to answer if he has tested an entire canister with a tablespoon), 231:17-232:4 (refusing to answer if he has tested an entire canister with a half cup), 234:6-235:1 (refusing to answer if he has "tested a Folgers ground coffee product for whether it meets the cups claim after it's been packed and sealed?").

[45] Ex. 56, FOL00022071 [redacted] Ex. 31, Hennig Dep. at 119:15-16 [redacted] 120:10-121:7 [redacted] 127:5-128:2 [redacted] 129:15-19; Ex. 5, Trout Dep. at 64:20-65:25 [redacted]

[redacted] *See* Ex. 59, FOL00024678 [redacted] Ex. 46, Marshall Dep. at 97:19-98:7 [redacted] *See* Ex. 60, FOL00026610-FOL00026611 [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 262:6-263:6 (discussing FOL00026622 and stating, [redacted] J. M. Smucker's VP of R&D, James Trout, stated the obvious during his deposition: [redacted] *See* Ex. 5, Trout Dep. at 152:7-153:5 ("if you reduce the density of a constant volume, and if you end up with less weight, then – and everything else is equal . . . you would be introducing less caffeine into a cup because you have less weight, if everything else is equal.").

In an email chain from July 2021, Sr. Technologist, Courtney Benson emailed Mr. Mickowski, stating the [redacted] Ex. 1, FOL00148022. That email also contemplates, [redacted]

[46] Ex. 29, Oct. 4 Mickowski 30(b)(1) Dep. at 342:13-21; Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 134:23-135:2 (confirming the intent of [redacted] 167:10-20; Ex. 46, Marshall Dep. at 47:3-13, 47:20-48:4 (referring to Ex. 57, FOL00023900); Ex. 57, FOL00023900 [redacted] Ex. 5, Trout Dep. at 223:10-14; Ex. 58, FOL00423352.

[redacted] *Id.* (emphasis added). Defendants have not produced any documents suggesting they ever made an effort to inform consumers about [redacted]. Thus, not only did [redacted]

Defendants continue to maintain the Cups Claims on the Products' labels for the sole purpose of continuing to mislead consumers "that their experience would not change with the change of net weight." *See* Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 135:12-19, 166:23-167:9 (Folgers keeps the Cups Claims to "ensure consumers did not have a behavior change" [redacted], 169:18-21; Ex. 5, Trout Dep. at 149:9-19 ("[K]eeping it [the Cups Claim] the same . . . helps assure consumers that – that they're getting the same number of serving across the change.").[48] In other words, the Cups Claim is intended to stand for the counterintuitive proposition that consumers are receiving the same amount of coffee despite the drop in net weight.[49]

Any attempt by Defendants to argue that the Cups Claim is not material to consumers is expressly contradicted by the discovery documents and testimony produced in this case. When Folgers internally considered removing the Cups Claim,[50] it received strong pushback from retailers and its own internal sales team who were concerned that the removal of the Cups Claim

---

[47] *See* Ex. 6, 30 (b)(6) Meyer-Hawkes Dep. at 150:12-23, 260:4-6 (Q. "How did price per ounce on Folgers coffee go up or down [redacted] A. "Price per ounce would go up.").

[48] *See also* Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 95:10-17 (the Cups Claim was added to Folgers' front label [redacted] to help with the conversion for the customers and consumers and to deliver more consistency across the different product lines."), 181:21-182:10 ("The basis of the servings claims, we added them [redacted] to - - for both our consumers and customers to help them with the education of the change."); Ex. 44, FOL00396708 ("Several years in advance [redacted] we began putting cups claims on the package, in anticipation of the change. As we got closer to launch, we made Cups Claims more prominent.").

[49] Ex. 33, Hennig Dep., available at https://www.tiktok.com/@divinebpqueen/video/7126883665283697966.

[50] Ex. 46, Marshall Dep. at 55:13-20; Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 199:14-200:4 ("Once the weights are in the market and established, then we would take the [Cups Claims] messaging off the label."); Ex. 61, FOL00026325.

would (correctly) cause consumers to view [redacted] downsizes as shrinkflation. *See* Ex. 62, FOL00141328 ("The optics of removing the cups claim would be like we're hiding what we're doing with the downsize."); Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 131:12-134:22 (discussing Ex. 62, FOL00141328); *see also* Ex. 39, FOL00275313 at slide 3 ("There are concerns about consumers perceiving the product as a poorer value"); Ex. 63, FOL00415154 ("Buyer did have some concerns with the timing of which we're going to roll out herc, mentioning 'shrinkflation' multiple times during the call."); Ex. 38, FOL00175456 ("Sounds like we are already addressing her biggest pushback on consumer perception of the 'Shrinkflation' . . . I think once consumers learn same cups per cannister this will not be a major issue."). Interestingly, Defendants viewed the possibility of consumers perceiving [redacted] downsizes as "shrinkflation" as the "large[st] risk to our business and brand equity." Ex. 64, FOL00196668 (email entitled [redacted] listing several "Shrinkflation" articles and stating, "I honestly can't think of a larger risk to our business and brand equity than this.").

Ironically, avoiding the appearance of consumer deception was among Folgers' chief motivations in deciding to keep the Cups Claim. *See* Ex. 6, 30(b)(6) Meyer-Hawkes Dep. at 163:11-164:16. Indeed, in 2018, Defendants commissioned [redacted] *See* Ex. 39, FOL00275313; *see also* Ex. 29, Oct. 4 Mickowski Dep. 30(b)(6) at 251:24-252:22, 253:12-23 (discussing Ex. 39, FOL00275313). More to the point, during 2021, Folgers even went so far as to produce a Q&A-type video for its internal sales team so that they could better assuage retail store customer concerns over [redacted] downsize. *See* Ex. 65, FOL00080866 ("Creative Brief" for [redacted] Science Video" explaining "Market Objective/Goal" to "execute a flawless transition as this new process involves customer and consumer changes. A key component of this is ***convincing our sales and ultimately, our customers, that this is not smoke and mirrors***.") (emphasis added); Ex. 66, FOL00175166 (video pre-production book slides); Ex. 67, FOL00080867 ("We should also mention the Cups Claims meaning they aren't changing as customers really like to know its

still the same cups and not just another downweight."); Ex. 68 FOL00175145-FOL00175147 (email chain discussing upcoming filming of "Folgers [redacted] video shoot"); Ex. 69, FOL00080863-FOL0080865 ("Please note this [video] is internally facing but could be presented to a customer in a closed meeting setting.").[51] Of course, nowhere in the video does Folgers indicate that the strength of the coffee is weaker, less caffeinated or generally more diluted. *See* Ex. 66, FOL00175166; Ex. 72, FOL00340368-FOL00340374.

Finally, Defendants have profited tremendously from the [redacted] shrinkflation campaigns to the tune [redacted]. According to Mr. Trout, [redacted] Ex. 5, Trout Dep. at 206:25-207:14, 208:4-12; Ex. 29. Oct. 4 Mickowski 30(b)(6) Dep. at 192:11-193:11 [redacted] *see also* Ex. 61, FOL00026325 [redacted] Ex. 73, FOL00396245 (listing "total platform savings per year [redacted] Ex. 74, FOL00434953 [redacted][52]

## III. SUGGESTIONS IN SUPPORT

### A. The Claims Plaintiffs Seek to Certify

Plaintiffs seek to certify a California statewide class for violations of consumer protection statutes, common law fraud, unjust enrichment/quasi-contract, and breaches of implied and express warranties under the laws of California, all of which are regularly certified.

---

[51] *See also* Ex. 5, Trout Dep. at 310:12-16 (Q. "did Smucker produce any video to educate retail customers on [redacted] A. "There was a video produced."), 321:9-323:12 (discussing format of the [redacted] informational video); Ex. 70, FOL00340350-FOL00340352 (listing questions regarding [redacted] Ex. 71, FOL00340349 (email chain regarding [redacted] meeting).

