**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| **In re: Folgers Coffee Marketing Litigation** | Case No. 4:21-02984-MD-C-BP<br><br>**Defendants' Suggestions in Support of Motion for Summary Judgment on Florida Claims**<br><br>Hon. Beth Phillips<br><br>This Document Relates to *Sorin v. The Folger Coffee Company et al.*, No. 4:21-cv-00222 |


Andrew Ryan (Bar No. 45924)
**Sandberg Phoenix**
**& von Gontard P.C.**
701 Market Street, 6th Floor
St. Louis, Missouri 63101
Tel.: (314) 231-3332
ARyan@sandbergphoenix.com

Ronald Y. Rothstein (*pro hac vice*)
Sean H. Suber (*pro hac vice*)
Nathan R. Gilbert (*pro hac vice*)
**Winston Taylor LLP**
300 N. LaSalle Dr.
Chicago, Illinois 60654
Tel.: (312) 558-5600
Fax: (312) 558-5700
Ron.Rothstein@winstontaylor.com
Sean.Suber@winstontaylor.com
Nathan.Gilbert@winstontaylor.com

Jeffrey S. Wilkerson (*pro hac vice*)
**Winston Taylor LLP**
300 South Tryon Street, 16th Floor
Charlotte, North Carolina 28202
Tel.: (704) 350-7700
Fax: (704) 950-7800
Jeffrey.Wilkerson@winstontaylor.com

*Counsel for Defendants*
*The J. M. Smucker Company and The Folger Coffee Company*


July 10, 2026

## TABLE OF CONTENTS

**Page**

STATEMENT OF UNCONTROVERTED MATERIAL FACTS ........ 1

I. Folgers' Coffee Products ........ 1

A. The Up-To Claim ........ 1

B. Defendants' research showed the Up-To Claim was not material to consumers. 2

C. Folgers uses a formula, product specifications, and manufacturing controls to ensure that each Product can meet the Up-To Claim using the brewing recommendations on the label. ........ 3

II. Plaintiffs ........ 7

A. Marcia Sorin ........ 7

B. All Plaintiffs ........ 10

III. Sorin fails to produce evidence that supports her claims. ........ 11

A. Sorin has no evidence that the reasonable consumer understands the claims in the manner alleged. ........ 11

B. The evidence shows the Products can meet the Up-To Claim. ........ 16

1. A former plaintiff's expert concluded the Pot Method "reasonably met the label claim printed on the cans that pertain[s] to the total number of servings a can of ground coffee might produce." ........ 16

2. Sorin failed to meaningfully rebut Defendants' testing. ........ 17

3. Sorin's retained expert confirms each container she tested can yield an amount "close to," if not more than, the Up-To Claim. ........ 18

4. Hockert's procedure compacted the ground coffee into her one-half measuring cup, biasing the results in Sorin's favor. ........ 19

IV. Sorin's flawed and unreliable evidence of materiality. ........ 21

A. Sorin presented a flawed survey that does not measure the materiality of the Up-To Claim or the materiality of a percentage shortfall. ........ 21

B. Sorin's conjoint expert did not offer an opinion on materiality. ........ 22

V. Sorin's evidence of damages is unreliable. ........ 23

INTRODUCTION ........ 25

SUMMARY OF FACTS ........ 26

I. Plaintiffs challenge the claim that the Products make "up to" a certain number of cups of coffee. ........ 26

II. The Florida court dismissed Sorin's claims, this Court allowed them to proceed, and the Eighth Circuit reversed class certification. ........ 27

III. The Products meet or exceed the Up-To Claim. ........ 28

IV. If consumers evaluate the Up-To Claim, they understand it as a maximum. ........ 28

V. The Up-To Claim plays little if any role in consumers' decisions to purchase the Folgers Products ........ 29
VI. The Eighth Circuit rejected Sorin's theories of harm and damages in this case. ........ 30
LEGAL ARGUMENT ........ A-1
ARGUMENT ........ A-2
I. Putative class members lack Article III standing. ........ A-2
A. Sorin lacks Article III standing. ........ A-3
B. The putative class lacks standing. ........ A-4
II. Sorin lacks statutory standing under the FDUTPA. ........ A-6
III. Sorin cannot create a genuine issue of material fact that the Up-To Claim is false or misleading. ........ A-7
A. The Up-To Claim is true. ........ A-9
B. Sorin cannot show that the Up-To Claim is misleading under the reasonable-consumer standard. ........ A-11
IV. Sorin's fraud claims fail because she lacks evidence that the Up-To Claim is material to reasonable consumers. ........ A-16
V. Sorin's claims fail because she has no evidence of damages. ........ A-18
VI. Sorin's fraud claim fails because there is no evidence Folgers acted with "knowledge" or "intent" or that Sorin relied on the alleged misrepresentation. ........ A-20
VII. Sorin lacks standing to pursue injunctive relief. ........ A-21
VIII. The Court should grant summary judgment on Plaintiffs' express warranty claim. ........ A-23
IX. Sorin's "Unjust Enrichment/Quasi-Contract" claim fails because none of her causes of action are viable. ........ A-24
X. Plaintiffs lack standing to pursue injunctive relief. ........ A-25
XI. The Court should grant summary judgment on Plaintiffs' claims for equitable relief because Plaintiffs cannot show that they lack an adequate legal remedy. ........ A-26
CONCLUSION ........ A-28

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anchor Prop. & Cas. Ins. Co. v. Trif*,
322 So. 3d 663 (Fla. Dist. Ct. App. 2021)....................A-17

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
999 F.3d 534 (8th Cir. 2021)....................A-1

*Barron v. Snyder's-Lance, Inc.*,
2015 WL 11182066 (S.D. Fla. Mar. 20, 2015)....................A-22

*Bassett v. Credit Bureau Servs., Inc.*,
60 F.4th 1132 (8th Cir. 2023)....................A-3, A-4, A-5

*Belcastro v. Burberry Ltd.*,
2017 WL 5991782 (S.D.N.Y. Dec. 1, 2017)....................A-5

*Blue Cross/Blue Shield v. Weiner*,
543 So. 2d 794 (Fla. Dist. Ct. App. 1989)....................A-16

*Bradshaw Fam. Tr. Inc. v. Twin City Fire Ins. Co.*,
105 F.4th 1089 (8th Cir. 2024)....................A-1

*Bustamante v. KIND, Ltd. Liab. Co.*,
100 F.4th 419 (2d Cir. 2024)....................A-16

*Butler v. Yusem*,
44 So. 3d 102 (Fla. 2010)....................A-20

*CDS & Assocs. of the Palm Beaches v. 1711 Donna Rd. Assocs.*,
743 So. 2d 1223 (Fla. Dist. Ct. App. 1999)....................A-24

*Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*,
789 F. Supp. 2d 1311 (S.D. Fla. 2011)....................A-26, A-27

*City First Mortg. Corp. v. Barton*,
988 So. 2d 82 (Fla. Dist. Ct. App. 2008)....................A-6

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................A-26

*Cohen v. Implant Innovations, Inc.*,
259 F.R.D. 617 (S.D. Fla. 2008)....................A-6

*Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*,
332 F. App'x 565 (11th Cir. 2009) .......... A-11

*Conseco Life Ins. Co. v. Williams*,
620 F.3d 902 (8th Cir. 2010) .......... A-1

*Cox v. Porsche Fin. Servs.*,
2020 WL 837167 (S.D. Fla. Feb. 19, 2020) .......... A-11

*Dapeer v. Neutrogena Corp.*,
95 F. Supp. 3d 1366 (S.D. Fla. 2015) .......... A-21

*David v. Am. Suzuki Motor Corp.*,
629 F. Supp. 2d 1309 (S.D. Fla. 2009) .......... A-27

*Debernardis v. IQ Formulations, LLC*,
942 F.3d 1076 (11th Cir. 2019) .......... A-6

*Douse v. Bos. Sci. Corp.*,
314 F. Supp. 3d 1251 (M.D. Fla. 2018) .......... A-23, A-24

*Dunham-Bush, Inc. v. Thermo-Air Serv., Inc.*,
351 So. 2d 351 (Fla. 4th DCA 1977) .......... A-23

*Durant v. Big Lots, Inc.*,
2024 WL 1826473 (M.D. Fla. Mar. 26, 2024) .......... A-8, A-9

*Fink v. Time Warner Cable*,
714 F.3d 739 (2d Cir. 2013) .......... 27

*In re Folgers Coffee Marketing Litig.*,
No. 24-2830 (8th Cir. Feb. 7, 2025) .......... 30, A-19

*In re Folgers Coffee Mktg.*,
159 F.4th 1151 (8th Cir. 2025) .......... *passim*

*Freeman v. Time, Inc.*,
68 F.3d 285 (9th Cir. 1995) .......... A-15

*FTC v. Nat'l Urological Grp., Inc.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) .......... A-8

*Fuccillo v. Century Enters.*,
2019 WL 11648480 (M.D. Fla. Mar. 8, 2019) .......... A-6

*Garcia v. Kashi Co.*,
43 F. Supp. 3d 1359 (S.D. Fla. 2014) .......... A-6

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*,
391 F.3d 907 (8th Cir. 2004) ........ A-1

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........ A-20

*Guido v. L'Oreal, USA, Inc.*,
2013 WL 3353857 (C.D. Cal. July 1, 2013) ........ A-19

*Hercules Cap., Inc. v. Gittleman*,
2018 WL 395489 (S.D. Fla. Jan. 12, 2018) ........ A-20

*Hernandez v. HP Inc.*,
2023 WL 12171845 (S.D. Fla. May 23, 2023) ........ A-9

*Hillcrest Pac. Corp. v. Yamamura*,
727 So. 2d 1053 (Fla. Dist. Ct. App. 1999) ........ A-17

*Inouye v. Adidas Am., Inc.*,
2023 WL 2351654 (M.D. Fla. Mar. 3, 2023) ........ A-23, A-24

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
589 F.3d 1179 (Fed. Cir. 2009) ........ A-1

*Jackson v. Anheuser-Busch Inbev SA/NV, LLC*,
2021 WL 3666312 (S.D. Fla. Aug. 18, 2021) ........ A-23

*Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.*,
2007 WL 5960207 (S.D. Fla. May 15, 2007) ........ A-27

*Johannessohn v. Polaris Indus. Inc.*,
9 F.4th 981 (8th Cir. 2021) ........ 31, A-2, A-4, A-5

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*,
903 F.3d 278 (3d Cir. 2018) ........ A-5

*Justice v. United States*,
6 F.3d 1474 (11th Cir. 1993) ........ A-27

*Kee v. Nat'l Rsrv. Life Ins. Co.*,
918 F.2d 1538 (11th Cir. 1990) ........ A-27

*Kennedy v. Floridian Hotel, Inc.*,
998 F.3d 1221 (11th Cir. 2021) ........ A-21

*Koziara v. City of Casselberry*,
392 F.3d 1302 (11th Cir. 2004) ........ A-21

*Krzyzanowski v. ROPK Holdings Inc.*,
2026 WL 1106751 (S.D. Fla. Apr. 2, 2026), *report and recommendation adopted*, 2026 WL 1103454 (S.D. Fla. Apr. 23, 2026) ........ A-27

*LaBlance v. Mo. Dep't of Corr.*,
2021 WL 5541945 (W.D. Mo. Jan. 13, 2021) ........ A-2

*Lance v. Wade*,
457 So. 2d 1008 (Fla. 1984) ........ A-8

*Linville v. Ginn Real Est. Co.*,
697 F. Supp. 2d 1302 (M.D. Fla. 2010) ........ A-17

*Lombardo v. Johnson & Johnson Consumer Cos.*,
124 F. Supp. 3d 1283 (S.D. Fla. 2015) ........ A-6

*Lorenzo v. MillerCoors*,
2023 WL 6614120 (S.D. Fla. Sep. 19, 2023), *aff'd*, No. 23-13247, 2024 WL 3983343 (11th Cir. Aug. 29, 2024) ........ A-21, A-22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ A-3, A-21, A-25

*Maisonet v. Comm'r, Ala. Dep't of Corr.*,
2022 WL 4283560 (11th Cir. Sep. 16, 2022) ........ A-21

*McCoy v. Samsung Elecs. Am., Inc.*,
2024 WL 3717299 (D.N.J. Aug. 8, 2024) ........ A-6, A-7

*Millennium Commc'ns & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affs.*,
761 So. 2d 1256 (Fla. Dist. Ct. App. 2000) ........ A-8, A-11

*Moore v. GNC, Holdings, Inc.*,
2014 WL 12634919 (S.D. Fla. Mar. 18, 2014) ........ A-24

*Mora v. Visionworks of Am., Inc.*,
2019 WL 13248146 (M.D. Fla. Oct. 31, 2019) ........ A-24

*Moss v. Walgreen Co.*,
765 F. Supp. 2d 1363 (S.D. Fla. 2011) ........ A-23

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ........ A-3, A-25

*Perez v. Scotts Co. LLC*,
2024 WL 5219736 (S.D. Fla. Nov. 15, 2024) ........ A-25, A-26

*Piescik v. CVS Pharmacy, Inc.*,
576 F. Supp. 3d 1125 (S.D. Fla. 2021) ........ A-15, A-16

*Prohias v. Pfizer, Inc.*,
485 F. Supp. 2d 1329 (S.D. Fla. 2007) .......... A-7

*Ramirez v. Kraft Heinz Foods Co.*,
684 F. Supp. 3d 1253 (S.D. Fla. 2023) .......... A-4, A-25, A-26

*Randolph v. J.M. Smucker Co.*,
303 F.R.D. 679 (S.D. Fla. 2014) .......... A-19

*Renne v. Geary*,
501 U.S. 312 (1991) .......... A-3

*Richardson v. Omaha Sch. Dist.*,
957 F.3d 869 (8th Cir. 2020) .......... A-12

*Ritchey v. S. Nuclear Operating Co.*,
423 F. App'x 955 (11th Cir. 2011) .......... A-1

*Romero v. Agent AU Pair, Inc.*,
2025 WL 2110244 (M.D. Fla. July 24, 2025) .......... A-16

*S. Broward Hosp. Dist. v. ELAP Servs., LLP*,
2023 WL 6547748 (S.D. Fla. Sep. 29, 2023) .......... A-11

*Searcy v. Gilead Scis., Inc.*,
2026 WL 171605 (E.D. Mo. Jan. 22, 2026) .......... A-5, A-6, A-7

*Shotz v. Cates*,
256 F.3d 1077 (11th Cir. 2001) .......... A-21

*SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*,
243 F. App'x 502 (11th Cir. 2007) .......... A-27

*Snyder v. Green Rds. of Fla. LLC*,
430 F. Supp. 3d 1297 (S.D. Fla. 2020) .......... A-25, A-26

*Sorin v. Folger Coffee Co.*,
2021 WL 5545292 (S.D. Fla. Mar. 5, 2021) .......... *passim*

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... A-2

*State Farm Mut. Auto. Ins. Co. v. At Home Auto Glass LLC*,
2025 WL 418015 (M.D. Fla. Feb. 6, 2025) .......... A-24

*Steyr Daimler Puch v. A & A Bicycle Mart, Inc.*,
453 So. 2d 1149 (Fla. Dist. Ct. App. 1984) .......... A-18

*Sweeney v. Kimberly-Clark Corp.*,
2016 WL 727173 (M.D. Fla. Feb. 22, 2016) ........ A-7

*Tampa Park Apts., Inc. v. Sec'y*,
2016 WL 398090 (M.D. Fla. Feb. 2, 2016) ........ A-27

*Thornton v. Boat Exp. USA, LLC*,
2021 WL 9565805 (S.D. Fla. July 28, 2021) ........ A-8

*Thurn v. Kimberly-Clark Corp.*,
2023 WL 4455630 (M.D. Fla. July 11, 2023) ........ A-23

*Timson v. Juv. & Jail Facility Mgmt. Servs.*,
2009 WL 10671134 (M.D. Fla. Apr. 24, 2009) ........ A-1

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ A-2, A-5

*United States v. Michael*,
2007 WL 1701697 (M.D. Fla. June 7, 2007) ........ A-1

*Universal Prop. & Cas. Ins. Co. v. Toshiba Am. Info. Sys.*,
2015 WL 5829838 (M.D. Fla. Sep. 30, 2015) ........ A-8

*Vidal v. Hershey Co.*,
2025 WL 2686987 (S.D. Fla. Sep. 19, 2025) ........ A-5

*Wasser v. All Market, Inc.*,
329 F.R.D. 464 (S.D. Fla. 2018) ........ *passim*

*Weiss v. Johansen*,
898 So. 2d 1009 (Fla. Dist. Ct. App. 2005) ........ A-23

*Wierman v. Casey's Gen. Stores*,
638 F.3d 984 (8th Cir. 2011) ........ A-1

*Williams v. City of St. Louis*,
783 F.2d 114 (8th Cir. 1986) ........ A-1

*Wooden v. Bd. of Regents of the Univ. Sys.*,
247 F.3d 1262 (11th Cir. 2001) ........ A-25

*Zlotnick v. Premier Sales Grp., Inc.*,
480 F.3d 1281 (11th Cir. 2007) ........ A-11

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ........ A-3

**Statutes**

Fla. Stat. § 501.204 .......... 25

**Other Authorities**

Fed. R. Civ. P. 12 .......... 27

Fed. R. Civ. P. 56(c)(1) .......... A-1

Restatement (First) of Restitution § 8 (1937) .......... A-17

<u>**STATEMENT OF UNCONTROVERTED MATERIAL FACTS**</u>

## I. Folgers' Coffee Products

### A. The Up-To Claim

1. At the relevant time, certain Folgers' Coffee Products stated on their labels that they "make up to __ 6 fl oz cups," with the number of six-fluid-ounce cups varying based on the size of the container and type of roast, and also included brewing recommendations on the side label, which provide that "1 Tablespoon" of ground coffee may be used to produce "1 Serving (6 fl oz)" and a "1/2 Measuring Cup" of ground coffee may be used to produce "10 Servings." A one-half measuring cup is equal to eight tablespoons, which means that the ratio of tablespoons of ground coffee to cups using the Single Serve Method is 1:1, and the ratio using the Pot Method is 8:10. Or, stated otherwise, the Pot Method is 25% more efficient than the Single Serve Method.