[52] [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 170:18-171:10; *see* Ex. 75, FOL00026278 [redacted] Ex. 5, Trout Dep. at 207:22-208:3 [redacted] Ex. 29, Oct. 4 Mickowski 30(b)(6) Dep. at 169:10-170:10 [redacted]

Public policy strongly favors certification of consumer class actions. Indeed, "class actions to enforce compliance with consumer protection laws are 'desirable and should be encouraged.'" *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 484 (C.D. Cal. 2012) (quoting *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 600 (E.D. Cal. 1999)) (cleaned up); *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007) (same); *Johns*, 280 F.R.D. at 555 (same). Any doubts a court has about class certification should be resolved in favor of certification. *Baghdasarian v. Amazon.com, Inc.*, 258 F.R.D. 383, 386 (C.D. Cal. 2009). "The value of individual claims also make class certification desirable" where, as here, "it does not appear that such individual actions would be viable to pursue in the event the claims made are meritorious." *Grayson v. 7-Eleven, Inc.*, No. 09CV1353-MMA WMC, 2012 WL 1059902, at *5 (S.D. Cal. Mar. 28, 2012). Recognizing this policy, district courts across the country routinely certify consumer class actions arising from alleged violations of consumer protection statutes.

With respect to Plaintiffs' unjust enrichment claim, a "straightforward statement" that a company "'entic[ed]' plaintiffs to purchase their products through 'false and misleading' labeling, and that [the defendant] was 'unjustly enriched' as a result . . . is sufficient to state a quasi-contract cause of action." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Such claims are well-suited for class treatment because they are established largely based on the consistent conduct of the defendant—namely, the deceptive labeling. *See*, *e.g.*, *Smith v. Keurig Green Mountain, Inc.*, No. 18-CV-06690-HSG, 2020 WL 5630051, at *5 (N.D. Cal. Sept. 21, 2020) (granting certification for unjust enrichment/quasi-contract in a deceptive trade practices case where the deceptive label at issue "raise[d] the same legal issues as to all class members.").

Further, breach of express warranty claims are regularly certified for class treatment since these warranties can be established through common proof and are presumed to be part of the basis of the bargain, and thus, material to reasonable consumers. *Tunick v. Takara Sake USA Inc.*, 806 F. Supp. 3d 912, 930 (N.D. Cal. 2025). *See also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 984 (C.D. Cal. 2015); *Shin v. Sanyo Foods Corp. of America*, 348 F.R.D. 477, 487 (C.D. Cal. 2025). For the same reasons, implied warranty claims are routinely certified. *See Tait*, 289 F.R.D.

at 485; *see also In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 997–98 (N.D. Cal. 2022).

Likewise, common law fraud claims can be established by common evidence as to all class members, "making this cause of action appropriate for class certification." *Falco v. Nissan N. Am. Inc.*, No. CV 13-00686 DDP (MANx), 2016 WL 1327474, at *11 (C.D. Cal. Apr. 5, 2016).

### B. Legal Standard for Class Certification

A class action is properly certified when plaintiffs demonstrate that the proposed class satisfy Rule 23(a)'s four requirements of numerosity, commonality, typicality, and adequacy along with at least one subsection of Rule 23(b). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019, 1022 (9th Cir. 1998). In evaluating whether a motion for certification should be granted, a court must accept the plaintiffs' substantive allegations as true and not assess the likelihood of success on the merits. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). Class treatment "save[s] the resources of both the courts and the parties 'by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.'" *Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005), *amended* No. 03-17095, 2005 WL 1154321 (9th Cir. May 17, 2005); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (policy at core of class actions is to permit adjudication of small claims); *Suchanek v. Sturm Foods, Inc.*, 764 F. 3d 750, 759 (7th Cir. 2014) (same).

### C. Application of Rule 23

"When a transferee court receives a case from the MDL Panel, the transferee court applies the law of the circuit in which it is located to issues of federal law." *In re Gen. Am. Life Ins. Co. Sales Practices Litig.,* 391 F.3d 907, 911 (8th Cir. 2004). But in considering class certification, the law of the transferor circuit still "merits close consideration" and should be applied so long as it does not conflict with precedent of the transferee circuit and "to the extent that the Court finds its

reasoning sound." *In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1074 (C.D. Cal. 2010) (quoting *In re Korean Air Lines Disaster,* 829 F.2d 1171, 1176 (D.C. Cir. 1987)).

Here, the Court should apply Ninth Circuit law because the applicable standard and rigor of review under Rule 23 is substantially the same as in the Eighth Circuit. *Compare Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc) ("Before it can certify a class, a district court must be 'satisfied, after a rigorous analysis, that the prerequisites' of both Rule 23(a) and 23(b)(3) have been satisfied.") (internal citation omitted) *with In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 611 (8th Cir. 2011) ("When deciding whether common issues predominate over individual issues under Rule 23(b)(3), the court should conduct a 'rigorous analysis' including an 'examination of what the parties would be required to prove at trial.'") (internal citation omitted).

Insofar as the circuits' interpretations of Rule 23 diverge, "it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law." *In re Korean Air,* 829 F.2d at 1175-76. In that case, the court should apply the law where it sits, "while still giving the case law of other circuits close consideration and striving to avoid conflicts if possible." *In re DirecTV Early Cancellation Litig*., 738 F. Supp. 2d at 1074 (citing *In re Korean Air*, 829 F.2d at 1176) (stating that "federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts"); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 104–05 (C.D. Cal. 2007) (similar). *See also In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 422 F. Supp. 3d 194, 241–43 (D.D.C. 2019) (applying this framework in multidistrict litigation). Because Plaintiffs only seek to certify California claims, and because the Court intends to eventually remand the case for a trial in California (*see* ECF No. 470), it is particularly appropriate to avoid any conflicts and give as much consideration as possible to Ninth Circuit law. *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 241 F.R.D. 185, 193 (S.D.N.Y. 2007) (noting that it would be more "just" and "efficient" to apply the law of the transferor circuit because "that is the law that will bind the trial

court and class certification is an issue on which the Supreme Court has directed courts to ensure that the requirements of Rule 23 are satisfied for purposes of trial.")

### D. Named Plaintiffs Have Standing to Represent Class Members Who Purchased Substantially Similar Products

Plaintiffs have standing for unpurchased Products because the misrepresentations are identical.[53] The "prevailing view" in the Ninth Circuit is that plaintiffs can satisfy Article III standing for products they did not purchase so long as the products and alleged misrepresentations are "substantially similar." *Barrales v. New Chapter, Inc.*, No. 2:25-cv-01171-HDV-KES, 2025 WL 1584424, at *4 (C.D. Cal. June 4, 2025) (citing *Cordes v. Boulder Brands USA, Inc.*, No. CV 18-6534-PSG-(JCx), 2018 WL 6714323, at *5 (C.D. Cal. Oct. 17, 2018) (collecting cases)). The same principle applies in the Eighth Circuit. *Browning v. Anheuser-Busch, LLC*, 539 F. Supp. 3d 965, 977-78 (W.D. Mo. 2021) (finding the "substantially similar" approach "most persuasive" and noting that the approach in which "plaintiff can represent only those who purchased the exact same product . . . [is] irreconcilable with the Supreme Court's decision in *Gratz v. Bollinger*, 539 U.S. 244 (2003)"); *Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 553 (W.D. Mo. 2017) ("'[f]ortuitous non-injury' to subset of class members will not necessarily defeat certification of an entire class, since a common policy or practice would expose the class as a whole to damages." (internal citation omitted) (quoting *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016))).