- Source: **Dkt. Nos. 263-15–263-28 & 263-30**, exemplar labels; **Dkt. No. 325-21**, FOL00028623 (Folgers Densities to Meet Servings Claims) ("The [Up-To Claim] has long been on the back or side panel near the brewing instructions, but in 2006 cups messaging was added to the front panel as well."); **Dkt. No. 373-3**, NIST, *Household Weights and Measures*.

### B. Defendants' research showed the Up-To Claim was not material to consumers.

2. Defendants conducted consumer research, the stated objectives of which were to "understand the awareness of [the] cups claim," "the usage of the cups claim statement," and the "perception of a servings range [versus] 'up to,' and any link to [the] brewing [recommendations]."

- Source: **Dkt. No. 373-5**, FOL00028621 (Summary of Servings Claim Consumer Research), at 1 ("Objective: Understand the awareness of cups claims on the front and back panel. Understand the usage of cups claims statement. Understand perception of a servings range vs. 'up to,' and any link to brewing instructions.").

3. A December 10, 2008 Folgers internal memorandum stated that the research found (1) that "[c]onsumers are generally unaware and uninterested in the cups claim statement and a range of cups is not necessary" and that "[participants] who … read [the] 'up to' [statement] had no negative issues with the language" and were paraphrased as stating, "It was simpler than including a range"; (2) that when participants were asked what they thought a range represented, they "interpreted [it] as accounting for how different people could make it stronger or weaker. No one related it to the two different brewing instructions"; and (3) that additional "Learnings" included that "[n]one of the panelists had ever noticed cups claims information on Folgers or any coffee package, either on the front or on the back [and] [w]hen directed to the information, they said it was not particularly relevant"; "[n]one of the panelists had read the brewing instructions before"; and "[n]o one related [the 'up to' cups claim] to the two different brewing instructions."

- Source: **Dkt. No. 373-5**, FOL00028621 (Summary of Servings Claim Consumer Research) at 1–2 ("Consumers are generally unaware and uninterested in the cups claim statement and a range of cups is not necessary."), ("[S]ome consumers will look at [cups messaging], but in general it is not important to consumers …. Those who did read 'up to' had no negative issues with the language. It was simpler than including a range …. The range was interpreted as accounting for how different people could make it stronger or weaker. No one related it to the two different brewing instructions."), 2–3 ("None of the panelists had ever noticed cups claims information on Folgers or any coffee package, either on the front or on the back. When directed to the information, they said it was not particularly relevant …. No one related it to the two different brewing instructions …. None of the panelists had read the brewing instructions before."); **Dkt. No. 263-6**, Meyer-Hawkes 30(b)(6) Dep. at 166:19–22 ("Q. Is it [Defendants'] position that consumers are generally uninterested in the cup claims? A. There's research that supports that[.]").

4. Separately, a Folgers presentation dated June 2011 summarizes the results of, among other things, an "eye tracking" study that showed that only 23% and 30% of respondents, respectively, "actively viewed" the Up-To Claim and 77% and 70% of respondents, respectively, did ***not*** "actively view[]" the Up-To Claim.

- Source: **Dkt. 373-6**, FOL00452870 ([redacted]) at 1–2, 6, 49–50.

**C. Folgers uses a formula, product specifications, and manufacturing controls to ensure that each Product can meet the Up-To Claim using the brewing recommendations on the label.**

5. Folgers' internal formula for predicting the number of servings a Folgers container can produce using the Pot Method [redacted]

- Source: **Dkt. No. 325-20**, FOL00028620 (Determining Coffee Servings per Package) [redacted] **Dkt. No. 325-21**, FOL00028623 [redacted] at 1–3 [redacted] **Dkt. No. 325-22**, Hennig Dep. at 212:15–213:11 [redacted]

[redacted] **Dkt. No. 325-23**, FOL00426375 (Weight Control Procedures) ¶¶ 1.05(a) [redacted] 1.05(b) [redacted] **Dkt. No. 329**, Mickowski Decl. ¶¶ 8–9 [redacted] **Dkt. No. 263-31**, Hennig Dep. at 95:11–17 [redacted]

6. [redacted]

- Source: **Dkt. No. 325-23**, FOL00426375 (Weight Control Procedures) ¶ 1.05(b) [redacted] **Dkt. No. 373-7**, Hennig Dep. at 243:18–244:5 [redacted] **Dkt. No. 373-8**, Trout Dep. at 135:6–136:1 [redacted]

7. [redacted]

- Source: **Dkt. No. 325-21**, FOL00028623 [redacted] at 1–2 [redacted] **Dkt. No. 325-20**, FOL00028620 (Determining Coffee Servings per Package) [redacted] **Dkt. No. 325-22**, Hennig Dep. at 212:15–213:11 [redacted]

8. [redacted]

- Source: **Dkt. No. 325-21**, FOL00028623 [redacted] **Dkt. No. 329**, Mickowski Decl. ¶¶ 8–9 [redacted] 10 [redacted] 11 [redacted]

[redacted] **Dkt. No. 325-23**, FOL00426375 (Weight Control Procedures) ¶¶ 1.05(a) [redacted]

9. [redacted]

- Source: **Dkt. No. 325-25**, Mickowski Dep. at 154:16–155:6 [redacted] **Dkt. No. 325-22**, Hennig Dep. at 208:20–209:17 [redacted] 212:24–213:11 [redacted] **Dkt. No. 373-7**, Hennig Dep. at 116:15–116:22 [redacted]

[redacted] Dkt. No. 329, Mickowski Decl. ¶ 14 [redacted]

10. Folgers has taken *tens of thousands* of measurements over several years that show the Products consistently meet their net weight and density specifications.

- Source: **Dkt. No. 329-4**, FOL00426394 (Products Laboratory Density Checks); *see also* **Dkt. No. 329-3**, FOL00452971 (Filler Density and Weight Checks); **Dkt. No. 329**, Mickowski Decl. ¶¶ 14–15 (detailing **Dkt. No. 329-4** measurements), 6, 10 ("The data show that from 2017 to 2022, the Folgers Coffee products met the specifications for net weight."), 11–13 (detailing **Dkt. No. 329-3** measurements).

## II. Plaintiffs

### A. Marcia Sorin

11. Sorin is a Florida resident who allegedly bought two of the Products (Classic Roast, 48 oz., and Black Silk, 24.2 oz.) and seeks to represent the proposed Florida Class. Sorin "does not maintain supermarket receipts" and has produced no documentary evidence of her alleged purchases.

- Source: **Dkt. No. 325-19**, Pls.' Resp. Rog. Nos. 2 ("Plaintiff Sorin does not maintain supermarket receipts that include the Products and is unable to identify each and every purchase made by her or on her behalf."), 17; **Dkt. No. 263-4**, Class Definitions.

12. Sorin testified that she began purchasing Folgers coffee in 1969 because she preferred the taste to Maxwell House coffee, and she continued purchasing Folgers coffee even after filing suit for "different purposes," including health considerations, taste, quality, and price.

- Source: **Ex. A**, Sorin Dep. at 111:12–111:20 ("Q. So, would you say it's a family tradition that you purchased Folgers coffee? A. It wasn't. I grew up in a Maxwell House Coffee [house]. When I was newly married, we were invited to someone's house, and I liked their coffee better than mine. I asked them what kind of coffee they were serving, and that's when I became a Folgers consumer. Q. And what year

was that? A. 1969."), 109:23–110:9 ("Q. And you purchased it for a variety of different reasons; isn't that right? A. You mean for different purposes? Q. Yeah. A. Uh-huh. Q. Is that a 'yes?' A. That is a 'yes.' Q. And could you tell me what those purposes were? A. When I have company, when my husband's health was involved, we switched him to decaf. When I have company, I use the Silk."), 110:20–111:5 ("Is one of the drivers for your purchase of Folgers Coffee, the taste? A. It is. Q. Is another driver of your purchase of Folgers Coffee, quality? A. Taste is quality. Q. Okay. So, is that a 'yes?' A. Yes. Q. Is another reason why you purchased Folgers Coffee the price? A. Certainly.").

13. Sorin testified that she did not notice the Up-To Claim when it first appeared on the label, does not recall when it first appeared, and does not have any recollection of seeing it. Only upon questioning from her attorney did Sorin testify that the Up-To Claim was a factor in her decision.

- Source: **Ex. A**, Sorin Dep. at 211:24–212:4 ("Q. Do you know when the cup claim started to appear on the container? A. No, I don't. Q. Okay. Did you notice the cup claim when it came out? A. No."), 226:1–6 ("Q. Okay. Well, when did you see it for the first time? A. I can't give you an honest answer to that. Q. Do you have any recollection of seeing it when you saw it? A. No."), 225:7–10 ("Q. Was it a factor? Was the label a factor in your decision to purchase the coffee? [objection] A. Yes.").

14. Sorin testified that when brewing Folgers coffee, she uses one tablespoon of ground coffee per serving and that the amount she brews varies from day to day, ranging from single servings to full "urns" of 30 cups; when making an urn, she does not follow the label but instead adds an "extra" tablespoon—i.e., 31 tablespoons for 30 cups.

- Source: **Ex. A**, Sorin Dep. at 169:6–9 ("[T]he way you make your coffee varied from day-to-day, ranging from a single serving to full pots, right? A. Correct."), 189:4–190:23 ("Q. Now when you measure your coffee, when you make a pot of coffee, how do you measure your coffee? A. With the line on the pot. Q. I'm asking you the coffee grounds. A. Oh, with my scoop or a tablespoon . . . . Q. So you don't follow the label when you're making 10 cups or 30 cups at a time? A. No. I follow the same way as I make one, plus I put in one extra for the pot. I was taught that[.] Q. One extra what? One extra of what? A. One extra tablespoon for the pot, that's how I was taught. . . . Q. So, you use 31 tablespoons? A. Yes. Uh-huh.").

15. Sorin testified that she "never actually attempted" to make the referenced number of servings using either brewing recommendation, conceding that she "never tried to make 240 cups of coffee" because she "live[s] in a house, not a hotel." In her view, the Up-To Claim means a container

should yield the referenced amount "[m]ore times than not," with "[a] miss here and there" not being a problem, and the claim "would be a truthful claim" if the Pot Method yielded the referenced number of cups, "if that's how you use your coffee in a 10-cup pot."

- Source: **Ex. A**, Sorin Dep. at 172:5–173:17 ("Q. [Y]ou admit that you never actually attempted to make 380 suggested strength 6 fluid ounce servings of coffee using the 48-ounce Classic Roast; isn't that correct? A. Correct…. Q. [Y]ou never tried to make 240 cups of coffee utilizing the [pot method], did you? A. No, I live in a house, not a hotel."), 130:25–131:5 ("Q. Okay. So, just so that I'm understanding clearly, 'up to' means you should get that amount—A. More times than not. Q. Okay. In your words, 'more times than not,' but you don't need to get it every time, right? A. A miss here and there. Maybe you get 378."), 158:2–159:4 ("Q. So, if you were to make 10 servings in this canister 38 times, and you were able to achieve 380 cups of coffee every time, then it's a truthful claim, right? A. It would be a truthful claim, but 99 percent of the time, I, and most consumers, don't use 10 servings at once…. Q. And if the consumer were to follow the 10 servings – ½ measuring cup of coffee 38 times, and they were to achieve 380 cups of coffee following the manufacturer's recommendation, it would be a truthful claim, right? A. It would be a truthful claim if that's how you use your coffee in a 10-cup pot.").

16. Sorin testified that she continued to buy the Products after the litigation began and "still paid the price they were charging" even though she believed she was getting "shorted" and getting "less coffee" "because of taste" and because "[she] like[s] [her] coffee."

- Source: **Ex. A**, Sorin Dep. at 105:14–106:24 ("Q. Did you ask to pay less because you believed that you were getting less coffee than you thought was being represented on the label? A. Who should I ask that of? … Q. But were you satisfied that you were paying a fair price for what you were purchasing? … A. No. Q. But you still paid the price that they were charging; is that right? A. I like my coffee. Q. But let me just understand this. You believe that you were paying more than you should have been paying; is that right? A. Yes. Q. But you purchased it nonetheless? A. This is after I filed the lawsuit, correct? Q. Yes. Yes. A. Yes."), 110:10–17 ("Q. And why do you use Folgers Coffee under those circumstances? A. Knowing that I'm being shorted…. Because of taste." (cross-talk omitted)).

17. Through this lawsuit, Sorin wants "Folgers [to change] their method of marketing on their can, and [sic] that the consumer is able to rely on the information."

- Source**: Ex. A**, Sorin Dep. at 44:25–45:14 ("Q. And what do you hope to achieve for yourself …? A. Number one, I'm looking to seek that Folgers changes their method of marketing on their can, and that the consumer is able to rely on the

information that any company puts out so that we can be an educated consumer and be told the truth about the quality of the ingredients, the ingredients, the amount of the ingredients. And what disturbs me is that Folgers knows about it now and still continues to, and I think that above all, speaks volumes for the company. If they really cared about the consumer as much as their own profit modes, I think they should have at least changed it by now, and that's why I'm here.").

### B. All Plaintiffs

18. All Plaintiffs, including non-Florida residents, agree that the Up-To Claim would be true if the containers purchased could have yielded the number of servings referenced by the Up-To Claim using the more efficient Pot Method, and some testified the Up-To Claim would be true if the canisters could produce close to that amount.

- Source: **Dkt. No. 325-5**, Ashton Dep. at 90:18–91:11, 94:4–12 ("Q. And you would agree with me that if you used the 10-serving, half measuring cup approach and were able to produce 210 or more 6-fluid-ounce cups of coffee, then the label is true, correct? … A. Yes, it should make at least 210 cups.… Q. And if it did make 210 cups, the label would be true, right? … A. Yes.… Q. And if you were able to make 240 cups of coffee using the 10-serving, half measurement cup approach, then the label would be true, correct? … A. It would be correct if it actually made that amount."); **Dkt. No. 325-10**, Tan Dep. at 150:13–17 ("Q. And if you could successfully do that 24 times and obtain 240 cups of coffee, then the statement on the label would be true; right? A. If it made near 240 cups, then the statement would be true."), 50:8–14, ("Q. And that statement in quotes, 'Makes Up to 240 6 Fluid Ounce Cups,' what does that mean to you? A. The term 'up to' gets used quite a bit but, to me, that means that we would be getting close to 240 6 ounce – 6 fluid ounce cups. It could be one or two more or one or two less, but close to it is what that means."); **Dkt. No. 325-7**, Moser Dep. at 98:25–99:8 ("Q. Okay. And so you would agree that if you followed [the pot] method and you got 240 cups of coffee, that the 240 cups of coffee representation would be true, correct? … A. If I followed that method for the entire container, yes."), 117:16–24 ("Q. What does 'up to' mean to you? That if you use a fairly standard way to measure your coffee, that you should be able to expect close to 240 cups.… I wouldn't expect it to be much less than 240 cups."); **Dkt. No. 325-6**, Fahey Dep. at 108:19–109:4 ("Q. So in order to make 210 servings using the 10 serving method, that would mean that this container should have 21 half cup scoops, correct? A. I suppose so, yeah. Q. And if you were able to get 21 half cup scoops out of this container, that statement … that it makes up to 210 suggested strength servings would be true, right? A. You know, I guess you can draw that conclusion, yeah."); **Ex. A**, Sorin Dep. at 130:25–131:5 ("Q. Okay. So, just so that I'm understanding clearly, 'up to' means you should get that amount—A. More times than not. Q. Okay. In your words, 'more times than not,' but you don't need to get it every time, right? A. A miss here and there. Maybe you get 378."), 158:2–159:4

("Q. So, if you were to make 10 servings in this canister 38 times, and you were able to achieve 380 cups of coffee every time, then it's a truthful claim, right? A. It would be a truthful claim, but 99 percent of the time, I, and most consumers, don't use 10 servings at once …. Q. And if the consumer were to follow the 10 servings – ½ measuring cup of coffee 38 times, and they were to achieve 380 cups of coffee following the manufacturer's recommendation, it would be a truthful claim, right? A. It would be a truthful claim if that's how you use your coffee in a 10-cup pot."); **Dkt. No. 325-11**, Thomson Dep. at 224:18–24 ("Q. And if you were to make 10 servings of coffee using 60 fluid ounces of water using the ½ measuring cup method and you were to achieve 240 suggested strength cups of coffee, then the statement on the label would be true; correct? A. Again, yes, in theory.").