In conducting the "substantially similar" test, the Court considers a variety of factors—including "similarity in products, similarity in claims, similarities in injury to consumers" —to determine which unpurchased products can be included. *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-WHO, 2014 WL 1024182, at *6 (N.D. Cal. Mar. 13, 2014). For cases involving food products, substantial similarity generally exists when the same mislabeling practice is challenged across different flavors, but not across dissimilar items like potato chips, corn chips, and puffed corn products. *Barrales*, 2025 WL 1584424, at *4 (*comparing Astiana v. Dreyer's Grand Ice*

[53] In its Motion to Dismiss Order, the Court stated its preference to "defer[] ruling on Plaintiffs' standing to assert claims concerning the various Folgers products until the class certification stage[.]" ECF No. 105 at p. 11.

*Cream, Inc.*, No. C-11-2910 EMC, 2012 WL 2990766, at *13 (N.D. Cal. July 20, 2012) *with Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1140-41 (N.D. Cal. 2013)).

Here, the misrepresentations on the Products are all identical. Specifically, each Product bears the claim that it "makes up to" a certain number of "6 FL OZ CUPS."[54] Further, each Product contains identical brewing instructions.[55] Lastly, the injury to consumers is uniform—each consumer paid more for the Products based on the mistaken but reasonable belief that they contained more ground coffee than they did. Because each of the Products, the misrepresentations, and Class members' economic injuries are sufficiently similar, Plaintiffs have standing to bring claims on behalf of purchasers of substantially similar Products.

Further, Plaintiffs have statutory standing under the UCL and FAL because they have "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code §§ 17204, 17535; *In re Sony PS3 Other OS Litig*., 551 F. App'x 916, 922 (9th Cir. 2014). Likewise, Plaintiffs have standing under the CLRA because they have established an economic injury-in-fact, which "demands no more than the corresponding requirement under Article III of the U.S. Constitution." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). Plaintiffs here suffered economic injury because they would not have purchased Defendants' Products or would have paid significantly less had they known that they did not contain the represented number of servings and could not meet the Cups Claim. *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 890 (Cal. 2011) (plaintiffs' pleadings—that they would not have purchased products that were mislabeled as "Made in the USA" if they had known the label was false—were sufficient to allege economic injury under the UCL, FAL, and CLRA).

---

[54] *See supra* II.C.

[55] *See id.*

## IV. PLAINTIFFS SATISFY RULE 23(A)

### A. Ascertainability

The Eighth Circuit "has not addressed ascertainability as a separate, preliminary requirement." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc*., 821 F.3d 992, 996 (8th Cir. 2016). Notably, *Sandusky* did not "apply any heightened ascertainability standard" of other circuits such as whether it is "administratively feasible to identify members of the proposed class[.]" *Lafollette v. Liberty Mut. Fire Ins. Co*., No. 2:14-cv-04147-NKL, 2016 WL 4083478, at *5 (W.D. Mo. Aug. 1, 2016) (discussing *Sandusky*, 821 F.3d 992). Thus, "[a] class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017) (citing *Sandusky*, 821 F.3d at 997-98). The Eighth Circuit has implicitly rejected any heightened ascertainability criteria, as have numerous sister circuits, including the Ninth Circuit. *In re McCormick & Co., Inc.*, 422 F. Supp. 3d at 242.

Likewise, the Ninth Circuit has repeatedly declined to find that there is a separate, preliminary requirement for ascertainability, reasoning that "Rule 23(a) constitutes an exhaustive list" and concerns about identifying class members are addressed through existing Rule 23 mechanisms—manageability under Rule 23(b)(3)'s superiority analysis and notice requirements under Rule 23(c)(2)(B). *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123, 1126-29 (9th Cir. 2017) (referring to ascertainability as "administrative feasibility"); *see also True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018).

"A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage*, 847 F.3d at 998 (citing *Sandusky*, 821 F.3d at 997-98); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 614 (N.D. Cal. 2015) (applying same standard). To satisfy the ascertainability standard, the Western District of Missouri has recognized, "self-identification affidavits are appropriate in 'consumer class actions concerning low-cost products . . . where class members are unlikely to retain purchasing records and financial incentives to falsify are low.'" *In re Dollar Gen. Corp.*, 2019 WL 1418292, at *16 (quoting 1 McLaughlin

on Class Actions § 4:2 (15th ed. 2018)); *Krueger v. Wyeth*, Inc., 310 F.R.D. 468, 476 (S.D. Cal. 2015) (Recognizing California district courts also accept self-identification affidavits.).

Here, the proposed Class includes any persons who made purchases of the Products within California for personal, family, or household purposes, and not for resale, during the relevant requisite time period, as set forth in Ex. 4. The proposed Class is, thus, ascertainable because the Class definitions are objectively defined and thus readily permit self-identification. *See McKeage*, 847 F.3d at 998; *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011); *Ries v. Arizona Beverages USA, LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012) (rejecting defendant's argument that ascertainability cannot be satisfied where class members cannot provide actual proof of purchase, otherwise "there would be no such thing as a consumer class action.").[56]

### B. Numerosity

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "While 'no exact numerical cut-off is required, numerosity is presumed where the plaintiff class contains forty or more members." *Kidd v. Mayorkas*, 343 F.R.D. 428, 437 (C.D. Cal. 2023) (internal quotations omitted) (cleaned up). In this District, a class of twenty to sixty-five members was found to be sufficiently numerous under Rule 23. *Bradford v. AGCO Corp.*, 187 F.R.D. 600, 604 (W.D. Mo. 1999). Further, where "'general knowledge and common sense indicate [a class size] is large,'" numerosity is met. *Reitman v. Champion Petfoods USA, Inc.*, No. CV 18-1736-DOC (JPRx), 2019 WL 7169792, at *4 (C.D. Cal. Oct. 30, 2019), *aff'd* 830 F. App'x 880 (9th Cir. 2020) (internal quotations omitted) (finding where total sales was approximately $350 million and sales for the Subclass was over $19 million, "common sense indicates numerosity is met."). Here, common sense indicates that numerosity is unquestionably met—Defendants' own data confirms that [redacted],

[56] Other courts have also found ascertainability satisfied in similar consumer cases. *See, e.g.*, *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1091-95 (C.D. Cal. 2015); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 969-71; *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 236-40 (N.D. Cal. 2014); *Forcellati v. Hyland's, Inc.*, No. CV 12-1983- GHK (MRWx), 2014 WL 1410264, at *5-8 (C.D. Cal. Apr. 9, 2014).

[redacted] Ex. 3, FOL00000001; Werner IR, Schedules 4, 5, 18, 21a.

### C. Commonality

Common questions of law and fact permeate Plaintiffs' claims in this action, satisfying Rule 23(a)(2). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011). Commonality is met when a plaintiff's claims "depend upon a common contention" that is "capable of classwide resolution —which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. However, "[i]t is not necessary that '[a]ll questions of fact and law . . . be common to satisfy the rule.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1019); *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561 (8th Cir. 1982); *In re Aquila ERISA Litig.*, 237 F.R.D. 202, 209 (W.D. Mo. 2006) ("commonality requires the existence of only one common issue of law or fact"). Rule 23(a)(2) only requires that there be at least one issue of law or fact common to the class.

Here, commonality is met because there are "one or more significant questions of law or fact [that] are common to the class." *See TBK Partners v. Chomeau*, 104 F.R.D 127, 130 (E.D. Mo. 1985). "[A]ll that Rule 23(a)(2) requires is 'a single significant question of law or fact.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir.2012)). Plaintiffs' statutory consumer claims and common law claims raise a number of common questions of law and fact, primarily: (1) whether Defendants misrepresented the number of cups of coffee the Products could make; (2) whether the Cups Claims on the Products are likely to deceive a reasonable consumer.[57] Both of these questions can be answered using common evidence that are applicable to the Class.

With respect to the first question, because the uniform packaging of the Products drives the common question of deception, resolution of this action is subject to common proof. *See supra*

[57] Other common questions include: (1) the cost to Defendants to manufacture, distribute, market, and sell the Products compared to the revenue they received from the sales; and (2) what profits Defendants earned on sales of their deceptively labeled Products.