## III. Sorin fails to produce evidence that supports her claims.

### A. Sorin has no evidence that the reasonable consumer understands the claims in the manner alleged.

19. Plaintiffs' consumer-perception expert Dennis's perception survey contains a *single* perception question, which, after showing respondents excerpted images of the front and back labels of one of the Products—Classic Roast, 30.5 oz—asked: "Do you believe or not that the ['makes up to 240 6 fl. Oz. cups'][1] description means that the product will make the same total number of cups of coffee when making **one cup** at a time and when making **10 cups** at a time?" Because 72.4% of respondents chose option (1) of the three responses available ((1) "Yes, I believe both methods will make the same total number of cups of coffee"; (2) "No, I do not believe both methods will make the same total number of cups of coffee"; and (3) "Don't know"), Dennis opined that "the reasonable consumer understands the ['up to' cups claim] to mean that the Products will make the same total number of cups of coffee when making one cup at a time as when making 10 cups at a time" and that the reasonable consumer understands the Challenged Descriptor to mean that the Products will meet the "Up-To" Claim regardless of which on-pack brewing method is followed.

- Source: **Dkt. No. 302**, Dennis Rep. ¶¶ 43 ("I then showed respondents the actual consumer perceptions question: Do you believe or not that the ['Makes Up to 240 Cups Claim'] means that the product will make the same total number of cups of coffee when making **one cup** at a time and when making **10 cups** at a time?") (emphases in original), 86 ("My survey found that **72.4%** of consumers perceived the Challenged Descriptor to mean that the Products 'will make the same total number of cups of coffee when making one cup at a time and when making 10

[1] A screenshot of the Up-To Claim was used in the question.

cups at a time.' Only **22.5%** of consumers do not believe both methods will make the same total number of cups of coffee. I conclude that my consumer survey found that the reasonable consumer understands the Challenged Descriptor to mean that the Products will make the same total number of cups of coffee when making one cup at a time and when making 10 cups at a time.") (emphases in original); **Dkt. No. 278-1**, Dennis Reply ¶ 59.

20. Dennis has no way to disagree with Folgers' position that the Up-To Claim means that a container can make the amount stated in the claim or less because Dennis's survey did not ask respondents whether they understood the Up-To Claim to mean that the referenced *number* of cups would be reached; whether, how often, or the circumstances under which they would expect a container to produce the referenced number of cups; or whether they understood the Up-To Claim to reference the number of cups that could be produced when following the brewing recommendations. Indeed, Dennis used the phrase "same total number" in his single perception question (instead of referencing the specific number of servings referenced in the Up-To Claim) precisely to allow "for the possibility that some consumers may interpret the 'Up To' Descriptor and the brewing instructions to mean that the product can yield *something less* than the [number of servings referenced in the Up-To Claim]."

- Source: **Dkt. No. 302**, Dennis Rep. ¶ 43; *see also* **Dkt. No. 482-3**, Dennis Dep. at 149:4–12 ("Q. Right. And you're saying if you make one cup at a time or 10 cups at a time, … do you think it will make the same total number of cups, right? A. The product. Right. Q. Right. And, you don't say, based on the brewing recommendations on the side of the label, do you? A. No, I don't."), 148:16–24 ("Q. I understand that, but your question just asks whether it will make the same total number of cups when making one cup at a time and when making 10 cups at a time, right? You don't call out or make reference to brewing methods or brewing recommendations or brewing instructions, do you? A. No. I, there's no reason to. That wouldn't even be appropriate. I'm measuring consumers' reactions to the challenged descriptor."), 184:23–185:22 ("Q. But when you say it could make up to 240 cups, that means it could make up to. What does, up to, mean, in the common meaning, English language meaning of the word? A. It would mean, literally, up to. So, where the 240 is described as, again, I mean, when I look at it, and I'm just a regular old consumer here, I look at that up to 240, and I'm expecting 240 or right around 240 cups of coffee to come out of this product. Q. And 240 would be the upper range, right? It could make up to. Up to is the top, right? A. I mean, that's one way of looking at it, sure. Q. And up to means expressly that it could make that amount, or it could make something less than that amount, right? A. Maybe. I didn't do a survey on that so. Q. Okay, but the plain English language

meaning of up to would tell you that directly, right? A. I don't have a way to disagree with that. I was just reporting to you what I take away from that, as a regular consumer."), 209:5–17 ("Q. So, [Plaintiffs] challenged the descriptor as being misleading to the consumers why? A. Because [P]laintiffs … allege that consumers are misled into thinking that the products will produce more coffee than they actually do. Q. And your survey is helpful to making that determination how? … A. I don't understand how my survey data and results fit into the [P]laintiffs' argument."), 257:12–258:11 ("Q. [I]sn't the inherent conclusion from your survey that the consumers or the respondents that took the survey somehow had to believe that the relationship or the ratio of tablespoons, whether making one cup at a time or 10 cups at a time, had to be a one-to-one relationship? A. It's possible. It's not something I've thought about. My mission was to get perceptions of this descriptor, and so I designed the project very specifically and narrowly to address that question. Q. Well, I understand that, but I guess what I'm very confused by is this, that if you're to get the exact same number of cups, using the one cup method or the 10 cup method, that that would necessarily mean that you are using the exact same number of tablespoons in the canister to get to the final number, right? A. It sounds like an interesting research project to take on, to find out why respondents answered the way they did to my survey question, but my theory is that they are looking at the challenged descriptor, and they are interpreting this challenged descriptor to mean that it's going to produce the same number of cups of coffee for each of these two methods."); **Dkt. No. 347**, Opp'n to Dennis 702 Mot. at 22 ("Indeed, Dr. Dennis's use of the phrases 'total number of cups', 'one cup at a time', and '10 cups at a time' fairly accounts for potential contrasting opinions consistent with Defendants' competing theory. That is, it accounts for the possibility that some consumers may interpret the 'Up To' Descriptor and the brewing instructions to mean that the product can yield something less than the cup claim serving representation when the tablespoon method is followed and perhaps also under the half cup method."); **Dkt. No. 327-3**, Kivetz Rep. ¶¶ 102–124.

21. Dennis has no data to show whether any respondents were capable of seeing or actually saw the brewing recommendations because he "did not direct the respondents to the brewing methods on the packaging" or provide an explanation about the brewing recommendations and did not analyze whether respondents believed they could make the same number of cups making one cup at a time or 10 cups at a time "based on the brewing recommendation on the side of the label."

- Source: **Dkt. No. 482-3**, Dennis Dep. at 73:14–18 ("Q. So, you don't know if anyone in your survey clicked on the thumbnail images. A. No. I, it's not a standard practice for me to record that. I did not ask for that information to be collected by the survey company."), 128:8–129:21 ("Q. I'm sorry, but do you know if they, that capability exists to zoom in and zoom out when you're on that particular page on the Internet when you're taking the survey? A. I'm not sure. It's not something I specifically tested. Q. And you never asked anyone to zoom in and zoom out if

they couldn't see the brewing recommendations, did you? A. No. It's not something I thought was important to instruct respondents to do… Q. So, you didn't tell them to zoom in and zoom out, right? A. No. Q. And, you didn't tell them to enlarge the image in any way in your question, did you? A. No, I did not tell them to."), 133:10–134:7 ("Q. And you have no way of knowing how many, if any, respondents could read, make out, or see the brewing recommendations when answering this question, correct? A. I know that all the respondents were exposed to the brewing instructions, but I can't tell you the percentage that would have attempted to enlarge the image and view it in a detailed way that I just did on your phone. Q. If the brewing recommendations were illegible, would it be your testimony that the respondents were nonetheless exposed to the brewing recommendations? A. Illegible. They were exposed. There's no doubt that they were exposed to it. Whether the respondents were able to read it clearly in every single instance, I don't, I didn't measure that. I can't say whether they did or not, conclusively."), 149:4–12 ("Q. Right. And you're saying if you make one cup at a time or 10 cups at a time, … do you think it will make the same total number of cups, right? A. The product. Right. Q. Right. And, you don't say, based on the brewing recommendations on the side of the label, do you? A. No, I don't."), 148:16–24 ("Q. I understand that, but your question just asks whether it will make the same total number of cups when making one cup at a time and when making 10 cups at a time, right? You don't call out or make reference to brewing methods or brewing recommendations or brewing instructions, do you? A. No. I, there's no reason to. That wouldn't even be appropriate. I'm measuring consumers' reactions to the challenged descriptor."), 161:11–162:3 ("Q. [Y]ou don't know here today whether anyone was capable [of seeing] or actually did see the brewing recommendations in reviewing the product packaging, right? A. No.… I did not have independent data that verifies the extent to which the consumers expanded the images to look at those images. I don't have data on that."), 164:6–22 ("Q. Again, you did not refer the respondents to the on-pack brewing methods, right? A. I didn't refer to the packaging, but my survey question calls out two different ways of making the coffee…. Q. [Y]ou did not refer [respondents] to the on-pack brewing methods at all, did you? A. I did not direct the respondents to the brewing methods on the packaging. I did not direct them to look at that, which I think is appropriate. I provided the entire product packaging for them to examine."), 168:7–21 ("Q. But where do you mention the on-pack brewing methods in the question? A. The survey question itself calls out the one cup at a time versus the 10 cup at a time. Q. Without referring to methods or to recommendations or to instructions, right? A. Well, that's a different question. I'm answering one question at a time. Q. Okay, well, answer the second question then. A. Well, the survey question itself appropriately does not point to or relate specifically to the product packaging. My assignment was to measure consumers' understanding of that challenged descriptor."), 202:20–23 ("No, I'm not measuring perceptions, as I've already said, in terms of consumers' expectations for the specific number of cups of coffee that this product will support."), 198:19–199:7 ("Q. [Y]ou didn't take into consideration the fact that up-to means that it could be … 240, or it could have been something less than 240, right? A. Well, that's measuring something different. I'm not measuring that. I'm not measuring what the challenged descriptor means to consumers in terms of a specific number

of cups of coffee. Q. Okay. So, in other words, they could have believed it made 240, or they could have believed it made 235, or believed it could have made 230. That was not your objective. A. That was not my objective."), 147:4–9 ("Q. And, how many total number of cups did [respondents] say the product would make? A. That's not what I'm measuring. I'm measuring whether they expect the two brewing methods to produce the same total number of cups of coffee."); **Dkt. No. 302**, Dennis Rep.; **Dkt. No. 278-1**, Dennis Reply Rep.

22. When asked whether "'up to' means expressly that it could make [the referenced] amount, or it could make something less than that amount," Dennis replied, "I didn't do a survey on that." And when Dennis was asked whether he has "an opinion about how many cups the respondents to your survey believe they would achieve making one cup at a time or 10 cups at a time, based on the challenged descriptor," Dennis replied: "No. My survey doesn't measure that."

- Source: **Dkt. No. 482-3**, Dennis Dep. at 185:8–16 ("Q. And 240 would be the upper range, right? It could make up to. Up to is the top, right? A. I mean, that's one way of looking at it, sure. Q. And up to means expressly that it could make that amount, or it could make something less than that amount, right? A. Maybe. I didn't do a survey on that."), 195:10–14 ("Q. And do you have an opinion about how many cups the respondents to your survey believe they would achieve making one cup at a time or 10 cups at a time, based on the challenged descriptor? A. No. My survey doesn't measure that.").

23. Dennis testified that his perception question "still makes sense to [respondents]" even "if their ambition … is to make 10 cups of coffee, or 20 cups of coffee, or more cups of coffee."

- Source: **Dkt. No. 482-3**, Dennis Dep. at 144:9–22 ("Q. But, what's the total? Is it if you were to make one cup of coffee 10 times, or 10 cups of coffee one time, would you expect that they will make the same number of cups; is that your objective? A. Well, my objective is to do what exactly I've done here, so, if respondents, if their ambition for any given scenario is to make 10 cups of coffee, or 20 cups of coffee, or more cups of coffee, this question still makes sense to them. So, the respondents, as consumers, they're going to vary in terms of how many cups of coffee they intend to make and need to make in any given scenario. So, here, I'm saying, regardless of which method, the one cup at a time or the 10 cups at a time method, will make the same number of cups of coffee.").

### B. The evidence shows the Products can meet the Up-To Claim.

#### 1. A former plaintiff's expert concluded the Pot Method "reasonably met the label claim printed on the cans that pertain[s] to the total number of servings a can of ground coffee might produce."

24. Before the start of this lawsuit, counsel for former Plaintiff R. Smith retained Biogen Laboratories Developments, LLC ("Biogen") "to verify the total servings of coffee a consumer could produce following the instructions printed on the retail packages" of "various sizes and varieties" of "Folger's ground coffee." In a June 4, 2020 "Certificate of Analysis," Biogen stated that "[t]he coffee cans tested following the optional prep of ½ cup coffee per 10 servings resulted in a 0-3.7% deficiency in the total number of servings per can," and that "[t]his variation is expected to fall within reasonable deviations from can to can, and/or prep-to-prep," and that the Pot Method "reasonably met the label claim printed on the cans that pertain to the total number of servings a can of ground coffee might produce."

- Source: **Dkt. No. 373-23**, Biogen Rep. at 3 ("Retail cans of Folger's ground coffee of various sizes and varieties, were examined to verify the total servings of coffee a consumer could produce following the instructions printed on the retail packages."), ("The coffee cans tested following the optional prep of ½ cup coffee per 10 servings resulted in a 0-3.7% deficiency in the total number of servings per can. This variation is expected to fall within reasonable deviations from can to can, and/or prep-to-prep."), ("[T]he manufacturer provided alternate instructions per 10 servings. These alternate instructions reasonably met the label claim printed on the cans that pertain to the total number of servings a can of ground coffee might produce.").

25. For purposes of this litigation, Defendants retained a Ph.D. chemist, Dr. Eric Smolensky, to evaluate whether the Products contain enough ground coffee to meet the Up-To Claim when using the Pot Method. His report shows the yields for each container ranged from 104.4% to 114.4% of the Up-To Claim, with an average of 108.6%, and nearly half of the 30 types of containers tested overdelivered against the "up to" cups by 10% or more.

- Source: **Dkt. No. 328-1**, Smolensky Opening Rep. at 1, 9 ("Exponential Business and Technologies Company ('Ebatco') have been retained as expert witnesses by Defendants, The J.M. Smucker Company and The Folger Coffee Company …. We were asked to evaluate whether the Folgers Coffee containers hold sufficient coffee to meet the "up to" representation on the label of the Folgers Coffee container

using the one-half measuring cup brewing recommendation."), 14-18. These results are summarized in **Dkt. No. 483**, Decl. of Dr. Eric Smolensky, **App'x 1**.[2]

### 2. Sorin failed to meaningfully rebut Defendants' testing.

26. Plaintiffs' rebuttal expert, Carol Hockert, did *not* criticize how Smolensky sampled the ground coffee. Instead, Hockert focused largely on whether Smolensky's results were "metrological[ly] traceab[le]."

- Source: **Dkt. No. 270-4**, Hockert Rebuttal Rep. at 1–3 ("The results and conclusions presented by Ebatco depend entirely on the measurements made using the ½ cup measuring tool, yet this tool has no metrological traceability.").

27. Smolensky disagreed with these criticisms, but he responded by following each step of Hockert's desired methodology and confirmed his original opinion—the one-half measuring cup he used for his procedure was indeed a one-half measuring cup. Hockert agreed that this additional calibration work resolved her traceability concerns.

- Source: **Dkt. No. 328-3**, Smolensky Reply Rep. at 2–5 ("In any event, even though I strongly disagree with Ms. Hockert's opinion, the ½ measuring cup was reverified in triplicate using a Rudolph DDM 2911 Density Meter (calibrated using NIST-traceable calibration standard liquid), a Cole Parmer Symmetry S-PA 224E balance capable of measuring up to 220 g of mass to an accuracy of 0.0001 g (calibrated using an ASTM Class 1 NIST-traceable deadweight), and a Millipore Simplicity UV water dispenser …. As expected, the ½ measuring cup was once again verified."); **Dkt. No. 325-2**, Hockert Dep. at 227:18–21 ("Q. So subject to providing you [an] uncertainty analysis, [Smolensky] [has] satisfied your criticisms in B, C, D, and E [of your rebuttal report], correct? A. From what I've seen."); *see also* **Dkt. No. 328-4**, Smolensky Suppl. Expert Rep. (producing measurement uncertainty analysis).

28. Hockert also opined that Smolensky should not have scooped the containers until they were empty and that Smolensky should have "measur[ed] the weight of a … ½ cup of coffee numerous times" to determine "an average weight of these measurements," which she said would "give[] a better approximation of what the consumer would use when measuring out coffee."

[2] All appendix cites are to Declaration of Eric Smolensky (Dkt. No. 483), unless otherwise noted.

- Source: **Dkt. No. 270-4**, Hockert Rebuttal Rep. at 3 ("The correct approach would be to follow the procedures in NIST Handbook 133-2020, Checking the Net Content of Packaged Goods, where a gravimetric calibration is conducted to determine the average weight of a given quantity of product, i.e., the approach followed in my initial report. By measuring the weight of a tablespoon or ½ cup of coffee numerous times, an average weight of these measurements gives a better approximation of what the consumer would use when measuring out coffee. This average takes into account the variability of the density of the coffee from one scoop to the next and provides added measurement assurance that the correct conclusions are drawn.").