§§ II.C.—II.D. (demonstrating the uniformity and content of the Products' packaging at the point of purchase); *In re NJOY, Inc.*, 120 F. Supp. 3d at 1096–97 ("There is no question that all class members were exposed to the product packaging; this suffices to show commonality."); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 569 (C.D. Cal. 2014) ("Because all class members were exposed to the statement and purchased [the] products, there is 'a common core of salient facts.'"); *Johnson*, 275 F.R.D. at 286 (certifying class where "UCL and CLRA claims raise common issues regarding General Mills' allegedly deceptive representation . . ."). *Mier v. CVS Pharmacy, Inc.*, No. SA CV 20-1979-DOC-(ADSx), 2021 WL 3468951, at *4 (C.D. Cal. Apr. 29, 2021). The class-wide evidence will include Plaintiffs' experts' consumer surveys and Defendants' internal documents such as records of consumer complaints, studies related to the Cups Claim, and records of [redacted] relevant to the origin of the Cups Claim. *See generally supra* §§ II.D.—II.H.

The second question, whether a reasonable consumer can be deceived by the Cups Claim on the Labels, is also a common question of fact and law that can be proven with scientific studies and expert testimony. *See Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *4-5 (N.D. Cal. July 15, 2016) (finding "sufficient common questions of fact and law" when "[t]he central question here is whether [defendant's] labels were likely to deceive a reasonable consumer."); *Allen v. Similasan Corp.*, 306 F.R.D. 635, 644 (S.D. Cal. 2015) (finding whether defendant's marketing would deceive a reasonable consumer "is an objective test, and as such is a common question determine on a class-wide basis, and it is a question that drives the resolution of this case."). "Variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat" commonality. *Astiana v. Kashi Co.*, 291 F.R.D. 493, 502 (S.D. Cal. 2013) (internal quotation marks omitted); *Johnson v. General Mills, Inc.*, 276 F.R.D. 519 (C.D. Cal. 2011).

Although not a requirement at this stage, Plaintiffs have demonstrated that consumers are actually deceived by the alleged deceptive representations. As discussed *supra* § II.D., Plaintiffs' materiality and consumer perception survey expert, Dr. Dennis, concluded that "79.8% of respondents preferred to purchase the Products *with* the Challenged Descriptor compared to only

14.3% for the Products *without* the Challenged Descriptor[,]" and thus that "the reasonable consumer finds material the Challenged Descriptor in terms of influencing their purchase decisions (compared to Products not having the Challenged Descriptor)." Dennis IR ¶ 87. Such findings serve as common proof of deception. *See Kim v. Benihana, Inc.*, No. 5:19-cv-02196-JWH-KKx, 2022 WL 1601393, at *4, 11 (C.D. Cal. Mar. 25, 2022) (finding survey evidence that 36% of consumers were deceived sufficient to show deception); *In re Conagra Foods, Inc.*, 90 F. Supp. 3d at 1019 (concluding for purposes of class certification that "100% natural" claim was material based on survey data that 65% of respondents were interested in purchasing natural products and stating "[c]ourts . . . have found a representation material when significantly smaller percentages of consumers than those reflected in the surveys here viewed it in that light.").

With respect to Plaintiffs' common law claims, whether Defendants were unjustly enriched or breached their express warranty or implied warranty of merchantability as a result of their Products' failure to meet the Cups Claim is a core issue. *See, e.g.*, *supra* § II.H. This issue is "'of such a nature that it is capable of classwide resolution'" which alone permits Plaintiffs' statewide unjust enrichment classes to demonstrate commonality. *See Sandusky*, 821 F.3d at 998 (quoting *Dukes*, 564 U.S. at 338); *see also Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660, 676 (N.D. Cal. 2024) (finding commonality satisfied for unjust enrichment claim because "[t]he question of whether Defendants were unjustly enriched by the proposed class members' purchase of the Products given the allegedly false representations raises the same legal issues as to all class members."); *Astiana*, 291 F.R.D. at 505 (collecting cases) (finding commonality was satisfied for breach of express warranty claim because "[d]eterminations of whether [d]efendant misrepresented its products and, as a result, whether warranties were breached, are common issues appropriate for class treatment."); *Hawkins v. Kroger Co.*, 337 F.R.D. 518, 533 (S.D. Cal. 2020) (finding question as to whether a products label claim was "sufficiently deceptive to violate the FAL, UCL, CLRA, and express and implied warrant[y of merchantability]" for commonality purposes). Similarly, the Ninth Circuit has long held that the commonality requirement is met when a common law fraud claim is based on a

common course of conduct, thus, Plaintiff's fraud claim satisfies the commonality requirement. *In re First All. Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006).

Finally, Defendants appear to agree that the central issue in this case—whether the Products meet the Cups Claim—can be determined on a Class-wide basis. Perfectly framing the issue for a trial, Defendants assert that the Products are capable of meeting the Cups Claim. Ebatco Testing and Analysis Expert Report, ECF No. 241 at 10 ("the Folgers Coffee canisters contain sufficient coffee to meet the 'up to' representation on the label of the containers."). Plaintiffs assert the opposite. *See* Hockert IR ¶ 28. This case thus presents a classic "battle of the experts," and "[t]he certification stage of this litigation is not, however, the proper forum in which to resolve this battle." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005) (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D. Minn. 1995)). Instead, this is "[a] factual dispute" which "is best settled . . . by a battle of the experts before the fact finder, not by judicial fiat." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).

Therefore, commonality has been met because the "proposed class members clearly share common legal issues regarding [the] alleged deception and misrepresentations in [the] advertising and promotion of [p]roducts." *Wiener v. Dannon Co.*, 255 F.R.D. 658, 664-65 (C.D. Cal. 2009).

**D. Typicality**

Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). Typicality is satisfied when each class member's claim arises from the same course of conduct and each class member makes similar legal arguments to prove the defendant's liability. *Id.*; *Labrier v. State Farm Fire & Cas. Co.*, 315 F.R.D. 503, 514 (W.D. Mo. 2016); *DeBoer v. Mellon Mortg. Co*., 64 F.3d 1171, 1174-75 (8th Cir. 1995). Typicality is satisfied if "the unnamed class members have injuries similar to those of the named plaintiffs and the injuries result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001), *abrogated on other grounds by Johnson v. Cal.*, 543 U.S. 499 (2005). However, "[t]ypicality does not mean that the claims of the class representatives must be identical or substantially identical to those of absent class members." *Staton v. Boeing*

*Co.*, 327 F.3d 938, 957 (9th Cir. 2003); *DeBoer*, 64 F.3d at 1174-75 ("When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment") (citations omitted); *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (same). Rather, they only need to be "reasonably co-extensive with those of absent class members[.]" *Hanlon*, 150 F.3d at 1020. Courts find typicality met in cases where defendants utilize "sufficiently similar" labeling claims. *See, e.g.*, *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 566 (S.D. Cal. 2012) (certifying claims for all models in "heating pad" product line where all "heating pads contain similar omission[s]" and were "sufficiently similar").

Here, each Class member purchased a Folgers Product bearing a label that misrepresented the number of cups the Product was capable of producing. *See supra* § II.C. Plaintiffs' consumer and common law claims thus satisfy the "permissive standard" for typicality because they all stem from the same course of conduct by Defendants in its false and deceptive labeling of the Products. *Staton*, 327 F.3d at 957.

**E. Adequacy**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of class members. Fed. R. Civ. P. 23(a)(4). Adequacy entails a two-pronged inquiry: whether "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton,* 688 F.2d at 562-63; *Pino v. Cardone Cap., LLC*, No. 2:20-CV-08499-JFW (KSX), 2026 WL 1381724, at *2 (C.D. Cal. Mar. 27, 2026) (similar).