29. Although Smolensky disagreed that this was a valid criticism, Smolensky's Rebuttal Report *did* "measur[e] the weight of a … ½ cup of coffee numerous times" to determine "an average weight of these measurements," and then determined the number of servings a container could produce by dividing the weight of ground coffee within the container by the average weight of his measurements from that container, and Smolensky concluded that when using this average-weight methodology with a straightedge at a 90° angle, each and every Folgers container he measured was capable of meeting the Up-To Claim.

- Source: **Dkt. No. 328-3**, Smolensky Reply Rep. at 4–5; **Dkt. No. 342-1**, Smolensky Am. Rebuttal Rep.at 8, 16.[3]

### 3. Sorin's retained expert confirms each container she tested can yield an amount "close to," if not more than, the Up-To Claim.

30. Hockert, who tested whether the Products could yield the number of cups claimed using the brewing recommendations, found, when using the Pot Method, the two highest-selling Products reached up to 99.0% and 99.4% of the referenced amounts, the average yield across all the containers she tested was 92.9% of the Up-To Claim, and the average of the maximum yield for each container was 94.3% of the Up-To Claim. The average maximum yield for all products tested ranged from 90.1% to 99.4%, and the average yields ranged from 89.3% to 97.7%.

[3] Hockert also opined that the test procedure was not within the scope of Smolensky's accreditation or that of the laboratory in which he conducted his work. As Smolensky's reply report explains, that is not a valid criticism. And Plaintiffs did not move to exclude Smolensky on the basis of his qualifications.

- Source: **Dkt. No. 260**, Hockert Opening Rep. at 1 ("I have been asked to determine whether the contents of containers of Folgers coffee could produce the number of cups of coffee claimed on the container if the brewing instructions are followed."), 14–21. The average yields reported by Hockert are summarized in **Appendix 3**, and the maximum yields reported by Hockert are summarized in **Appendix 4**.

31. Hockert stated that her results on average were accurate within 2%.

- Source: **Dkt. No. 260**, Hockert Opening Rep. ¶¶ 24, 14–21. The average yields reported by Hockert are summarized in **Appendix 3**, and the maximum yields reported by Hockert are summarized in **Appendix 4**.

**4. Hockert's procedure compacted the ground coffee into her one-half measuring cup, biasing the results in Sorin's favor.**

32. Defendants' rebuttal expert, Smolensky, hypothesized that the difference between his and Hockert's results was the product of Hockert improperly compressing the ground coffee into the one-half measuring cup. To test his hypothesis, Smolensky stated that he "performed two tests: one test using the Hockert protocol to determine the average mass of product in a leveled one-half measuring cup and another test using the protocol described in [his] Opening Report to determine the average mass of product in a one-half measuring cup."

- Source: **Dkt. No. 342-1**, Smolensky Am. Rebuttal Rep. at 7 ("Ms. Hockert's use of a non-lab-standard tool led me to believe she may have improperly compressed the ground coffee into the volumetric measuring container."), 11.

33. Folgers' in-house expert, Mr. Chris Mickowski, also analyzed the ground-coffee density of the half-cup measurements disclosed in Hockert's opening report and developed a methodology that *intentionally* compressed the ground coffee into the one-half measuring cup.

- Source: **Dkt. No. 329-1**, Mickowski Rebuttal at 1 ("Mr. Mickowski will testify about his efforts to recreate the data generated by Plaintiffs' expert metrologist, Ms. Hockert, and determine the densities of various roasts of Folgers ground coffee when scooped from Folgers ground coffee containers."); **Dkt. No. 373-9**, Mickowski Expert Dep. at 39:10–17 ("Q. [Y]ou didn't hold the spatula at a 90-degree angle to the face of the container; is that correct? A. Yeah. Ms. Hockert's report was not clear on that. So I started at a 90-degree angle, but I could not replicate her results that way, so I had to actually change the angle to get the same results she was getting, or close to those results."), 76:25–77:4 ("Q. [W]henever you utilized the Hockert method and used the spatula, was force applied [to the

ground coffee]? A. It would have been applied based on the angle of the spatula. So theoretically, I was pushing – putting force down on the coffee as I moved it across.").

34. Smolensky and Mickowski could replicate the densities reported in Hockert's results only when they intentionally compressed the ground coffee into the one-half measuring cup.

- Source: **Dkt. No. 342-1**, Smolensky Am. Rebuttal Rep. at 16 ("Table 2 shows that I was able to reasonably replicate Ms. Hockert's result when using a kitchen spatula to level the ground coffee in the one-half measuring cup. However, in order to achieve masses similar to those obtained by Ms. Hockert, I had to compress the ground coffee into the one-half measuring cup using the flat side of the spatula, and then level the one-half measuring cup at an acute Leveling Angle to further compress the ground coffee into the one-half measuring cup."); **Dkt. No. 329-1**, Mickowski Rebuttal at 1–2 ("Mr. Mickowski will opine that when the Folgers ground coffee is scooped from Folgers Coffee containers into a one-half measuring cup, and then leveled properly—i.e., in a manner that does not compress the Folgers ground coffee—then there is sufficient ground coffee in Folgers ground coffee containers to meet the servings representations.").

35. While Hockert disputes that Smolensky and Mickowski accurately replicated her methodology, she does not dispute that they intentionally compressed the ground coffee into the one-half measuring cup in attempting to replicate Hockert's methodology.

- Source: **Dkt. No. 338-4**, Hockert Reply ¶ 23 ("[I]t appears … the coffee was intentionally compacted into the measuring cup before weighing the contents.").

36. Hockert reported the volume of her one-half measuring cup was approximately 118.6 mL; Smolensky reported the volume of his one-half measuring cup was approximately 117.6 mL; Mickowski reported the volume of his one-half measuring cup was approximately 117.6 mL.

- Source: **Dkt. No. 270-2**, Hockert Rep., Ex. 3; **Dkt. No. 328-3**, Smolensky Reply at 4; **Dkt. No. 329-2**, Defs.' Designation of Rebuttal Expert Witness.

37. Hockert acknowledges that it is possible to compact ground coffee in a one-half measuring cup depending on the angle of the straightedge used to level the coffee in the measuring cup.

- Source: **Dkt. No. 325-2**, Hockert Dep. at 241:20–242:12 ("Q. But we could agree that if you tilted the spatula forward slightly, that could have the effect of compressing the coffee into the half cup, right? … A. [T]he more you would close your angle, the more opportunity for compaction.").

## IV. Sorin's flawed and unreliable evidence of materiality.

### A. Sorin presented a flawed survey that does not measure the materiality of the Up-To Claim or the materiality of a percentage shortfall.

38. Plaintiffs' materiality expert, Dennis, did not expose materiality-survey respondents to the brewing recommendations in his survey, but he asked respondents to choose between two otherwise identical Folgers products, one with the Up-To Claim and one without; he therefore opined that the "reasonable consumer" finds the Up-To Claim material because 79.8% of respondents stated they preferred the product with the Claim. Despite this, Dennis also stated he "[did not] know" whether the Up-To Claim could be material to a purchaser who did not see it on the label.

- Source: **Dkt. No. 302**, Dennis Rep. ¶¶ 29 ("My analysis of the survey data (n=575 interviews) found that 79.8% of consumers preferred to purchase the Product with the Challenged Descriptor rather than the Product without the Challenged Descriptor. Only 14.3% preferred to the [sic] purchase the Product without the Challenged Descriptor. 5.9% did not have an opinion."), 50 ("The survey informed the respondents that 'Product A' and 'Product B' are 'the same' with respect to brand, price, and other attributes."); **Dkt. No. 482-3**, Dennis Dep. at 95:3–96:14, 92:16–93:6 ("Q. So, right off the bat, you're showing them these two images, the [Up-To Claim] … without having ever seen the labels, so you make it blatantly clear and obvious that all you care about right now is the [Up-To Claim] that appears on page 29.… Right? A. Yes…. Q. Right, but you didn't give them a chance to say, please, take a look at this label, examine the label, I'm going to ask you some questions about the label. You didn't do that. A. No. I basically explained the differences between the two products, and did that first."), 353:22–354:2 ("Q. And from the, for the materiality survey, or the purchase intent survey, you didn't even show the side of the label. You just showed the front of the label, right? A. By design. I was measuring the materiality of that front panel descriptor."), 113:8–114:4 ("Q. I understand what you did, but what I'm asking you is, it's a fair point that if you walk into the store and you see a label and you don't notice the challenged descriptor on the label, that arguably that challenged descriptor is not material to the purchaser, right? A. I don't know. I mean, this is a survey where my assignment was to determine materiality of that descriptor, so I set up an appropriate survey project to answer that question. Q. Well, we can agree to disagree about whether you did that or not, but, by calling it out and calling it to the attention of the consumer, you left them with no choice but to assess that challenged descriptor, right? … A. No choice that, well, that was part of my design.

That's a key assumption that I made in my design that I'm measuring whether consumers prefer the product with or without the challenged descriptor.").

39. Respondents were then asked whether they preferred the product with or without the Up-To Claim. Because 79.8% of respondents stated they preferred the product with the Up-To Claim, Plaintiffs' survey expert opined that "the reasonable consumer" finds that claim material.

- Source: **Dkt. No. 302**, Dennis Rep. ¶¶ 53 ("After being shown the product package, the respondents are asked to state a preference for one of the two alternatives."), 87 ("My survey found that **79.8%** of respondents preferred to purchase the Products *with* the Challenged Descriptor compared to only **14.3%** for the Products *without* the Challenged Descriptor. My consumer survey found that the reasonable consumer finds material the Challenged Descriptor in terms of influencing their purchase decisions (compared to Products not having the Challenged Descriptor)." (emphases in original)).

40. Dennis expresses no opinion on the magnitude of shortfall that a consumer would find material or how important that Up-To Claim was in relation to any other claim or feature of the Products.

- Source: **Dkt. No. 347**, Pls.' Opp'n to Defs.' Mot. to Exclude Dr. J Michael Dennis at 18 (acknowledging that Dennis did not seek to "establish that a *specific percentage* of *shortfall* is material to consumers."(emphasis added)); **Dkt. No. 482-3**, Dennis Dep. at 357:23–358:3 ("Q. [Y]ou didn't seek to determine whether there were other aspects of this container that were driving purchase interest by the various plaintiffs in this case? A. That would be a very different project. That's not part of my assignment.").

**B. Sorin's conjoint expert did not offer an opinion on materiality.**

41. Plaintiffs retained Dr. Samantha Iyengar to perform a conjoint survey.

- Source: **Dkt. No. 303**, Iyengar Rep. ¶¶ 1 ("In connection with the above-captioned matter, I was asked by counsel for Plaintiffs to conduct research to determine the extent to which the contested statements … impacted consumers' preferences for the ground coffee products at issue."), 11 ("The methodology I used is known as a Conjoint or Choice Based Conjoint (CBC) Survey.").

42. Iyengar's choice sets did not provide respondents with the Up-To Claim as it appears on Folgers labels and encouraged respondents to use the "Servings Attribute" as a decision criterion.

- Source: **Dkt. No. 303**, Iyengar Rep. at 20, Fig. 4, ¶¶ 39 ("[R]espondents were shown the following description: … [Y]ou will see products with different number of servings. This is the maximum number of 6 fluid ounce servings you can get per container if you follow the brewing instructions on the label[.]"), 27–28 (describing servings attribute); **Dkt. No. 346**, Opp'n to Iyengar 702 Mot. ("Respondents were merely encouraged to make trade-offs between the attributes presented to them ([**Dkt. No. 303**,] Iyengar Rep. ¶¶ 23, 30) and were told that they 'will see products with different number of servings.' [**Dkt. No. 303**,] Iyengar Rep. ¶ 39, Figure 7."); **Dkt. No. 429** at 4 (quoting **Dkt. No. 279-1** ¶ 54) ("[A]s the number of 6 fluid ounce servings shown on the product label rises, the more likely respondents are to select that ground coffee product…. In other words, respondents are less likely to select a ground coffee product shown with a lower number of 6 fluid ounce servings, as compared to an otherwise identical product shown with a higher number of 6 fluid ounce servings.").

## V. Sorin's evidence of damages is unreliable.

43. The report of Plaintiffs' damages expert, Dr. Daniel Werner, discloses four damages models: (1) a conjoint analysis, (2) a conjoint analysis and market simulation ("Market Simulation"), (3) a hedonic regression, and (4) a model in which the price of the Products is assumed to be a factor of nothing other than the number of cups in the Up-To Claim ("Servings Proxy Model").

- Source: **Dkt. No. 304**, Werner Rep. ¶ 11 ("Based on the available documents and data, there are at least four damages methods available, which utilize different assumptions."); *see also id.* ¶¶ 42–43, 46, 49, 61–62, 71–72.

44. All four of Werner's damages models estimated damages by multiplying a "per-cup" price premium and Hockert's alleged "minimum servings shortfalls." Werner's Market Simulation model only assigns a fixed value to every cup and multiplies it by the shortfall. His Servings Proxy Model is based on an unfounded assumption that "the percentage shortfall represents a proxy for the overcharge paid by each customer." They cannot show a price premium attributable to the presence or absence of the Up-To Claim.

- Source: **Dkt. No. 304**, Werner Rep. ¶¶ 44, 54, 66, 73, 71 ("Plaintiffs allege that consumers paid a price premium related to the shortfall between the advertised number of servings and actual number of servings received."); **Dkt. No. 349-7**, Werner Dep. at 254:15–21 ("Q. And is it your testimony that [the incremental price impact of a change in cup count] [is] a linear relationship…? A. So the calculation uses 1.9 cents for all changes in the cup count."), 255:25–256:19 ("Q. [T]hat assumes that every single cup of coffee in that alleged shortfall has exactly the same value? … A. [Y]es, the assumption is it's approximately linear…. I just have

to multiply 1.9 … to get my number."), 330:13–23 ("Q. Is this an ad hoc model? … A. Every damage methodology has a number of assumptions baked in, including calculations 1 to 3. I perform sensitivity analyses to explore whether or not my conclusions changed with respect to those assumptions and I find that they don't change and this model also has an assumption baked into it."), 330:25–331:11 ("Q. I don't see any reference to a textbook or to an article or anything else like that [to] demonstrate that this model is valid. Do you agree with me? … A. The model is valid if the assumption is valid …. [T]o the extent this assumption is valid, then this model is valid."), 331:13–24 ("A. Counsel asked me to illustrate a damages model which assumes the percentage shortfall represents a proxy for the overcharge paid by each consumer …. Counsel asked me to illustrate a damages model with the assumption that's described here."), 332:9–12 ("Q. Counsel give you the assumption and then you ran with the assumption? A. Counsel asked me to illustrate a damages model that utilizes this assumption."), 334:7–335:6 ("[H]ave you ever seen a textbook describe the assumption that the percentage shortfall represents a proxy for the overcharge paid by each consumer? … A. I'm not sure I've seen a textbook. They don't go into all the specific assumption[s] …. [T]extbooks don't cover the full suite of possible assumptions you can make in the world."); **Dkt. No. 325-13**, Iyengar Dep. at 240:11–19 ("Q. And just to be clear, you didn't seek to measure whether the presence or absence of the cups claim had any bearing on consumer preference? … A. I did not test the presence or absence of the cup claims statements.").

45. Sales of Folgers Classic Roast make up approximately 62.25% of the Folgers' sales Plaintiffs' damages expert analyzed.

- Source: **Dkt. No. 304**, Werner Rep. at 55, Sched. 4 (identifying top-selling products).

## INTRODUCTION

This Court should grant summary judgment for Defendants on Sorin's claims. Sorin says the claim on the front label of the relevant Folgers ground-coffee products ("Products")—that the Products can make "up to" a specific number of "6 fl oz cups" (the "Up-To Claim")—is misleading. Specifically, she alleges the Products do not contain enough ground coffee to make "even close to" the referenced number of servings when following the "recommendations" for "best brewing results" (one tablespoon for a single six-ounce serving ("Single Serve Method") and one half-cup for 10 six-ounce servings ("Pot Method") (collectively, the "brewing recommendations")). Dkt. No. 240, Third Am. Compl. ("TAC") ¶¶ 2, 27.

***Sorin cannot demonstrate Article III or Statutory Standing.*** Article III requires an injury in fact that is concrete and actual rather than hypothetical. In the context of an alleged misrepresentation, claimants must prove that they relied on the alleged misrepresentation and that their injuries were caused by (or are "fairly traceable" to) the alleged misrepresentation to establish an Article III injury. Sorin's Florida statutory claim—under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA," Fla. Stat. § 501.204)—has the same requirement. But the Eighth Circuit has rejected Sorin's only argument regarding classwide reliance and causation. And Sorin cannot demonstrate an injury because she cannot show that she received less than the value for which she paid.

***The Up-To Claim is truthful, and Sorin has no evidence of a "huge disparity."*** Unrebutted expert testing and years of manufacturing data show that the Products meet or exceed the Up-To Claim using the Pot Method. Even Sorin's expert, despite a biased methodology, concluded that the best-selling Product, for example, could make up to **99.4%** of the referenced servings (239 rather than 240 cups) and could ***exceed*** the Up-To Claim considering her expected "accuracy range." This precludes all of Sorin's claims.

***Sorin has no evidence that consumers understand the Up-To Claim as she alleges.*** Sorin has no evidence that consumers understand the Up-To Claim to mean the referenced number of servings will be reached under all circumstances. Sorin admits she has no evidence of how

consumers understand "up to" in terms of the number of servings they will be able to brew. And Sorin, every other named Plaintiff, and even Plaintiffs' experts testified that "up to" means an upper limit and that the output could be less.