With respect to the first prong, each representative plaintiff must be a member of the class or sub-class they seek to represent, and hence, must possess the same interest and have suffered the same injury as the class members. *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). Here, Plaintiffs are all members of the Class they seek to represent and hold no interest antagonistic to any other Class members. *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) ("an absence of antagonism [and] a sharing of interests between representatives and absentees."). All Class members suffered similar damages in that they

purchased underfilled Products at artificially inflated prices. *See* Werner IR ¶¶ 9, 32-34, 38. The interests of Plaintiffs and the Class are fully aligned, as all Class members seek to hold Defendants liable for their misconduct, obtain relief, and ensure that going forward, Defendants' labeling complies with applicable laws; thus, there are no conflicts of interest.[58]

Additionally, Plaintiffs and their counsel "continue to vigorously prosecute the case for the Class." *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 562 (N.D. Cal. 2020); *see also Hopkins v. Kan. Teachers Cmty. Credit Union*, 265 F.R.D. 483, 487 (W.D. Mo. 2010). Plaintiffs are represented by counsel with decades of class action litigation experience. Indeed, in appointing interim lead counsel under Rule 23(g), this Court already found counsel to be "eminently qualified" and consisting of "highly seasoned skilled litigators." ECF No. 48 at 4. Since then, counsel has *vigorously* prosecuted this case by, *inter alia*, engaging in extensive discovery, prevailing in several hard-fought discovery disputes, and retaining the services of several qualified experts. In short, Plaintiffs' counsel are committed and have the resources to litigate this action through certification, dispositive motions, and trial in order to secure the best result for the Class. *See* ECF No. 432 (Or. Granting in Part Class Cert.) at 11 (finding the firms Lynch Carpenter and Faruqi & Faruqi to be "skilled counsel who are experienced in complex litigation and have been vigorously prosecuting this case."); *id.* at 22 (appointing same as class counsel).

## V. PLAINTIFFS ALSO SATISFY RULE 23(B)(3) PREDOMINANCE AND SUPERIORITY

### A. Predominance

"Predominance is a test readily met in certain cases alleging consumer . . . fraud. . . ." *Amchem Prods., Inc.*, 521 U.S. at 625. The predominance requirement "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Blades v. Monsanto Co.*, 400 F.3d 563, 566 (8th Cir. 2005); *In re Hyundai and Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (quoting *Amchem Prods., Inc.*, 521 U.S. at 623). "[E]ven if just one common

[58] Ex. 76, Deposition of Shelly Ashton ("Ashton Dep.") at 28:24-31:2, 60:18-61:10, 74:8-75:3; Ex. 77, Deposition of Frederick Tan ("Tan Dep.") at 29:2-31:3, 33:12-22, 40:5-42:22, 140:13-141:1, 179:21-180:8.

question predominates, 'the action may be considered proper under Rule 23(b)(3)[.]'" *Id.* (quoting *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016)); *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1235 (9th Cir. 2024), *cert. denied* 145 S.Ct. 1051 (2025) ("At the class certification stage, identification of a common question is all that is required.").

"In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (emphasis in original), *cert. denied* 145 S. Ct. 1308 (2025) (quoting *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 666-67); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d at 618 (holding that "a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.").

As discussed below, Plaintiffs meet the predominance requirement for all of their California consumer protection claims. Here, the common questions of (1) whether the Products meet the Cups Claim, and (2) whether the Cups Claim is deceptive and likely to deceive a reasonable consumer, predominate over any individual issues Defendants may identify or assert.[59]

Plaintiffs' claims under the relevant consumer protection statutes satisfy the predominance requirement because each Class member was exposed to the same uniform misrepresentations on the Label and suffered similar damages in the form of overpaying for the Products. *See supra* § II.C. The record clearly shows that the Cups Claim graphic was uniform across the Products' packaging throughout the class period, eliminating the need for individualized inquiry.[60]

---

[59] For instance, and for the avoidance of doubt, individualized issues regarding damages calculus cannot defeat class certification. *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("We have said that '[t]he amount of damages is invariably an individual question and does not defeat class action treatment.' . . . Thus, because there are no individualized issues sufficient to render class certification inappropriate under Rule 23, class issues predominate." (internal citation omitted)).

[60] *See Fitzpatrick v. General Mills, Inc.*, 263 F.R.D. 687, 693-94 (S.D. Fl. 2010) (holding that predominance can be found where "digestive health is a consistent and prominent theme among all the various mediums

Moreover, Plaintiffs will proffer the same common evidence to demonstrate a specific intentional course of conduct by Defendants: the branding, labeling, and sale of mislabeled Products during the relevant class period. *See supra* § II.C. Likewise, the issue of whether Defendants' conduct constitutes culpable acts or practices under the California consumer protection laws claimed here (*i.e.*, acts or practices that are deceptive, unlawful, unconscionable, unfair, or misleading) is capable of class wide resolution using common evidence. *See White v. Symetra Assigned Benefits Servs. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024) ("' [A] common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" (quoting *Bouphakeo*, 577 U.S. at 453)).

As discussed below, common issues will predominate with respect to each consumer claim as well as unjust enrichment.

**California UCL.** The UCL consists of three prongs—unlawful, unfair, and "fraudulent" advertising. Cal. Bus. & Prof. Code §17200. Each prong is separately actionable. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). The statute imposes strict liability for violations. *Cortez v. Purolator Air Filtration Prods. Co*., 23 Cal. 4th 163, 181 (2000). "Unlawful" business acts or practices "include anything that can properly be called a business practice and that at the same time is forbidden by law." *McKell v. Washington Mut., Inc*., 142 Cal. App. 4th 1457, 1460, 1474 (Cal. Ct. App. 2006) (citing *Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). That is, violations of other laws may serve as *per se* violations of the UCL. *Id.* at 1474-75; *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 155 (Cal. Ct. App. 2010). Defendants' breaches of the FAL, CLRA, and other laws alleged herein are predicate violations supporting claims under the unlawful prong of the UCL. *See City and Cty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 685-89 (N.D. Cal. 2020).

The "unfair" prong of the UCL is established by weighing "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *State Farm Fire & Cas. Co. v.*

---

employed by General Mills to market [the product]."), *vacated on other grounds by Fitzpatrick v. General Mills, Inc.,* 635 F. 3d 1279, 1282-83 (11th Cir. 2011).

*Superior Ct.*, 45 Cal. App. 4th 1093, 1104 (Cal. Ct. App. 1996). False advertising has no utility and is not a justified business practice. *Vasquez.*, 4 Cal.3d at 808. Thus, Defendants' efforts to persuade consumers to purchase the Products, and the harm resulting from these purchases, are issues common to members of the Class.

The "fraudulent" prong is not synonymous with common law fraud. Instead, Plaintiffs need "only to show that members of the public are likely to be deceived" by the challenged conduct. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (Cal. 2009); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011). Whether the public is "likely to be deceived" is determined by the effect the advertisement would have on "the reasonable consumer." *Williams v. Gerber Food Prods. Co.*, 523 F.3d 934, 938 (9th Cir. 2008); *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506-07 (Cal. Ct. App. 2003). Thus, "the fundamental question that predominates is whether the packaging was materially misleading to a *reasonable* consumer." *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2018 WL 4952519, at *12 (N.D. Cal. Sept. 25, 2018) (emphasis in original); *id*. at *11 (finding predominance was satisfied for CLRA, UCL, and FAL claims when "[Dr. J. Michael] Dennis's survey results, in combination with statements by [defendant] and [p]laintiffs' damages experts' results, are sufficient to raise the common question of [materiality.]"); *see Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 613-14 (N.D. Cal. 2018) (finding common issues predominate where the "material alleged misrepresentations were made [] to the entire class" and plaintiffs proffered consumer survey evidence and defendant's internal documents to demonstrate materiality under the CRLA, UCL, and FAL). "This objective test renders claims under the UCL . . . ideal for class certification." *Tait*, 289 F.R.D. at 480 (holding that the question of whether a reasonable consumer was likely to be deceived was a central question satisfying the predominance requirement).