***Sorin has no evidence of materiality.*** Sorin has no evidence that the small "shortfalls" her expert supposedly found (as little as 239 rather than 240 cups of coffee) "w[ere] a significant factor in [her] decisions to purchase the Products." TAC ¶ 44. Indeed, her materiality "expert" did not even *test* that question.

***Sorin has no evidence creating a genuine issue of fact as to damages.*** Sorin's damages models are so flawed they are irrelevant. The Eighth Circuit has already held that this evidence cannot show a legally cognizable injury. And in any event, all four models turn on a fundamental presumption, for which Sorin has no evidentiary support, that the Products' prices would change equally for each marginal serving by which the Products were "short"—a premise undermined by Sorin's own evidence. All four also suffer from several other flaws that render them incapable of creating a *genuine* issue of fact, which forecloses Sorin's claims.

***The remaining claims and remedies fail for the same reasons.*** Plaintiffs have no evidence Folgers knew the Up-To Claim was false or intended to deceive; the warranty claims fail because the Up-To Claim is true, was not a basis of the bargain, and caused no injury; unjust enrichment fails because there is no deception, loss, or unjust retention; and Plaintiffs cannot seek injunctive relief because they lack standing to do so or, alternatively, have an adequate remedy at law.

## SUMMARY OF FACTS

### I. Plaintiffs challenge the Products make "up to" a certain number of cups of coffee.

This case is about the labeling statement on certain Folgers Coffee containers that they "make up to __ 6 fl oz cups." SUMF 1. The stated maximum number of cups varies based on the size of the container and type of roast. *Id.* The brewing recommendations provide that "1 Tablespoon" of ground coffee may be used to produce "1 Serving (6 fl oz)," and a "½ Measuring Cup" of ground coffee may be used to produce "10 Servings." Plaintiffs claim to have been misled by the Up-To Claim

and that they, and reasonable consumers everywhere, understand the Up-To Claim to mean that the Products at issue will make exactly or at least the number of cups stated in the Up-To Claim. *Id.*

## II. The Florida court dismissed Sorin's claims, this Court allowed them to proceed, and the Eighth Circuit reversed class certification.

Sorin first brought her Florida claim in the Southern District of Florida, where Folgers moved to dismiss. The Florida court granted that motion, holding that "up to" would lead a reasonable consumer to expect that the actual number of cups produced could be less and that "up to" is not a guarantee that the number of cups will be reached. *Sorin v. Folger Coffee Co.*, 2021 WL 5545292, at *2 (S.D. Fla. Mar. 5, 2021). The Florida court also held that Sorin lacked standing to seek injunctive relief because she had not alleged a likelihood of future injury. *Id.*

After the cases were centralized in this MDL, Folgers again moved to dismiss under Rule 12. Dkt. Nos. 74, 77. It argued it is not plausible that consumers understand the Up-To Claim to mean the Products "will produce" the referenced number of servings. Dkt. No. 77-1 at 13. This Court agreed consumers would not reasonably understand the Up-To Claim as "a guarantee that that [quantity] will be achieved" but disagreed with the Florida court's conclusion on plausibility and held that, accepting the amended consolidated complaint's allegations as true, Plaintiffs had adequately alleged that a reasonable consumer could be misled by the label. Dkt. No. 105 at 14–15 (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 742 n.3 (2d Cir. 2013)). This Court also denied dismissal of the FDUTPA claim, explaining that, although nothing would prevent the transferor court from reaching the same conclusion it had reached before transfer on a fuller record, the pleadings stated a claim at that stage. *Id.* at 21–22.

But after discovery and class-certification proceedings, the Eighth Circuit rejected Sorin's classwide theory of harm and damages, concluding that individualized inquiries would be required to determine which consumers understood the Up-To Claim as Sorin alleged and relied on that claim such that they were injured. *In re Folgers Coffee Mktg.*, 159 F.4th 1151 (8th Cir. 2025). Thus, this case proceeded beyond dismissal only because the Court was required at the pleading stage to assume the truth of allegations that discovery has now disproven.

## III. The Products meet or exceed the Up-To Claim.

Folgers uses a formula that controls [redacted] to ensure each Product can meet or exceed the Up-To Claim when following the Pot Method. SUMF 5–10. Folgers has tens of thousands of measurements—the accuracy of which Plaintiffs do not contest—showing that the Products consistently meet [redacted]. *Id.* 10.

Rather, Sorin hired an expert witness, Carol Hockert, who tested how much coffee the Products contain. She found the average maximum yield for the Products she tested was 94.3% of the Up-To Claim. *Id.* 30. The average yield was 92.9% of the Up-To Claim. *Id.* The average maximum yield for each Product ranged from 90.1% to 99.4%, and the average yields ranged from 89.3% to 97.7%. *Id.* For the two best-selling Products—the 11.3- and 30.5-ounce containers of Folgers Classic Roast[4]—Hockert's average maximum yields were 99.0% and 99.4%, respectively (more than 100% when accounting for Hockert's stated 2% accuracy range). *Id.*; App'x 4.

Folgers' expert, Dr. Eric Smolensky, also tested the amount of ground coffee in the Products. SUMF 25. He found that each Product he tested met or exceeded the Up-To Claim when following the Pot Method. *Id.* Yields ranged from 104.4% to 114.4% and averaged 108.6%. *Id.*

## IV. If consumers evaluate the Up-To Claim, they understand it as a maximum.

Consumers understand the Up-To Claim to state a potential maximum rather than a guaranteed minimum. Sorin testified that the Up-To Claim means a container should yield the referenced amount "[m]ore times than not," with "[a] miss here and there" not being a problem, and that the claim "would be a truthful claim" if the Pot Method yielded the referenced number of cups, "if that's how you use your coffee in a 10-cup pot."[5] *Id.* 15. Moreover, Folgers' internal prelitigation research of the Up-To Claim shows that surveyed consumers understood the claim to account "for how different people could make [their] coffee stronger or weaker." *Id.* 3.

---

[4] These containers account for about 62.25% of the sales that Sorin's damages expert analyzed. SUMF 45.

[5] Testimony from the other named Plaintiffs was similar, with several testifying that the Up-To Claim is true if the Pot Method would yield "close to" the referenced number of servings some of the time. *Id.* 18.

Sorin hired a survey expert, Dennis, to evaluate how consumers understand the Up-To Claim, but he did not test how many cups of coffee consumers expect based on the Up-To Claim. *Id.* 19, 22. Dennis showed respondents excerpted images of the front and side labels of one of the Products. *Id.* 19. He asked respondents, "Do you believe or not that the [makes up to 240 6 fl oz cups] description means that the product will make the same total number of cups of coffee when making **one cup** at a time and when making **10 cups** at a time?" *Id.* Because 72.4% of respondents answered "Yes," Dennis opined that "the reasonable consumer understands the [Up-To Claim] to mean that the Products will make the same total number of cups of coffee when making one cup at a time as when making 10 cups at a time." *Id.* But when Dennis was asked whether "up to" means the "upper range," or "it could make that amount, or it could make something less than that amount," Dennis answered: "Maybe. ***I didn't do a survey on that***." *Id.* 22 (emphasis added).

## V. The Up-To Claim plays little if any role in consumers' decisions to purchase the Folgers Products.

The undisputed evidence is that the Up-To Claim does not drive consumers' purchase decisions. Sorin continued to buy the Products even though she thought she was getting "less coffee"; she "still paid the price [Defendants] were charging" because she "like[s] [her] coffee." *Id.* 16.

Dennis also conducted a survey purportedly pertaining to the materiality of the Up-To Claim to consumers' decisions to purchase the Products, but he did not test how the Up-To Claim drove purchase decisions. *Id.* 38. Dennis asked respondents whether they preferred a Product with or without an Up-To Claim. *Id.* He did not test whether consumers notice the Up-To Claim, or what weight they place on it relative to other product attributes. *Id.* He gave respondents "no choice" but to notice the Up-To Claim, which was "part of [his design]." *Id.* Nor did Dennis test whether consumers cared about shortfalls of the magnitudes alleged by Hockert. *Id.* 40.

Sorin's conjoint-survey expert, Iyengar, also did not test whether the Up-To Claim drove consumers' decisions to purchase the Products. *Id.* 41–42. Rather, she encouraged respondents to use the Up-To Claim as a decision criterion and concluded that "as the number of 6 fluid ounce servings

shown on the product label rises, the more likely respondents are to select that ground coffee product." Dkt. No. 429 at 4 (quoting Dkt. No. 279-1 ¶ 54); SUMF 42.

## VI. The Eighth Circuit rejected Sorin's theories of harm and damages in this case.

Sorin's evidence of damages comes entirely in the form of four damages models proffered by her damages expert, Werner. SUMF 43. Werner's models purport to provide a "per-cup" price premium for the Product based on Hockert's alleged "shortfalls." *Id.* 44. According to Sorin, the alleged premia determine the damages for each consumer who purchased a product during the class period regardless of whether the consumers relied on the Up-To Claim. *See* Dkt. No. 256 at 43 n.83; *In re Folgers Coffee Marketing Litig.*, No. 24-2830, Appellee Br. at 27, 36–37, 60 (8th Cir. Feb. 7, 2025).

The Eighth Circuit reversed the certification of a Missouri class. *In re Folgers*, 159 F.4th at 1158. It found common questions did not predominate over individualized inquiries, which were required to determine which consumers understood the Up-To Claim as alleged and relied on that claim such that they were injured. *Id.* at 1156. According to the Eighth Circuit, "the conclusion seems ineluctable that a significant proportion of the proposed class did not read [the Up-To Claim] or, if they did, did not care about them one way or the other." *Id.* Moreover:

> [F]or those who read and cared about [the Up-To Claim], a significant proportion likely did not interpret the representations in the manner [Plaintiffs] suggest[]: A hefty percentage may well have read the representations and believed that the promised number of cups could be achieved only some of the time under certain conditions. Or perhaps they understood the representations to mean that other, non-recommended brewing methods could brew the promised number of cups. After all, some consumers prefer relatively weak cups of coffee. What matters is that many class members weren't deceived, and figuring out who was and who wasn't will require consumer-by-consumer inquiries into each class member's individual tastes, interpretations, and circumstances, undermining the efficiencies class actions are intended to provide.

*Id.*

The Eighth Circuit observed that Plaintiff tried to sidestep this issue by arguing that all class members were injured regardless of whether they relied on the Up-To Claim because it led to inflated prices for the Products. *Id.* at 1157. But the Eighth Circuit explained that it "ha[d] already turned aside a similar price-premium argument" because it "did 'not create an *Article III* injury in fact.'" *Id.* (quoting

*Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 987–88 (8th Cir. 2021)) (emphasis added). Plaintiffs have proposed no damages model taking into account whether consumers relied on the Up-To Claim.

## LEGAL ARGUMENT

### STANDARD

This Court applies Eighth Circuit precedent to issues of federal law and Florida substantive law to issues of state law. *See In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 391 F.3d 907, 911 (8th Cir. 2004). In the absence of a Florida Supreme Court decision resolving a disputed issue of Florida substantive law, the Court must predict how the Florida Supreme Court would resolve that issue. *Bradshaw Fam. Tr. Inc. v. Twin City Fire Ins. Co.*, 105 F.4th 1089, 1093 (8th Cir. 2024). However, because Eleventh Circuit decisions would have bound the Florida federal court in which Sorin filed suit, the Court should follow Eleventh Circuit decisions on disputed issues of Florida substantive law. *See In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 999 F.3d 534, 538 (8th Cir. 2021) (stating that "this court and others have concluded in many instances that the substantive law of the forum the individual complaint was or would have been brought in should govern, rather than the law of the MDL forum").

Defendants are "entitled to [summary] judgment as a matter of law" if "there is no genuine issue of material fact." *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011); *see also United States v. Michael*, 2007 WL 1701697, at *1 (M.D. Fla. June 7, 2007) ("Material facts are those that may affect the outcome of the case under the applicable substantive law."). "An expert's unsupported conclusion on [an] ultimate issue … will not alone create a genuine issue of material fact." *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1184 (Fed. Cir. 2009); *see also Timson v. Juv. & Jail Facility Mgmt. Servs.*, 2009 WL 10671134, at *10–11 (M.D. Fla. Apr. 24, 2009) (same).

Sorin cannot defeat summary judgment by simply asserting that a genuine issue of fact exists; she must point to record evidence showing a material factual dispute. Fed. R. Civ. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909–10 (8th Cir. 2010); *Ritchey v. S. Nuclear Operating Co.*, 423 F. App'x 955, 958 (11th Cir. 2011). When, as here, the ultimate burden of proof is on the nonmoving

party, it is "enough for the movant to bring up the fact that the record does not contain [evidence to support the] issue and to identify the part of the record which bears out this assertion.… [I]t is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *LaBlance v. Mo. Dep't of Corr.*, 2021 WL 5541945, at *3 (W.D. Mo. Jan. 13, 2021) (Phillips, J.) (citation omitted).

## **ARGUMENT**[6]

The Court should grant summary judgment on all Florida claims. Those are the alleged violation of the FDUTPA, TAC ¶¶ 150–158; breach of express warranty, *id.* ¶¶ 74–89; common-law fraud, *id.* ¶¶ 183–189; negligent misrepresentation, *id.* ¶¶ 190–197; and unjust enrichment, *id.* ¶¶ 198–204.

Although Sorin brings numerous claims, she has a single theory of liability. Her claims rest on the assertion that the Up-To Claim misleads consumers into purchasing Folgers Products because the Products do not meet the Up-To Claim. *Id.* ¶¶ 155 (FDUTPA), 80 (express warranty), 185 (fraud), 192 (negligent misrepresentation), 200 (unjust enrichment). Because the undisputed evidence shows that Sorin cannot establish this theory, the Court should grant summary judgment on the Florida claims in full.

### **I. Putative class members lack Article III standing.**

Sorin cannot establish Article III standing as to herself or as to the putative class members. "The [Article III standing] doctrine limits the category of litigants empowered to maintain a lawsuit in federal court." *Johannessohn*, 9 F.4th at 987 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). In a class action, "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "If [class] members who lack the ability to bring a suit themselves are included in a class," because they lack standing, "the court lacks

[6] Because summary judgment and class certification are being briefed contemporaneously, this motion includes arguments directed both at Sorin individually and at the putative class. As stated in the parties' joint status report, Folgers does so without waiver of the protection of the one-way intervention doctrine. *See* Dkt. No. 475 at 8–9.

[subject matter] jurisdiction over their claims." *Id.* (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011)). Federal courts must presume that they lack subject matter jurisdiction. *See, e.g.*, *Renne v. Geary*, 501 U.S. 312, 316 (1991).

Article III standing requires, among other things, a concrete and particularized injury in fact. *Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1134–35 (8th Cir. 2023). When a plaintiff alleges harm from a misrepresentation, the plaintiff must demonstrate an "injury that results from reliance on [that] misrepresentation." *Id.* at 1136. "[H]ypothetical" or "conjectural" injuries do not suffice. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Nor do violations of mere statutory rights. *Bassett*, 60 F.4th at 1135. Further, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

The standing analysis begins and ends with Sorin. If she cannot "establish[] the requisite of a case or controversy with the defendants," she cannot "seek relief on behalf of [herself] or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

### A. Sorin lacks Article III standing.

Sorin lacks Article III standing because she did not rely on the Up-To Claim. *See In re Folgers*, 159 F.4th at 1156–58 (stating that class members who did not rely on the Up-To Claim were not injured). Sorin allegedly purchased Classic Roast, 48 oz., and Black Silk, 24.2 oz. SUMF 12. When asked in her deposition what drove her purchases of Folgers coffee over other coffee brands, Sorin testified that she had been loyal to Maxwell House until 1969, when she was "invited to someone's house" and "liked their coffee better." *Id.* 13. When asked if quality "[i]s another driver of [her] purchase of Folgers Coffee," Sorin agreed and said that "[t]aste is quality." *Id.* And when asked if price is "another reason why [she] purchased Folgers Coffee," Sorin said, "Certainly." *Id.* Sorin also testified that her reasons for deciding which Folgers Product to buy included health considerations because "when [her] husband's health was involved, [they] switched him to the decaf." *Id.* And when Sorin had guests over, she "use[d] the Silk." *Id.* Thus, when given the opportunity to explain why she purchased

the Products, Sorin testified about taste, quality, health, and entertaining, but she never testified that the Up-To Claim was a reason why she purchased the Products over other brands.

Critically, Sorin kept purchasing the Folgers Products after filing suit. *Id.* 16. According to Sorin, she continues to buy the Products even though she "kn[ew] [she was] being shorted … [b]ecause of taste." *Id.* That is dispositive because it shows she cannot demonstrate an "injury that results from reliance on [the alleged] misrepresentation." *Bassett*, 60 F.4th at 1136. Courts in the Eleventh Circuit agree, holding that when a plaintiff "continue[s] to pay the alleged price premium knowing that the Product" does not conform to the representations, the "[p]laintiff [i]s not deprived of the benefit of her bargain" and lacks Article III standing. *Ramirez v. Kraft Heinz Foods Co.*, 684 F. Supp. 3d 1253, 1258 (S.D. Fla. 2023) (collecting cases).