**California FAL.** "California's false advertising law bars 'any advertising device . . . which is untrue or misleading.'" *Shaeffer v. Califia Farms, LLC*, 44 Cal.App.5th 1125, 1136 (Cal. Ct. App. 2020) (citing Cal. Bus. & Prof. Code, § 17500). Because the FAL and the fraudulent prong of the UCL substantively overlap, the plaintiff's burden under these provisions is the same: to

prevail on a claim under the false advertising law, she must show that members of the public are likely to be deceived and must do so as adjudged through the eyes of the reasonable consumer. *Id.* (quotations omitted); *see also Hughes v. Big Heart Pet Brands*, 740 Fed. App'x 876, 878 (9th Cir. 2018). As discussed above, the objective reasonable consumer test renders this claim "ideal for class certification." *Tait*, 289 F.R.D. at 480.

**California CLRA.** A defendant is liable under the CLRA if it engages in "unfair or deceptive acts or practices" in connection with the sale of goods to a consumer. Cal. Civ. Code § 1770(a)(5). The test of whether conduct is deceptive is an objective one. A representation that is likely to deceive the reasonable consumer violates the CLRA. *Paduano v. Am. Honda Motor Co., Inc.*, 169 Cal. App. 4th 1453, 1497 (Cal. Ct. App. 2009).

Courts have presumed class-wide reliance for CLRA claims when "the plaintiff shows that common proof is capable of resolving the question of whether material representations were made to the proposed class." *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 407-08 (N.D. Cal. 2021) (citing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (Cal. Ct. App. 2009)).[61] Materiality of the alleged misrepresentation is determined by a "reasonable person" standard. *Steroid Hormone*, 181 Cal. App. 4th at 157; *see also Lytle v. Nutramax Labs., Inc.*, No. ED CV 19-0835 FMO (SPx), 2022 WL 1600047, at *16 (C.D. Cal. May 6, 2022) (quoting *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018)) ("questions as to whether the contested label claims 'were misleading and material must be evaluated according to an objective "reasonable consumer" standard'"). Therefore, "California courts often find predominance satisfied in CLRA cases because 'causation, on a classwide basis, may be established by materiality.'" *Lytle*, 2022 WL 1600047, at *15 (quoting *Stearns*, 655 F.3d at 1022).

[61] *See, e.g.*, *In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, No. 2:11-07382, 2019 WL 2521958, at *9-10 (D.N.J. June 18, 2019); *Stearns*, 655 F.3d at 1022; *Rikos*, 799 F.3d at 522; *Massachusetts Mut. Life Ins. Co. v. Superior Ct.*, 97 Cal. App. 4th 1282, 1292 (Cal. Ct. App. 2002); *see also Khoday v. Symantec Corp.*, No. 11-180 (JRT/TNL), 2014 WL 1281600, at *24 (D. Minn. Mar. 13, 2014) ("Where exposure to a misrepresentation is uniform amongst class members, however, California courts have presumed reliance on the part of purchasers who encounter the misrepresentation, and have certified classes finding that individual issues of reliance would not predominate.") (collecting cases).

Here, Plaintiffs Ashton and Tan are entitled to a presumption of reliance for their CLRA claims based on Plaintiffs' showing of materiality. *See supra* § II.D.; Dennis IR ¶¶ 29, 87. *See Bailey*, 338 F.R.D. at 400-04, 408 (finding common evidence, including plaintiff's expert's opinion that the label was material and a proposed conjoint analysis that would determine the value of the at-issue statement, sufficient to invoke reliance presumption for CLRA claim). As in *Bailey*, all Class members here were exposed to the same Cups Claim statement on the Labels. Likewise, Plaintiffs here have set forth preliminary common evidence in the form of Dr. Dennis's materiality and perception survey results, Dr. Iyengar's conjoint analysis,[62] consumer complaints, and even Folgers' own internal documents and studies to show that "a reasonable consumer would find the [] statement at issue to be material when purchasing [the Products]." *Bailey*, 338 F.R.D. at 408; *see supra* §§ II.D.—II.E. Further, Plaintiffs' testimony is consistent: they purchased the Products in reliance on the Cups Claim representation on the Labels.[63]

It has long been the law in California, first established in an *en banc* order more than 50 years ago, that "if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class[,]" and further, "[i]f the court finds that a reasonable man would have relied upon the alleged misrepresentations, an inference of justifiable reliance by each class member would arise." *Vasquez*, 4 Cal.3d at 805 & n.9. The 9th Circuit recently reaffirmed that this presumption of reliance applied in class action cases, holding that "the Rules Enabling Act *requires* application of California's presumption of reliance." *DZ Reserve*, 96 F.4th at 1238 (emphasis in original). This presumption of reliance is applicable where all class members were necessarily exposed to the same misrepresentation, as is the case with the Cups Claim on the Products' label, here. *See Johns*, 280 F.R.D. at 558 ("[A]t a minimum, everyone who purchased the Men's Vitamins would have been exposed to the prostate claim that appeared

---

[62] Iyengar IR ¶ 56 ("there is a statistically significant positive association between number of servings and the likelihood of selecting a product, such that consumers prefer ground coffee products with a greater number of servings.").

[63] Ex. 77, Tan Dep. at 98:8-24, 183:11-184:11; Ex. 76, Ashton Dep. at 65:9-66:17.

on ***every package*** from 2002 to 2009. This is the predominant issue[.]") (emphasis in original). Accordingly, CLRA, FAL, and UCL claims are regularly certified.[64]

**Unjust Enrichment/Quasi-Contract.** The basic principle underlying a claim of unjust enrichment is that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Restatement (First) of Restitution* § 1 (1937). "Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another." *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007).

Here, as discussed above, Defendants' actions in systematically mislabeling the Products were uniform; the Labels were substantially similar; and Plaintiffs and Class members received essentially identical products when purchasing the Products during the class period. Other examples of common evidence to answer the question of whether Defendants retained an unjust benefit include evidence of: (1) Defendants' uniform labeling practices, (2) Defendants' retail sales of the Products across California, (3) Defendants' knowledge that the Products did not meet the Cups Claim, (4) Defendants intentionally labeling the Products as meeting the Cups Claim in order to assuage any consumer concerns over the Products' continually decreasing net weights [redacted] and (5) Plaintiffs being denied the expected value of the Products. *See, e.g.*, Hockert IR ¶ 26; Werner IR ¶ 39 ("damages in this case can be calculated as the difference between the price paid by consumers and the value of the product received by consumers"). Thus, all transactions were equitably similar and no individual inquiry is necessary to determine whether Defendants' retention of the benefit was unjust. Further, courts have certified unjust enrichment classes for California in the context of consumer protection class actions.[65]

[64] *See, e.g.*, *In re Conagra Foods, Inc.*, 90 F. Supp. 3d 919; *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324 (S.D.N.Y. 2021); *Tait*, 289 F.R.D. 466; *Bailey*, 338 F.R.D. 390; *Astiana*, 291 F.R.D. 493; *Allen v. Hyland's Inc.*, 300 F.R.D. 643 (C.D. Cal. 2014); *Lilly*, 308 F.R.D. 231; *Fitzhenry-Russell*, 326 F.R.D. 592; *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17cv2335-GPC(MDD), 2018 WL 6300479 (S.D. Cal. Nov. 29, 2018).