**B. The putative class lacks standing.**

Sorin's only theory of classwide injury is that the Up-To Claim inflated the price of the Products, such that "*all* consumers paid an overcharge for the Products" regardless of their "rationale for purchasing the Product[s]." Dkt. No. 256, Mot. at 43 n.83 (emphasis in original). The Eighth Circuit has twice squarely rejected that theory. In *Johannessohn*, the plaintiffs argued that buyers whose products did not manifest an alleged defect could "show economic injury by the mere fact that they paid an inflated purchase price." 9 F.4th at 988. The Eighth Circuit held that an inflated purchase price "does not create an Article III injury in fact." *Id.*

More important, the Eighth Circuit has since applied *Johannessohn*'s holding to this very case: "[F]or many people in [the] proposed class, the representations on the containers would not have caused them any ascertainable loss; instead, they got exactly what they had bargained for when they purchased the Folgers products at issue," and "the conclusion seems ineluctable that a significant proportion of the proposed class did not read those representations or, if they did, did not care about them one way or the other." *In re Folgers*, 159 F.4th at 1156. And this was not, as Sorin will argue, limited to the context of the Missouri Merchandising Practices Act ("MMPA"). The Eighth Circuit "turned aside" the "price-premium argument" because it "did 'not create an *Article III* injury in fact.'"

*Id.* at 1157 (emphasis added) (quoting *Johannessohn*, 9 F.4th at 987–88). This Court is bound by that holding.

Sorin's damages models cannot be reconciled with Eighth Circuit law—they assign an overcharge to every consumer who purchased a Product regardless of the consumer's reason for purchasing. SUMF 44. Sorin has proposed no model that accounts for whether any class member relied on the Up-To Claim. Nor could the record support one. Sorin's survey expert never asked respondents whether the Up-To Claim influenced their purchasing decisions, *id.* 19–23, 38–40; her conjoint expert *encouraged* respondents to use the Up-To Claim as a decision criterion and therefore cannot say whether consumers would rely on it unprompted, *id.* 42; and Folgers' prelitigation research showed that "consumers are generally unaware [of] and uninterested in the [Up-To Claim]" and that the claim "is not important to consumers," *id.* 3. Because "[e]very class member must have Article III standing in order to recover individual damages," *TransUnion*, 594 U.S. at 431, Sorin has no evidence of classwide, reliance-based injury, and the putative class lacks standing.

Nor can Sorin show that any class member overpaid for the Products by an objective measure. *Belcastro v. Burberry Ltd.*, 2017 WL 5991782, at *4 (S.D.N.Y. Dec. 1, 2017); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 290 (3d Cir. 2018); *accord Vidal v. Hershey Co.,* 2025 WL 2686987, at *6 (S.D. Fla. Sep. 19, 2025) (holding plaintiffs' overpayment allegations failed where they offered "no factual allegations regarding the price they might have paid for the [Products]" without the misleading representation). As shown below, the undisputed evidence is that the Products can make "up to" the number of cups stated on the label using the Pot Method. Class members thus received exactly what the label promised—a product that can make up to the stated maximum—and they suffered no objective economic injury.

In opposing this motion, Sorin may assert that a consumer who pays a price premium because of a misrepresentation suffers economic injury. However, controlling law holds that a consumer who *relied on* a misrepresentation, and paid more *because of* that reliance, is injured; it does not relieve a plaintiff of proving reliance, which is a required element of standing. *Bassett*, 60 F.4th at 1136; *see also Searcy v. Gilead Scis., Inc.*, 2026 WL 171605, at *5 (E.D. Mo. Jan. 22, 2026) ("Article III 'requires at a

minimum that the injury 'exist' in the real world independent of a legislature's choice to confer the right to sue and independent of the plaintiff's claim to be hurt.'") (quoting *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1089 (11th Cir. 2019) (Sutton, J., concurring)). Summary judgment is appropriate because the putative class lacks standing.

## II. Sorin lacks statutory standing under the FDUTPA.

To have standing under the FDUTPA, a consumer must establish "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1383 (S.D. Fla. 2014) (quoting *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)). Causation "is a necessary element of the FDUTPA claim, and 'causation must be direct, rather than remote or speculative.' Thus, a plaintiff's damages must be shown … to have been caused by the defendant's conduct." *Fuccillo v. Century Enters.*, 2019 WL 11648480, at *7 (M.D. Fla. Mar. 8, 2019) (quoting *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015)). "Causation also presents an individualized question. Each putative class member would have to prove causation in order to establish the defendant's liability under FDUTPA." *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 643 (S.D. Fla. 2008). Thus, "the Court must determine that (1) each putative class member was exposed to the Defendants' advertising and marketing materials alleged to constitute a deceptive trade practice and (2) if exposed, the advertising and marketing materials caused each putative class member damage." *Id.*

Here, Sorin cannot show that the Up-To Claim caused her alleged damages for the reasons stated in Part I. As noted, the Eighth Circuit "turned away" Sorin's price-inflation argument, "noting it 'would allow those who suffered no ascertainable loss from Folgers's representations to piggyback on the injuries of others to pursue a remedy.'" *Searcy*, 2026 WL 171605, at *7(quoting *In re Folgers*, 159 F.4th at 1158). And courts find the MMPA's ascertainable-loss requirement to be similar to the actual damages requirement in the FDUTPA. *McCoy v. Samsung Elecs. Am., Inc.*, 2024 WL 3717299, at *4–5 (D.N.J. Aug. 8, 2024) (dismissing FDUTPA claim because it was "unclear what specific materials

[plaintiff] saw, and what statements … [plaintiff] relied on" and dismissing MMPA claim because "[t]he reliance issue also defeats the MMPA claim").

That means the Eighth Circuit's reasoning applies as much here as in *Searcy*— where "for many people in [the] proposed class, the representations on the containers would not have caused them any ascertainable loss; instead, they got exactly what they had bargained for when they purchased the Folgers products at issue," and "the conclusion seems ineluctable that a significant proportion of the proposed class did not read those representations or, if they did, did not care about them one way or the other." *In re Folgers*, 159 F.4th at 1158. Sorin has no evidence to overcome this.

Indeed, Sorin did not rely on the Up-To Claim because she continued to buy the Products even after she came to believe that the Products she purchased did not make the number of cups of coffee stated in the Up-To Claim on those Products. SUMF 12. This is fatal to her FDUTPA claim. *See Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007) (dismissing FDUTPA claim because "the fact that [plaintiffs] currently take Lipitor, in light of the information they have, requires me to conclude that they take Lipitor for its cholesterol-reduction or other undisputed health benefits, and therefore cannot claim to have suffered any damage from the allegedly misleading statements"); *Sweeney v. Kimberly-Clark Corp.*, 2016 WL 727173, at *6 (M.D. Fla. Feb. 22, 2016) ("[T]he Plaintiffs lack standing to prosecute their FDUTPA claim under a price premium theory because the undisputed facts and record evidence demonstrate that they continue to pay the alleged 'price premium' despite their knowledge and belief that the wipes are not flushable."). Thus, the conclusion here also is "ineluctable" that Sorin cannot demonstrate statutory standing for herself or the class.

## III. Sorin cannot create a genuine issue of material fact that the Up-To Claim is false or misleading.

Sorin cannot show that the Up-To Claim is misleading. As the Court has explained, evidence of a material misrepresentation "is a necessary prerequisite to all of Plaintiffs' claims." MTD Order

at 13.[7] The only way the claim could be false or misleading is if consumers understand the Up-To Claim to mean that the Products will yield "at least" the amount referenced.

But the Southern District of Florida transferor court has already rejected that exact argument from Sorin. In her individual suit, *Sorin v. The Folger Coffee Company*, Sorin brought claims for "deceptive and false package labeling in that they misrepresent to consumers the number of servings its coffee containers provide[.]" 2021 WL 5545292, at *1. Sorin alleged, as she does here, that the Up-To Claim promises consumers a total serving amount that the canisters cannot achieve. *Id.* The court disagreed as a matter of law because "'Up to' a certain number of cups of coffee would lead a reasonable consumer to expect that the actual number of coffee cups produced could be less. 'Up to' is not a guarantee that the number of cups will be reached." *Id.* at *2. "Up to" means *no more than*, *as far as*, or *as many as*. "Reasonable consumers do not perceive 'up to' statements like those on this Product as a guarantee because their plain meaning clearly establishes a 'ceiling, not a floor.'" *Durant v. Big Lots, Inc.*, 2024 WL 1826473, at *4 (M.D. Fla. Mar. 26, 2024). So too here. "Makes up to 240 6 fl oz cups" promises a ceiling rather than the guarantee Sorin invents. *Sorin* thus forecloses any argument that a reasonable consumer, especially Sorin herself, reads "up to" to mean "exactly" or "at least."

Sorin may argue that her consumer-perception survey creates a material issue of fact, but this argument fails as well. "If the advertisement explicitly states or clearly and conspicuously implies a claim, the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim." *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008). Here, Sorin's

---

[7] Sorin's common-law fraud claim requires proof of a misrepresentation. *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984). Sorin's breach-of-express-warranty claim requires proof that Folgers breached an express warranty—here, the alleged warranty is the Up-To Claim. *Universal Prop. & Cas. Ins. Co. v. Toshiba Am. Info. Sys.*, 2015 WL 5829838, at *3 (M.D. Fla. Sep. 30, 2015). And "[u]nder FDUTPA, deception exists when there is any 'representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" *Thornton v. Boat Exp. USA, LLC*, 2021 WL 9565805, at *6 (S.D. Fla. July 28, 2021) (quoting *Millennium Commc'ns & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affs.*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000)). Thus, to show that the Up-To Claim is likely to deceive, Sorin "must show probable, not possible, deception ('likely to mislead,' not 'tendency and capacity to mislead')." *Millennium Commc'ns & Fulfillment, Inc.*, 761 So. 2d at 1263. Given the undisputed evidence, Sorin can make no such showing.

survey does not defeat summary judgment because Florida courts have already held her reading of the Up-To Claim unreasonable as a matter of law. *See Sorin*, 2021 WL 5545292, at *2; *Durant*, 2024 WL 1826473, at *4; *Hernandez v. HP Inc.*, 2023 WL 12171845, at *2–3 (S.D. Fla. May 23, 2023) (dismissing FDUTPA claim because "in [the] most applicable case upon which Hernandez relies, a court found that the 'up to' language at issue was not deceptive as matter of law" (citing *Sorin*, 2021 WL 5545292, at *2)).

**A. The Up-To Claim is true.**

The uncontroverted evidence proves false Sorin's central allegations: that the Products cannot make the referenced number of servings and that there is a "*huge disparity* between the amount of coffee a consumer could make using the [brewing recommendations] and the amount of coffee indicated" in the Up-To Claim. Dkt. No. 105, MTD Order at 15–16 (emphasis added). In fact, the evidence shows that the Products overshoot the Up-To Claim because they can make as many servings as or more servings than the maximum numbers stated in the Up-To Claim (and even accepting Sorin's expert's flawed numbers, they can make nearly that many cups—there is no "huge disparity"). SUMF 24, 25, 30.

Defendants use a formula to ensure that the Products meet the Up-To Claim if they are produced consistently with their [redacted]. *Id.* 5–10. Defendants also produced tens of thousands of measurements showing that, for the entire proposed class period, the Products consistently met those specifications. *See id.* 10. Defendants' expert confirmed that each Product meets the Up-To Claim using the Pot Method. *Id.* 25. Indeed, every Product tested could meet or exceed (in many cases by 10% or more) the Up-To Claim. *Id.*; *see also* App'x 1. When Defendants' expert Mickowski tested the Products, he could replicate the densities reported by Sorin's expert Hockert only by intentionally compacting the ground coffee into a one-half measuring cup. SUMF 34. In short, a mountain of data, much of which predates this litigation, confirms that even if consumers understand the Up-To Claim as a promise that *the brewing recommendations* can brew as many

or "close to" as many servings as referenced (which Sorin cannot prove, as shown below), that understanding is correct.

Sorin may argue that Hockert's findings create a genuine issue of fact. That is wrong. To begin with, Dr. Smolensky found that every one of the Products he tested met or exceeded the Up-To Claim when following the Pot Method. Specifically, each and every container he tested filled enough half measuring cups to exceed the Up-To Claim when using the Pot Method—yields ranged from 104.4% to 114.4% and averaged 108.6%. *Id.* 25. The difference between Smolensky's and Hockert's results boils down to compaction. The densities Mickowski calculated from Hockert's results prove her coffee was more compacted than Smolensky's. *Id.* 32–34. This is an immutable fact—Density = Mass/Volume. Because Hockert fit more ground coffee by mass into the same volume as Folgers' experts, it is a mathematical fact that she more densely compacted it. And Sorin *certainly* has no evidence that any consumer, much less any substantial number of consumers, has understood the Up-To Claim to make a promise about how many servings can be made when the ground coffee is more or less compacted.

Hockert's results also do not support Sorin's allegations. Hockert reported that the Products average **94.3%** of the amounts referenced in the Up-To Claim using the Pot Method—up to **96.3%** applying her accuracy range. *Id.* 30, 31; *see also* App'x 3. Hockert found the two highest-selling Products could make up to **99.0%** and **99.4%** of the referenced amounts—**101.0%** and **101.4%** applying her stated accuracy range. SUMF 30, 31; *see* App'x 4. Thus, ***Hockert found that the Products could make "close to" the referenced number of cups—if not more.*** At bottom, the experts have no *material* difference of opinion—*all* the evidence shows that the Products can make close to or more than the number of servings referenced in the Up-To Claim when using the Pot Method.

Even taking Sorin's experts' results as true, no material dispute of fact exists. Sorin's results show only that consumers following the same brewing recommendations can achieve different results depending on the amount of compaction they introduce when they measure their coffee. After all, Smolensky and Mickowski were able to replicate Hockert's results by intentionally compressing the coffee into their one-half measuring cups. SUMF 32. Whose expert leveled coffee "better" is not a

trial issue. Consumers make coffee differently. But if consumers follow Defendants' valid and unrebutted methodology that meticulously follows the brewing recommendations, the evidence is clear—they will achieve the stated number of cups every time. Thus, the evidence is undisputed that the Products can make "Up To" the number of cups stated in the Up-To Claim.

### B. Sorin cannot show that the Up-To Claim is misleading under the reasonable-consumer standard.

Sorin cannot show "probable, not possible, deception," i.e., that the Up-To Claim is "likely to mislead" rather than that it has a mere "tendency and capacity to mislead." *Millennium Commc'ns & Fulfillment, Inc.*, 761 So. 2d at 1263. Sorin claims that consumers interpret the Up-To Claim to mean that they can make the number—not *up to* the number—of cups stated in the Up-To Claim "when following the brewing instructions," whether they are making single cups of coffee or ten-cup pots of coffee. Dkt. No. 350 at 12. Sorin avoided dismissal by relying on this Court's presumption that her allegations were true, but she now needs to "demonstrate actual or likely consumer harm" in light of the circumstances as a whole. *S. Broward Hosp. Dist. v. ELAP Servs., LLP*, 2023 WL 6547748, at *10 (S.D. Fla. Sep. 29, 2023); *see Zlotnick v. Premier Sales Grp., Inc.,* 480 F.3d 1281, 1284 (11th Cir. 2007) (holding allegedly deceptive act must be "likely to cause injury to a reasonable relying consumer"); *Cox v. Porsche Fin. Servs.*, 2020 WL 837167, at *5 (S.D. Fla. Feb. 19, 2020) ("In determining deception, a court must view the relevant acts 'in light of the circumstances as a whole.'" (quoting *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009))).

Sorin has no evidence that consumers understand "Up-To" to mean "exactly" or "at least." The only evidence Plaintiffs have proffered is Dennis's single-question "consumer perception" survey, which asked only whether survey respondents believed they would obtain "the same total number of cups" when brewing coffee "one cup at a time" and "ten cups at a time." SUMF 19–23. Dennis did not ask respondents whether they thought the Up-To Claim indicated they could brew exactly, close to, or at least, the number of cups stated in the Up-To Claim. *Id.* And to the extent that Plaintiffs are now asserting that consumers were "misled" simply into believing that the Single Serve Method and the Pot Method would make the same, undefined amount of servings, that cannot prove the case they

have pleaded. Plaintiffs' complaint does not allege any misrepresentation by Defendants as to the relative efficiency of the Pot Method vs. the Single Serve Method. *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 877–78 (8th Cir. 2020) (holding district court need not have considered theories of liability not alleged in complaint). In fact, it is undisputed that the brewing recommendations *disclose* the efficiency of each method using common household measurements. SUMF 1. Moreover, *all* of Plaintiffs' damages models are driven by the difference between the number of servings referenced in the Up-To Claim and the number they claim can actually be achieved. *Id.* 44. That theory makes no sense absent evidence that the "same number" of servings consumers expect is in fact the number referenced in the Up-To Claim. Plaintiffs *must* have such evidence, or their theory cannot hold together.

When the Eighth Circuit reversed this Court's order granting class certification, it implicitly held that Dennis's survey does not provide such evidence, and Sorin has no other consumer-perception evidence that can fill the gap. The Eighth Circuit explained that "the conclusion seems ineluctable that a significant proportion of the proposed class did not read [the Up-To Claim] or, if they did, did not care about [it] one way or the other." *In re Folgers*, 159 F.4th at 1158. And as "for those who read and cared about them, a significant proportion likely did not interpret the representations in the manner [Sorin] suggests":

> A hefty percentage may well have read the representations and believed that the promised number of cups could be achieved only some of the time under certain conditions. Or perhaps they understood the representations to mean that other, non-recommended brewing methods could brew the promised number of cups. After all, some consumers prefer relatively weak cups of coffee. What matters is that many class members weren't deceived, and figuring out who was and who wasn't will require consumer-by-consumer inquiries into each class member's individual tastes, interpretations, and circumstances, undermining the efficiencies class actions are intended to provide.