[65] *See, e.g.*, *In re: Dollar Gen. Corp.*, 2019 WL 1418292 (certifying California statewide unjust enrichment class); *In re JUUL Labs, Inc.*, 609 F. Supp. 3d at 997; *Beck-Ellman*, 283 F.R.D. at 568-69 ("unjust enrichment claims are appropriate for class certification as they require common proof of the defendant's conduct and raise the same legal issues for all class members."); *Cartwright v. Viking Indus., Inc.*, No. 2:07-

**Breach of express warranty.** To prevail on a breach of express warranty claim under California law, a plaintiff must prove that (1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was the basis of the bargain; and (3) the warranty was breached. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 984; *see also Shin*, 348 F.R.D. at 487 (same). Here, the Cups Claim is an affirmation or promise that the Products will contain the represented number of servings. Under California law, this warranty is presumptively part of the basis of the bargain for reasonable consumers. *Tunick*, 806 F. Supp. 3d at 930 (California's express warranty statute "creates a presumption that the seller's affirmations go to the basis of the bargain."); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 984–85 (noting that "[p]roof of reliance on specific promises or representations is not required"). Since the Products demonstrably *do not* contain the represented number of servings, Defendant has breached its express warranty. *See* Hockert IR ¶¶ 23-25.

A claim for breach of express warranty is appropriate for class treatment where, as here, the warranty is material to reasonable consumers. *See In re ConAgra*, 90 F. Supp. 3d at 985-86; Dennis IR ¶¶ 29, 87. Accordingly, the breach of express warranty claim should be certified.

**Breach of implied warranty of merchantability.** For a breach of implied warranty claims, vertical privity between the consumer and defendant is not required since the Products fit squarely within the foodstuff exception. *Clemens v. Daimler Chrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008); *see also Tunick*, 806 F. Supp. 3d at 931 ("Here, the Products all qualify as 'foodstuffs' because they are beverages intended for human consumption. . . . Accordingly, the foodstuffs exception applies to Plaintiff's claim for breach of implied warranty of merchantability, and Plaintiff need not demonstrate vertical privity to bring an implied warranty claim.").

Under California law, the promises and affirmations on the label—namely, the Cups Claim—create an implied warranty, and this warranty is breached where the product does not

CV-02159-FCD-EFB, 2009 WL 2982887, at *13 (E.D. Cal. Sept. 14, 2009); *Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at *28 (N.D. Cal. June 13, 2014); *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, No. SACV 07-1306 JVS (RNBx), 2008 WL 4906433 (C.D. Cal. Nov. 13, 2008).

conform to the label claims. *See Clemens*, 534 F.3d at 1023; Cal. Comm. Code § 2314(2)(f). Since the warranty is common across all Products and Defendants' conduct in breaching the warranty was similarly common across all Products, this claim is appropriate for class treatment. *See Tait*, 289 F.R.D. at 485 (citation omitted); *see also In re JUUL Labs, Inc.,*609 F. Supp. 3d at 997–98.

**Common law fraud.** In California, "[t]he elements of a common-law fraud claim appear to be identical to those of a CLRA claim for punitive damages, and inclusive of a UCL claim for fraudulent business practices and a CLRA claim that does not seek punitive damages." *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 588–89 (C.D. Cal. 2011). A claim of common law fraud requires proof of five elements: (1) a misrepresentation; (2) knowledge of falsity or scienter; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 990 (2004). Such claims are readily certifiable. *In re JUUL Labs, Inc.*, 609 F. Supp. 3d at 997; *Broomfield*, 2018 WL 4952519, at *12–13; *Falco*, 2016 WL 1327474, at *11; *Delarosa*, 275 F.R.D. at 595; *Chavez*, 268 F.R.D. at 376–77; *Occidental Land, Inc. v. Superior Ct.*, 18 Cal.3d 355, 363-64 & n.6 (1976) (relying on *Vasquez*, 4 Cal.3d. 800, and holding that the trial court properly refused to decertify a certified common law fraud class claim). As noted *supra*, "if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class[,]" and further, "[i]f the court finds that a reasonable man would have relied upon the alleged misrepresentations, an inference of justifiable reliance by each class member would arise." *Vasquez*, 4 Cal.3d at 805 & n.9; *see also DZ Reserve*, 96 F.4th at 1238; *Johns*, 280 F.R.D. at 558.

Here, Plaintiffs can and will establish, through common evidence, that Defendants' Cups Claim is a common misrepresentation placed on all Products upon which reasonable consumers can and do rely. §§ II.D-E, *supra*. Plaintiffs can also establish, through common evidence of Defendants' [redacted], that Defendants knew that the Cups Claim was false, regardless of brewing method, and nevertheless intended to defraud consumers when they placed the Cups Claim on the Products' label. §§ II.F-H, *supra*. Finally, Dr. Werner's damages models establish uniform, measurable economic damages resulting from Defendants' fraudulent conduct, including models supported by Dr.

Iyengar's conjoint analysis. Werner IR ¶¶ 11, 33, 34, 36, 38, 39, 44, 45, 50, 51, 53. Accordingly, the common law fraud claim should be certified.

**Plaintiffs' Damages Models.** The predominance analysis also includes Plaintiffs' burden to establish "that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). At the class-certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case . . ." *Id*. (quotation omitted). Plaintiffs' theory of damages (i.e., that consumers paid a per cup price premium for the difference between the represented and actual number of cups) falls squarely in line with the theory of liability (i.e., that the Products do not contain enough ground coffee to meet the Cups Claims) and as such, comports with *Comcast*. *See Comcast Corp.*, 569 U.S. at 38 ("The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.").

Here, Plaintiffs' damages expert, Dr. Werner, calculates losses for Class members premised on Plaintiffs' allegations that, "'Defendants have sold the Products to consumers based on the representation that they contain enough ground coffee to make up to a specific number of servings (e.g., '240 6 FL OZ CUPS'). However, by following Defendants' own definitions and instructions, the Products do not contain enough ground coffee to make the number of servings represented or even close to it.'" Werner IR ¶ 5 (quoting Complaint ¶ 2). As such, the theory of liability and Dr. Werner's preliminary calculations of damages under each of the four methods he proposes are intrinsically linked. *See id*. ¶ 39 ("Consistent with Plaintiffs' allegations and theory of injury, damages in this case can be calculated as the difference between the price paid by consumers and the value of the product received by consumers (*i.e.,* the "overcharge" or "price premium" paid by consumers).").

In his initial report, Dr. Werner explains that from an economic perspective, individual inquiries are not necessary to calculate damages under the generally accepted methodologies he

sets forth. *See* Werner IR ¶¶ 33, 34, 36, 38.[66] Specifically, the four methodologies that exist to calculate the overcharge paid by consumers (i.e., damages) in this case are: (1) a calculation based on consumers' willingness-to-pay that utilizes conjoint analysis and assumes fixed supply; (2) a market simulation that utilizes conjoint analysis and incorporates dynamic supply; (3) a regression analysis that measures the relationship between prices paid and the Cups Claims; and (4) a calculation based on the percentage shortfall of servings representing a proxy for price. Werner IR ¶ 11. The first two methods are supported by the conjoint analysis from Plaintiffs' expert Dr. Iyengar. Werner IR ¶¶ 44, 50, 51, 53. Indeed, Plaintiffs went to great efforts and expense not only to provide these methodologies, but to actually perform them using discovery produced to date in order to provide real, if only preliminary, damages figures. *See, e.g.*, Werner IR ¶¶ 42-74.