*Id.* at 1156. Dennis's survey simply cannot fill these gaps, and Sorin has no other evidence that can either.

*First*, Dennis did not ask respondents whether they shared Sorin's understanding that the Up-To Claim guarantees an exact or at least a certain number of cups of coffee. He asked only whether respondents believed they would obtain "the same total number of cups" when brewing coffee "one cup at a time" and "ten cups at a time." SUMF 19. Dennis provided survey respondents thumbnail images of the front and back labels of one of the Products—Classic Roast, 30.5 oz.—and asked a single question: "Do you believe or not that the [makes up to 240 6 fl oz cups] description means that the product will make the same total number of cups of coffee when making **one cup** at a time and when making **10 cups** at a time?" *Id.* Dennis gave three response options: (1) "Yes, I believe both methods will make the same total number of cups of coffee"; (2) "No, I do not believe both methods will make the same total number of cups of coffee"; and (3) "Don't know."[8] *Id.* Because 72.4% of respondents chose answer (1), Dennis opined that "the reasonable consumer understands the [Up-To Claim] to mean that the Products will make the same total number of cups of coffee when making one cup at a time as when making 10 cups at a time." *Id.*

Despite claiming that consumers understood the Up-To Claim to mean the Products would "meet" the claim if consumers followed the brewing recommendations, Dennis admitted he "didn't do a survey" about how consumers understand the Up-To Claim and has no "way to disagree with Defendants' view of how that language would be understood." *Id.* 19, 22. For example, Dennis did nothing to test whether respondents understood the up-to-240-cups claim he used in his survey to mean that 240 servings (or some other number) could be brewed, how often, or under what circumstances. *Id.* 20. When asked whether "up to" means the "upper range," or "it could make that amount, or it could make something less than that amount," Dennis answered: "Maybe. ***I didn't do a survey on that***." *Id.* 22 (emphasis added); *see also id.* ("Q. ***And 240 would be the upper range,***

[8] Although the question Dennis posed asked consumers what they understood the Up-To Claim to mean, the answers did not reference that claim at all. Dkt. No. 302 ¶ 43. Thus, a consumer who thought that it was true that "both methods will make the same total number of cups of coffee," but did not think that based on or because of the Up-To Claim, might still have chosen a "yes" answer to Dennis's survey question. And because Dennis did not run a control, he has no data that would show how the Up-To Claim impacted the number of respondents that answered "yes."

***right?*** It could make up to. Up to is the top, right? A. ***I mean, that's one way of looking at it. Sure***."(emphasis added)). According to Dennis, he was "***not measuring perceptions … in terms of consumers' expectations for the specific number of cups of coffee that this product will support***." *Id.* 21 (emphasis added). He simply was not testing whether consumers believed the Product would yield 240 cups or something less. *Id.* ("Q. Okay. So, in other words, they could have believed it made 240, or they could have believed it made 235, or believed it could have made 230. That was not your objective. A. ***That was not my objective***." (emphasis added)).

Moreover, Sorin has admitted that Dennis's survey was intentionally designed to include ambiguous terms—such as "total number of cups"—to "account for the possibility" that survey respondents might "interpret the [Up-To Claim] and the brewing [recommendations] to mean that the product can yield something less" than the number referenced in the Up-To Claim. Dkt. No. 347 at 22. Since Dennis's survey was intentionally designed to allow an affirmative answer even by respondents who understood the Up-To Claim to "mean that the product can yield something less," it cannot prove that respondents believed the Product would "meet" the stated number of servings. Thus, Sorin has no objective evidence that reasonable consumers, acting reasonably under the circumstances, understand "Up-To" to mean "at least."

*Second*, Dennis's survey is fundamentally divorced from Sorin's theory that consumers understand the Up-To Claim to mean that they will always get the number of cups stated in the Up-To Claim *if they follow the brewing recommendations*. Dennis did **not** direct respondents to the brewing recommendations and did not explain to respondents (as disclosed by the brewing recommendations) that the ratio of coffee to water differs for the Single Serve Method and the Pot Method. SUMF 20.[9] Dennis does not even know whether respondents read the brewing recommendations or whether they "[were] able to read [them] clearly." *Id.* 21. Thus, Dennis's survey has nothing to do with Sorin's theory

[9] Folgers recognizes that the Court previously found that the perception survey sufficiently directed respondents to the brewing recommendations. Dkt. No. 428, Order Denying Mot. to Exclude Dennis. For the reasons previously stated in Folgers' motion to exclude Dennis (Dkt. No. 320, Mot. to Exclude Dennis), Folgers respectfully disagrees.

of deception and therefore provides no evidence that respondents understood the Up-To Claim to refer to the brewing recommendations.

Sorin's situation is worse than a lack of evidence; the testimony from her and other named Plaintiffs in this MDL confirms that they do *not* understand the Up-To Claim as she alleges. Sorin believes the Up-To Claim would be true if the container made the referenced amount "more times than not." SUMF 15. Plaintiff Moser believes consumers should be able to make "close to" the number of servings if they use a "fairly standard way to measure your coffee"—but it could be a little less, just not "much less." SUMF 18. And Plaintiff Tan believes the Up-To Claim means "close to it." SUMF 18. The only thing Plaintiffs agreed on was that the Up-To Claim would be true if the *more efficient* Pot Method made the referenced number of servings. SUMF 18. *See In re Folgers*, 159 F.4th at 1157 (noting this Court should not "discount the testimony of the other proposed class representatives").

And even if "up to" were ambiguous (it is not), Florida courts recognize that "[t]he presence of true information or a disclaimer" on a back label "can rebut a claim of deception" based on representations made on the front label. *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1133 (S.D. Fla. 2021) (dismissing allegation that sanitizer bottle's claim "kills 99.99% of all germs" was deceptive) (citing *Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995)). In *Piescik*, "the asterisk on the back" of the product "clearly disclose[d] to the consumer that it does not kill 99.99% of *all* germs, and a reasonable consumer would not be expected to ignore the asterisk and the information it leads to." *Id.* The Up-To Claim does not float free of the label. It sits on the same continuous panel of the cylindrical canister as the brewing recommendations, which disclose the more efficient Pot Method. SUMF 1. The claim and the recommendations are meant to be read together. *See Piescik*, 576 F. Supp. 3d at 1133.

And when read together, the Up-To Claim and brewing recommendations are not misleading because Folgers' expert confirmed that the Pot Method yields the number of cups stated in the Up-To Claim, and then some: every Product tested met or exceeded the claim, many by 10% or more. SUMF 25; App'x 1. Sorin cannot escape that result through her expert—even Hockert found the Products came close to the stated maximum, and the two highest-selling Products reached up to 99.0%

and 99.4% of the referenced amounts. SUMF 30, *see also* App'x 4. There is no daylight that matters: by every account, including Sorin's, a method printed on the label produces at or near the stated number of cups. That defeats the deception theory as a matter of law, because "a reasonable consumer would not be expected to ignore" the true information on the back label rebutting her claims. *Piescik,* 576 F. Supp. 3d at 1133.

*Sorin* confirms the point and supplies the answer to Plaintiffs' real complaint that the Single Serve Method may not reach the maximum: "'Up to' a certain number of cups of coffee would lead a reasonable consumer to expect that the actual number of coffee cups produced could be less. 'Up to' is not a guarantee that the number of cups will be reached." *Sorin*, 2021 WL 5545292, at *2. Nothing in the claim or in controlling law requires both recommendations to deliver the stated number; the question is whether the "up to" figure is achievable, and the Pot Method indisputably makes it so.

Because Sorin does not have evidence supporting her theory of consumer perception, summary judgment is appropriate. *See Bustamante v. KIND, Ltd. Liab. Co.*, 100 F.4th 419, 434 (2d Cir. 2024) (granting summary judgment on FDUTPA claim, among others, because "plaintiffs failed to produce admissible evidence demonstrating what a reasonable consumer, acting reasonably, would expect of … products labeled [with the challenged statement]").

## IV. Sorin's fraud claims fail because she lacks evidence that the Up-To Claim is material to reasonable consumers.

Summary judgment is also appropriate because Sorin has no evidence of materiality—an essential element of her fraud claim. *Blue Cross/Blue Shield v. Weiner*, 543 So. 2d 794, 796 (Fla. Dist. Ct. App. 1989) ("Recovery for fraud requires proof of intentional and knowing misrepresentation of material fact, designed to cause detrimental reliance.").[10]

---

[10] The requirements to establish fraud also apply to Sorin's negligent-misrepresentation claim (Count XIV) because, "[i]n Florida, actions for negligent misrepresentation sound in fraud rather than negligence." *Romero v. Agent AU Pair, Inc.*, 2025 WL 2110244, at *4 (M.D. Fla. July 24, 2025). Thus, the elements of common-law fraud and negligent misrepresentation are similar: "Under Florida law a claim for negligent misrepresentation requires that: (1) [T]here was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in

To prove materiality, Sorin must show the alleged deception "would be likely to affect the conduct of a reasonable man with reference to the transaction in question." *Anchor Prop. & Cas. Ins. Co. v. Trif*, 322 So. 3d 663, 672 (Fla. Dist. Ct. App. 2021) (quoting Restatement (First) of Restitution § 8 (1937)). Thus, Sorin must show that the alleged misstatement is "so material to the interests of the party thus relying and acting upon it, that he is pecuniarily prejudiced by its falsity, is placed in a worse position than he otherwise would have been." *Hillcrest Pac. Corp. v. Yamamura*, 727 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 1999).

Sorin's surveys do not make the required showing. The relevant deception is narrow: this Court held that "*the specific shortfall* is the unlawful conduct at issue." Dkt. No. 428 at 9 (emphasis added). Dennis's survey presented to respondents two products that were identical except one bore an Up-To Claim and one did not, and asked which they preferred. SUMF 19–23. Dennis did not measure how consumers view shortfalls below the maximum stated in the Up-To Claim. Thus, Dennis's survey did not analyze the materiality of any shortfalls—much less whether any shortfalls were "so material to the interests of the party … that [consumers] [are] pecuniarily prejudiced by its falsity." *Hillcrest Pac. Corp.*, 727 So. 2d at 1056. Indeed, Sorin's only evidence on this issue shows that she did not consider the claim material. Even after forming the belief the Up-To Claim was false, and that she was being "shorted" and getting "less coffee" as a result, she continued to buy the Products "because of taste" and because "[she] like[s] [her] coffee." SUMF 16.

Iyengar, Sorin's conjoint-survey expert, cannot overcome this testimony. Crucially, Iyengar did not test ***whether*** the Up-To Claim influenced purchase decisions. Her survey ***encouraged*** respondents to use the Up-To Claim as a decision criterion. SUMF 42. And she opined merely about how consumers compare Up-To Claims of different magnitudes to one another. According to Iyengar, "[A]s the number of 6 fluid ounce servings shown on the product label rises, the more likely respondents are to select that ground coffee product." *Id.* Thus, even if Iyengar's conclusions suggest that, in a set of products with Up-To Claims, consumers prefer larger Up-To Claim over smaller ones

justifiable reliance upon the misrepresentation." *Linville v. Ginn Real Est. Co.*, 697 F. Supp. 2d 1302, 1307 (M.D. Fla. 2010).

when they are encouraged to consider Up-To Claim, that says nothing about whether the Up-To Claim actually influenced purchase decisions. The claim certainly did not influence Sorin's purchase decision. *See id.* 16. Thus, like Dennis, Iyengar provides no evidence that the shortfalls are material.

This is significant because each of Sorin's damages models estimates a "per-cup" price premium based on Hockert's insignificant "shortfalls." SUMF 44. Thus, taking the incredible assumption that consumers interpreted "Up To" to mean "exactly" or "at least" as true *only* for the sake of argument, Sorin had to show, for example, that the alleged claim that the Products make 240 cups when they allegedly make only 239 cups is material to reasonable consumers' purchasing decisions. *See Steyr Daimler Puch v. A & A Bicycle Mart, Inc.*, 453 So. 2d 1149, 1150 (Fla. Dist. Ct. App. 1984) (reinstating jury verdict where "[i]n searching the record for the essential elements of common law fraud … [t]here is insufficient evidence of either a knowing misrepresentation of specific material facts or justifiable reliance[.]"). Sorin finds no salvation arguing that summary judgment is unwarranted because the Products may not meet the upper range of the Up-To Claim using the *less* efficient Single Serve Method. Neither Dennis nor Iyengar measured whether consumers expect to "*meet* the 'Up To' statement regardless of which on-pack brewing method is followed." *Id.* 37–42 (emphasis added). Sorin's Complaint does not allege as much, and she can point to no case holding it is misleading to advertise an efficiency.

## V. Sorin's claims fail because she has no evidence of damages.

Sorin's evidence of injury consists of the four models offered by her damages expert, Werner. SUMF 43–45. Summary judgment is appropriate because Sorin's damages expert's models are no longer viable after the Eighth Circuit's opinion. Werner's models all calculated a per-cup overcharge based on Hockert's alleged shortfalls and "applied the overcharge to Defendants' historical sales data for a Product, which resulted in the total overcharge paid by *all consumers* for that Product." Dkt. No. 431 at 6 (emphasis added). By assigning damages to all consumers who purchased a Product, Sorin's damages theory assigns damages to consumers regardless of whether they relied on the Up-To Claim. *See, e.g.*, Dkt. No. 256 at 43 n.83 ("An inquiry into each Class member's rationale for

purchasing the Product is not needed to calculate damages because to the extent market prices were artificially inflated due to Defendants' misconduct, *all* consumers paid an overcharge for the Products.") (emphasis in original); *In re Folgers Coffee Mktg. Litig.*, Appellee Br. at 27, 36–37, 60. Sorin relied on this inflation theory to secure and defend certification of the Missouri class. *Id.* But the Eighth Circuit rejected this inflation theory of injury because purchasers who did not rely on the Up-To Claim do not have Article III or statutory standing. *See supra* Parts I–II. Werner's models have no way to account for purchasers who did not rely on the Up-To Claim and therefore cannot serve as evidence of damages.

Werner's models also fail because they try to quantify a purported harm that Plaintiffs have not shown is material to consumers and that is untethered from their liability theory. Each of Werner's models purports to price a "per-cup price premium," which he multiplies by Hockert's alleged per-container shortfalls, e.g., the difference between a 240-cup claim and Hockert's finding of 239 cups for one Product. SUMF 44, 30; App'x 4. But Plaintiffs' materiality expert never tested whether any such shortfall matters to consumers. Dennis compared a product bearing the Up-To Claim to one without it; he did not measure whether reducing the represented yield by some number of cups (or by one cup) would affect consumers' purchase decisions. SUMF 38–40. Plaintiffs therefore have no evidence connecting Werner's priced variable, the incremental cup shortfall, to any material consumer harm. A plaintiff cannot create a triable issue of fact with evidence that does not measure the economic injury allegedly caused by the challenged conduct. *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 697 (S.D. Fla. 2014) (explaining damages theory must be "consistent with the plaintiffs' theory of liability") (quoting *Guido v. L'Oreal, USA, Inc.*, 2013 WL 3353857, at *15–16 (C.D. Cal. July 1, 2013)).

Werner's testimony confirms that the critical assumption underlying his analysis is unsupported. He admitted that counsel asked him to "illustrate a damages model which assumes the percentage shortfall represents a proxy for the overcharge paid by each consumer." SUMF 44. He further admitted that the model is valid only if that assumption is valid. *Id.* Yet Werner could identify no textbook, article, or economic literature endorsing the proposition that the percentage by which a product allegedly falls short of an advertised maximum yield is itself a proxy for consumer overcharge.

*Id.* Nor did he derive that assumption from any consumer research conducted in this case; rather, he simply illustrated a model built around an assumption supplied by counsel. *Id.*

Finally, even if Werner's "single-cup" price premiums could be credited (and they cannot), he offered no basis for his unstated assumption that these price premiums apply in a linear fashion to each marginal cup by which the Products are allegedly short. His models assume that the economic significance of a one-cup difference remains constant regardless of the size of the alleged shortfall. Yet, Plaintiffs offer no evidence that consumers value each additional cup equally, that consumers suffer any measurable loss from the minor shortfalls alleged here, or that any such shortfall translates proportionally into diminished market value. Indeed, Werner admitted that his model simply assigns a fixed value to each cup and multiplies that figure by the alleged shortfall on the assumption that the relationship is "approximately linear." *Id.* This is the key premise of his damages models, but it is *ipse dixit* and insufficient to preclude summary judgment. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## VI. Sorin's fraud claim fails because there is no evidence Folgers acted with "knowledge" or "intent" or that Sorin relied on the alleged misrepresentation.