Each of Dr. Werner's methods "that measure[] class-wide damages, is also tailored to [Plaintiffs'] theory of liability, because [they] seeks[] to multiply the premium . . .by the number of products sold to members of the proposed class . . . . and is therefore consistent with *Comcast*." *Bailey*, 338 F.R.D. at 410 (citing *Comcast*, 569 U.S. at 35); *see also In re McCormick & Co., Inc.*, 422 F. Supp. 3d at 247-48 (finding plaintiffs met their burden to prove damages are calculable on a class-wide basis when plaintiffs' expert proposed calculating damages "by multiplying the overcharge by the number of units sold."). Throughout his Initial Report, Dr. Werner not only expertly lays out the economic theory behind each methodology, explaining why they work in this case, but he also actually performs the models and calculates damages under each method by multiplying the price premium by sales volume for the applicable Class. *See* Werner IR ¶¶ 39, 45 ("Classwide damages are then calculated by applying each product's calculated overcharge to the historical unit sales reported by Folgers during the Class Period."), ¶ 55 (same re conjoint analysis and incorporating dynamic supply), ¶ 67 (same re hedonic regression), ¶ 74 (same re percentage shortfall as proxy for price premium). He then proceeds to set forth the actual damages for each

---

[66] An inquiry into each Class member's rationale for purchasing the Product is not needed to calculate damages because to the extent market prices were artificially inflated due to Defendants' misconduct, *all* consumers paid an overcharge for the Products. *See* Werner IR ¶ 33. Likewise, inquiries into each Class member's purchase price are not necessary to calculate class wide damages. *See id*. ¶ 34.

statewide Class under each method. *See* Werner IR, Schedules 19a-19f (fixed supply), 21a-21f (dynamic supply), 25a-25f (regression), 27a-27f (percentage shortfall as proxy for price premium). Accordingly, Plaintiffs' damages models are linked with Plaintiffs' theory of liability and common questions predominate with respect thereto, including whether Plaintiffs are entitled to price premium damages for their purchases.[67]

Indeed, courts have conclusively "reject[ed] the notion that because individual damages calculations might be necessary, the class is not properly certifiable." *In re Dial Complete Mktg. and Sales Practices Litig.*, 312 F.R.D. 36, 76 (D.N.H. 2015). So long as common questions predominate as to liability, courts find predominance is met despite individual damages issues. *Id*. (explaining the principle is "valid even after *Comcast*"); *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013). To the extent individual damages questions arise, they do not preclude certification and may be addressed post-judgment. *See Yokoyama*, 594 F.3d at 1094 ("damage calculations alone cannot defeat certification."). Further, the Ninth Circuit has "repeatedly found class treatment to be appropriate . . . based upon a showing that damages *could* be calculated on a classwide basis, even where such calculations have not yet been performed." *Lytle*, 114 F.4th at 1025 (citing cases). Here, Plaintiffs have undoubtedly cleared that bar.

### B. Superiority

Rule 23(b)(3) also requires a finding "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors

---

[67] As explained by Dr. Werner, the fixed and dynamic supply models relied on a coefficient from Dr. Iyengar's conjoint survey and analysis. Werner IR ¶¶ 44, 50-53. Calculations under each of the four methods incorporated the servings shortfall measurements performed by Ms. Hockert. Werner IR ¶¶ 44, 54, 66, 73. As Dr. Werner explains, "If the finder of fact in this case ultimately determines that the servings shortfall is different than what Ms. Hockert measured, the ***same damages methodologies described throughout this Report can be utilized to calculate classwide damages by simply adjusting the servings shortfall input***." Werner IR ¶ 44, n.102 (emphasis added). In other words, Dr. Werner's models still hold as reliable for purposes of class certification even if their inputs change later. *See Chavez*, 268 F.R.D. at 379 (plaintiffs do not need to show their damages model will work "with certainty at [the class certification stage]."); *In re Dial*, 312 F.R.D. at 79 ("at the class certification stage, it is not necessary that class damages be calculated to a mathematical certainty. Even in *Comcast*, the Court held that "[c]alculations need not be exact," but rather "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case . . .'") (citing *Comcast,* 569 U.S. at 35).

relevant to whether a class action is the superior vehicle for fair and efficient adjudication include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.* Ultimately, "class actions are superior when 'the class members' claims are generally small and unlikely to be pursued individually.'" *Custom Hair Designs by Sandy v. Central Payment Co., LLC*, 984 F.3d 595, 605 (8th Cir. 2021) (en banc) (quoting *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018)); *Shields v. World Aquatics*, No. 23-15092, 2024 WL 4211477, at *4 (9th Cir. Sept. 17, 2024) (similar).

Here, each factor favors a finding of superiority. Given the relatively small amount of individual damages [redacted] based on the most conservative (i.e., minimum) shortfall measured by Ms. Hockert using the half-cup method),[68] and the cost of obtaining the type of evidence (including expert opinions) necessary to prove Class members' claims, individual actions would result in negative value propositions. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) ("Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action."). Thus, any economic interest in individually controlling litigation is low. As for the second factor, Plaintiffs are not aware of *any* litigation of these claims outside of this consolidated action, likewise weighing in favor of superiority. As for the third factor, certifying the California class would achieve far greater efficiency than individual claimants litigating their own claims, including the two named California plaintiffs. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually.").

[68] Werner IR ¶ 54 ([redacted] per unit damages under market simulation); *see also* ¶ 66 ([redacted] under hedonic regression); ¶ 54, n.131 (explaining that average per unit overcharge is greater under the "single serving" brewing approach and "[i]n each case, an overcharge exists for each class product, although the overcharge per product varies depending on which product was purchased.").

Finally, the California class would present a manageable jury trial in which the jury will be instructed as to the applicable consumer protection, unjust enrichment, warranty, and fraud laws. Any administrative feasibility concerns surrounding identifying all class members is not a bar to class certification. *Briseno*, 844 F.3d at 1128 ("[R]equiring class proponents to satisfy an administrative feasibility prerequisite 'conflicts with the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns.'"); *id.* at 1133 ("In summary, the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification[.]").

## VI. CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that the Court certify the proposed Class, designate Plaintiffs Shelly Ashton and Frederick Tan as representatives of the California Class, and appoint Faruqi & Faruqi, LLP and Lynch Carpenter, LLP as Class Counsel. In the alternative, and to the extent the Court believes Plaintiffs have not satisfied any of the elements for class certification, Plaintiffs respectfully request that the Court grant certification as to the claims and class that it believes may be properly certified and/or afford Plaintiffs leave to file a renewed motion for class certification.[69]

Respectfully submitted,

Dated: June 22, 2026

By: */s/ Todd D. Carpenter*

Todd D. Carpenter (*pro hac vice*)
Scott G. Braden (*pro hac vice*)
Matthew J. Zevin (*pro hac vice*)
**LYNCH CARPENTER, LLP**
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Tel.: (619) 762-1900
Fax: (619) 756-6991

[69] *See Moore v. Wilson Logistics, Inc.*, No. 21-03212-CV-S-BP, 2022 WL 22961415, at *3 n.2 (W.D. Mo. Nov. 14, 2022) (Phillips, J.) (citing *Combs v. Cordish Cos.*, 2015 WL 438154, at *3 (W.D. Mo. Feb. 3, 2015) ("The Court is not bound by the proposed definition and can amend it if doing so resolves any problems that would preclude certification."); *Chapman v. Wagener Equities, Inc.*, No. 09 C 07299, 2012 WL 6214597, at *5 (N.D. Ill. Dec. 13, 2012) ("[A]bsent the plaintiff's motion to modify the class definition, the Court still has the discretion, and the obligation, to modify the class definition if necessary.").

todd@lcllp.com
scott@lcllp.com
mattz@lcllp.com

Tim E. Dollar, MO # 33123
**DOLLAR, BURNS, BECKER & HERSHEWE, L.C.**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105-5194
Tel: (816) 876-2600
Fax: (816) 221-8763
timd@dollar-law.com

Lubna M. Faruqi (*pro hac* vice)
Timothy J. Peter (*pro hac vice*)
Lisa T. Omoto (*pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York New York 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
lfaruqi@faruqilaw.com
tpeter@faruqilaw.com
lomoto@faruqilaw.com

Bonner C. Walsh (*pro hac* vice)
**WALSH PLLC**
1561 Long Haul Road
Grangeville, ID 83530
Tel.: (541) 359-2827
Fax: (866) 503-8206
bonner@walshpllc.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 22, 2026, I electronically filed the above and foregoing document via the Court's CM/ECF system, which will send notification of said filing to all counsel of record.

/s/ *Todd D. Carpenter*

*Counsel for Plaintiffs*