Sorin's common-law fraud claim independently fails for lack of scienter, intent, and reliance. Fraud requires "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Hercules Cap., Inc. v. Gittleman*, 2018 WL 395489, at *21 (S.D. Fla. Jan. 12, 2018) (quoting *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)). This Court should grant summary judgment on Sorin's fraud claims because there is no evidence that Defendants acted with the requisite knowledge or intent. To prevail, Sorin must establish that Folgers knew the alleged misrepresentation was false and that she relied on the alleged misrepresentation. Sorin cannot show such knowledge because the undisputed evidence shows that Folgers believed, documented, and verified each Product could meet the Up-To Claim. *See* SUMF 5–10. Plaintiffs also cannot establish justifiable reliance for the reasons stated above in Parts I, II, and IV (discussing reliance in the context of Article III and statutory standing and materiality). As the standing analysis shows, the undisputed evidence is that Sorin did not actually rely on the Up-To

Claim—she continued purchasing the Products while believing the claim was false. SUMF 16. And any reliance on her reading of the claim would not be justifiable in any event, because "up to" promises only a ceiling, not a guarantee, and no reasonable consumer could justifiably understand it to mean the Products will always yield the stated number of cups. *See Sorin*, 2021 WL 5545292, at *2. Thus, the Court should grant summary judgment on Plaintiffs' fraud claim.

## VII. Sorin lacks standing to pursue injunctive relief.

Sorin cannot establish Article III standing to pursue injunctive relief. Under the FDUTPA, Sorin seeks injunctive relief "enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign." TAC, Prayer for Relief, ¶ E. Under Article III, "a party has standing to seek injunctive relief only if the party shows 'a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury.'" *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001)). Allegations of past and possible unlawful conduct are insufficient. *Maisonet v. Comm'r, Ala. Dep't of Corr.*, 2022 WL 4283560, at *2 (11th Cir. Sep. 16, 2022). Rather, "[w]hen a plaintiff seeks an injunction, she must demonstrate that a future injury is imminent—that there is 'a sufficient likelihood that he [or she] will be affected by the allegedly unlawful conduct in the future.'" *Kennedy,* 998 F.3d at 1229–30 (quoting *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004)). Because this case is at summary judgment, Sorin must support standing with evidence, not mere allegations. *Lujan*, 504 U.S. at 561.[11]

Sorin cannot satisfy that burden. In *Lorenzo v. MillerCoors*, for example, the district court found that the plaintiff lacked standing to bring an injunctive-relief claim for corrective advertising because "[n]othing on the face of Plaintiff's pleadings plausibly allege[s] that he is at risk of future harm from Defendant's supposedly deceptive advertisements." 2023 WL 6614120, at *4 (S.D. Fla. Sep. 19, 2023),

[11] "Although the FDUTPA allows a plaintiff to pursue injunctive relief even where the individual plaintiff will not benefit from an injunction[,] it cannot supplant Constitutional standing requirements. Article III of the Constitution requires that a plaintiff seeking injunctive relief allege a threat of future harm." *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015).

*aff'd*, No. 23-13247, 2024 WL 3983343 (11th Cir. Aug. 29, 2024). Noting that the plaintiff has "now uncovered" the truth about the defendant, the court explained that the plaintiff was not at risk of future harm because "the only harm that Plaintiff alleges is deception from the Coors brand's advertisements[.]" *Id.* Thus, "although Plaintiff might not have *originally* purchased Coors Light 'but for' such 'deception,' … [a]ny purchases Plaintiff makes of Coors Light would be despite any 'lingering effects' of the advertisement campaign." *Id.*

The same is true of Sorin, who testified that she continued to purchase the Products even after filing this suit despite believing that the Up-To Claim is overstated. Sorin testified that she knows that she's "being shorted," yet continues to purchase the Product "because of taste." SUMF 16. A consumer who keeps buying the product with full knowledge of the fact she claims is false faces no threat of future deception, since she cannot be misled by a representation she already disbelieves. As such, "the Court can rest assured that Plaintiff suffers no credible threat of future injury." *Lorenzo*, 2023 WL 6614120, at *4.

To the extent Sorin has stopped purchasing the Products since her deposition, she still cannot establish a likelihood of future harm. When asked what she hopes to achieve from this lawsuit, Sorin said she wants "Folgers [to change] their method of marketing on their can, and that the consumer is able to rely on the information." SUMF 18. Thus, to the extent Sorin suggests that she will resume purchasing the Product only if the label is changed, this is insufficient to confer standing as well. A plaintiff who will purchase only a truthful label has no live controversy that an injunction could redress. *Barron v. Snyder's-Lance, Inc.*, 2015 WL 11182066, at *11 (S.D. Fla. Mar. 20, 2015) ("[A] consumer fraud Plaintiff seeking to enjoin a manufacturer from deceptively labeling a product cannot establish Article III standing if she is not likely to purchase the 'noncompliant' product in the future."); *see Valiente v. Unilever U.S., Inc.*, 2022 WL 18587887, at *8 (S.D. Fla. Dec. 8, 2022) ("Plaintiff does not allege that she intends to purchase the <u>deceptively-labeled</u> Product in the future. In fact, she alleges the opposite … However, purchasing a properly-labeled Product will result in no injury. Consequently, Plaintiff has failed to allege a likelihood of future injury sufficient to establish Article III standing to pursue injunctive relief.").

Because Sorin lacks Article III standing to pursue injunctive relief, the Court should grant summary judgment on Sorin's claim for prospective injunctive relief under the FDUTPA.

## VIII. The Court should grant summary judgment on Plaintiffs' express warranty claim.

Under Florida law, a breach of an express warranty claim requires a plaintiff to show "(1) the sale of goods; (2) the express warranty; (3) breach of the warranty; (4) notice to seller of the breach; and (5) the injuries sustained by the buyer as a result of the breach of the express warranty." *E.g.*, *Moss v. Walgreen Co.*, 765 F. Supp. 2d 1363, 1368 (S.D. Fla. 2011) (citing *Dunham-Bush, Inc. v. Thermo-Air Serv., Inc.*, 351 So. 2d 351, 353 (Fla. 4th DCA 1977)).

Sorin alleges that the Up-To Claim is an express warranty and that Folgers breached that warranty because the Up-To Claim is "patently false." TAC ¶ 80. It is not. The Up-To Claim is true for the reasons set forth above, and Folgers did not breach the alleged warranty. *See Jackson v. Anheuser-Busch Inbev SA/NV, LLC*, 2021 WL 3666312, at *18 (S.D. Fla. Aug. 18, 2021) ("Thus, to the extent Plaintiffs contend that the breach of express warranty stems from Veza Sur's representations that it has ties to Miami, the Court reiterates that these statements are factually accurate and cannot therefore form the basis of a breach.").

The express warranty claim also fails for lack of privity. Sorin purchased the Products from grocery stores rather than from Folgers (SUMF 11, 16), and there is no evidence of the only privity exception available—the exception for substantial direct contacts with the manufacturer. *Weiss v. Johansen*, 898 So. 2d 1009, 1012 (Fla. Dist. Ct. App. 2005) ("[I]n order to recover for the breach of a warranty either express or implied, the plaintiff must be in privity of contract with the defendant."). True, "[w]here privity does not exist, some courts have found that 'a plaintiff who purchased a product from a third party may properly bring claims for a breach of warranty against the manufacturer if 'substantial direct contacts' existed between the plaintiff and the manufacturer.'" *Thurn v. Kimberly-Clark Corp.*, 2023 WL 4455630, at *3 (M.D. Fla. July 11, 2023) (quoting *Inouye v. Adidas Am., Inc.*, 2023 WL 2351654, at *8 (M.D. Fla. Mar. 3, 2023)). But "product label representations are insufficient to establish the [substantial-direct-contacts] exception." *Inouye*, 2023 WL 2351654, at *8 (citing *Douse v.*

*Bos. Sci. Corp.*, 314 F. Supp. 3d 1251, 1262 (M.D. Fla. 2018) ("[T]he interests of privity are satisfied by direct contact, but only in the sense of personal contact between the consumer and the manufacturer.")).

Because Sorin cannot show direct contact, she cannot invoke the exception and has no other basis for privity.

## IX. Sorin's "Unjust Enrichment/Quasi-Contract" claim fails because none of her causes of action are viable.

Under Florida law, "[t]he elements of a cause of action for a quasi-contract are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *CDS & Assocs. of the Palm Beaches v. 1711 Donna Rd. Assocs.,* 743 So. 2d 1223, 1224 (Fla. Dist. Ct. App. 1999). Sorin claims that Folgers received benefits from her that would be unjust for Folgers to retain, based on her allegations that the Up-To Claim deceived her. TAC ¶¶ 198–204. As discussed above, Sorin has no evidence that the Up-To Claim deceived her or anyone else. Thus, the Court should grant summary judgment on Sorin's "Unjust Enrichment/Quasi-Contract Claim."

In *State Farm Mutual Automobile Insurance Co. v. At Home Auto Glass LLC*, the court denied reconsideration after granting summary judgment on the plaintiff's FDUTPA claims, finding "that State Farm had failed to show injury or detriment to a consumer." 2025 WL 418015, at *1 (M.D. Fla. Feb. 6, 2025). The court granted summary judgment on the parallel unjust enrichment claim, holding that "At Home had provided value in exchange for the benefit received." *Id.* (citation omitted); *see also Moore v. GNC, Holdings, Inc.*, 2014 WL 12634919, at *5 (S.D. Fla. Mar. 18, 2014) (granting summary judgment on FDUTPA claims where "no consumer paid a premium, or suffered actual damages," and finding no inequity to support unjust enrichment because consumers "paid only the market value of [the] Product in its actual state"); *Mora v. Visionworks of Am., Inc.*, 2019 WL 13248146, at *2 (M.D. Fla. Oct. 31, 2019) (granting summary judgment on FDUTPA and unjust enrichment claims where

plaintiff did not suffer actual damages and "did not confer a benefit without receiving the same value in return").

The same result follows here. Plaintiff's unjust enrichment claim rests entirely on the allegation that the Up-To Claim deceived her and is predicated on the same alleged misconduct underlying her FDUTPA and warranty claims. Because Sorin has no evidence that the Up-To Claim deceived anyone, she cannot show that Folgers' retention of any benefit was unjust or that she suffered any loss, and the claim fails as a matter of law, entitling Folgers to summary judgment.

## X. Plaintiffs lack standing to pursue injunctive relief.

Sorin also lacks Article III standing to pursue injunctive relief. Sorin seeks injunctive relief in the form of barring the allegedly false advertising and mandating "a corrective advertising campaign." TAC, Prayer for Relief, ¶ E. "[T]o satisfy Article III, a Plaintiff pursuing injunctive relief must seek to redress a real and immediate threat of future injury, and past harm will not suffice." *Wasser v. All Market, Inc.*, 329 F.R.D. 464, 470 (S.D. Fla. 2018); *see also Perez v. Scotts Co. LLC*, 2024 WL 5219736, at *6 (S.D. Fla. Nov. 15, 2024) (holding no Article III standing for corrective advertising FDUTPA claim because no real and immediate threat of future injury). Past exposure to allegedly unlawful conduct is insufficient. *O'Shea*, 414 U.S. at 495–96. "[A] party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Wooden v. Bd. of Regents of the Univ. Sys.,* 247 F.3d 1262, 1284 (11th Cir. 2001). Plaintiffs must support standing with evidence, not allegations. *Lujan*, 504 U.S. at 561.

Sorin cannot satisfy that burden. In *Ramirez v. Kraft Heinz Foods Co.*, a consumer who believed a product was mislabeled sought injunctive relief, arguing that "because Defendant persists in its deceptive practices … she will be affected by unlawful conduct in the future." 684 F. Supp. 3d at 1260 (S.D. Fla. 2023). The court held that the plaintiff lacked standing because she already knew the facts underlying her alleged deception theory and therefore faced "no real and immediate threat of future injury." *Id.* at 1261. The court explained that the consumer "has not alleged that there is an imminent threat to future injury since she knows that the product is not" as advertised. *Id.*; *see also Snyder v. Green*

*Rds. of Fla. LLC*, 430 F. Supp. 3d 1297, 1304 (S.D. Fla. 2020) (finding no risk of future deception because "Plaintiffs['] allegations make clear that they will not purchase more of Defendant's products so long as the labelling does not meet their standards").

The same is true of Sorin, who testified that she continued to buy the Products even though she thought she was getting "less coffee"; she "still paid the price [Defendants] were charging" because she "like[s] [her] coffee." SUMF 16. Consumers who buy the Products with full knowledge that the Up-To Claim is "false" cannot be misled by representations they already disbelieve. *See Ramirez*, 684 F. Supp. 3d at 1261.

Plaintiffs have no evidence of future harm or "an inability to rely on" the representation going forward. Sorin's continued purchases of the Product are the antithesis of an inability to rely. SUMF 16. This establishes, at most, a willingness to consider buying a *corrected* product, which by definition could not deceive her. A plaintiff who will purchase only a truthful label has no live controversy an injunction can redress. *See Perez*, 2024 WL 5219736, at *5 ("Plaintiffs' theory that they satisfy Article III standing for injunctive relief under FDUTPA because they allege a real and immediate threat of future harm—that they might buy the Product again—has been roundly rejected as insufficient for injunctive standing" (collecting cases)); *Wasser*, 329 F.R.D. at 471 ("The Plaintiffs 'cannot manufacture standing by choosing' not to purchase a product because of allegedly deceptive labeling, when the Plaintiffs actually know the truth underlying that labeling and thus cannot be deceived by it in the future.") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)); *Snyder,* 430 F. Supp. 3d at 1304 ("Plaintiffs['] allegations make clear that they will not purchase more of Defendant's products so long as the labelling does not meet their standards. Accordingly, Plaintiffs lack standing to assert a claim for injunctive relief.").

## XI. The Court should grant summary judgment on Plaintiffs' claims for equitable relief because Plaintiffs cannot show that they lack an adequate legal remedy.

The Court cannot award Plaintiffs any equitable relief. A federal court sitting in diversity may not award a plaintiff equitable relief unless the plaintiff establishes that he or she lacks an adequate remedy at law. *Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*, 789 F.

Supp. 2d 1311, 1317 (S.D. Fla. 2011) ("It is well-settled that 'equitable relief is available only in the absence of an adequate remedy at law.'") (quoting *SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 F. App'x 502, 503 (11th Cir. 2007)); *Krzyzanowski v. ROPK Holdings Inc.*, 2026 WL 1106751, at *7 (S.D. Fla. Apr. 2, 2026), *report and recommendation adopted*, 2026 WL 1103454 (S.D. Fla. Apr. 23, 2026) ("Unjust enrichment is an equitable remedy, which requires that there be no adequate remedy at law.") (citing *Justice v. United States*, 6 F.3d 1474, 1480 (11th Cir. 1993)).

When plaintiffs seek damages under an express contract theory, such as breach of express warranty, courts have ruled that such plaintiffs have an adequate remedy at law precluding claims for equitable relief under an unjust-enrichment theory. *Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.*, 2007 WL 5960207, at *10 (S.D. Fla. May 15, 2007) (granting summary judgment on unjust enrichment because, "[s]ince Jeld-Wen has an adequate legal remedy in its breach of contract claim, a claim for unjust enrichment is not available here."); *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1324 (S.D. Fla. 2009) ("It follows that a party may not maintain an action for unjust enrichment if the damages sought are covered by an express contract.").

In *Jeld-Wen*, the district court granted summary judgment against a plaintiff's unjust enrichment claim. 2007 WL 5960207, at *10. Damages the plaintiff sought for breach of contract provided an adequate legal remedy for the past harms the plaintiff claimed to have suffered, which precluded her claims for unjust enrichment. *Id.*; *see also Tampa Park Apts., Inc. v. Sec'y*, 2016 WL 398090, at *6 (M.D. Fla. Feb. 2, 2016) (granting summary judgment on claim for equitable relief because "[w]hen a judgment for breach of contract is obtainable, the remedy at law is considered adequate, precluding the need for the imposition of an equitable remedy") (quoting *Kee v. Nat'l Rsrv. Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990)).

Summary judgment on Sorin's claims for equitable relief is proper here, too. Plaintiffs seek damages under the FDUTPA and Sorin's fraud cause of action for alleged overpayments for the Products. TAC ¶¶ 111, 189. She has neither alleged nor proven an injury resulting from her alleged purchases of the Products other than this overpayment. Moreover, as discussed above, Sorin cannot

demonstrate a future injury that could entitle her to injunctive relief. Thus, the Court should grant summary judgment on Sorin's claims for equitable relief.

## **CONCLUSION**

For these reasons, the Court should grant summary judgment on all claims.

Dated: July 10, 2026

Respectfully submitted,

By: *<u>/s/ Ronald Y. Rothstein</u>*
Ronald Y. Rothstein (*pro hac vice*)
Sean H. Suber (*pro hac vice*)
Nathan R. Gilbert (*pro hac vice*)
**Winston Taylor LLP**
300 N. LaSalle Drive
Chicago, IL 60654
Tel.: (312) 558-5600
Fax: (312) 558-5700
Ron.Rothstein@winstontaylor.com
Sean.Suber@winstontaylor.com
Nathan.Gilbert@winstontaylor.com

Jeffrey S. Wilkerson (*pro hac vice*)
**Winston Taylor LLP**
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel.: (704) 350-7700
Fax: (704) 950-7800
Jeff.Wilkerson@winstontaylor.com

Andrew Ryan (Bar No. 45924)
**Sandberg Phoenix**
**& von Gontard P.C.**
701 Market Street, 6th Floor
St. Louis, Missouri 63101
Tel.: (314) 231-3332
ARyan@sandbergphoenix.com

*Counsel for Defendants*
*The J.M. Smucker Company and*
*The Folger Coffee Company*